**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| XAVIER BECERRA, in his official | ) | |
| capacity as Secretary of Health and Human | ) | |
| Services; U.S. DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| JESSICA S. MARCELLA, in her official | ) | |
| capacity as Deputy Assistant Secretary for | ) | |
| Population Affairs; and OFFICE OF | ) | |
| POPULATION AFFAIRS, | ) | |
| | ) | |
| *Defendants.* | ) | |

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

1.      This case involves the federal government's latest effort to coerce States into carrying out pro-abortion policy in violation of statutory, constitutional, and administrative-law limits.  Plaintiff the State of Tennessee brings this Complaint against the U.S. Department of Health and Human Services (HHS) and related Defendants, alleging as follows.

### INTRODUCTION

2.      A State's decision to permit or restrict abortion carries "profound moral" implications. *Dobbs v. Jackson*, 142 S. Ct. 2228, 2241 (2022).  In Tennessee, voters have opted to vindicate an interest in valuing all life by restricting elective abortions and promoting policies that will help women carry pregnancies to term.  Out of respect for the deeply held opposition to abortion shared by Tennessee and countless others, Congress has long barred federal funds from aiding abortions.  These funding bans pervade federal law and govern myriad programs today.

1

3.     Title X of the Public Health Service Act tracks the general federal policy against funding abortion-related activity.  Through Title X, HHS grants Tennessee and other entities substantial funding to provide counseling and family planning services—primarily to individuals who cannot otherwise afford care.  But from the start, Title X has specified that no granted funds can flow to "programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.

4.     Congress has only strengthened Title X's no-abortion rule in recent decades.  Since the mid-1990s, all Title X appropriations bills have expressly banned funding for elective abortions.  *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. H, Tit. V, § 506 (2023).  And each has further required that "all pregnancy counseling" conducted under Title X "shall be nondirective"—thus prohibiting Title X recipients from encouraging women to seek abortions.  *See, e.g.*, *id.* at Div. H, Tit. II.

5.     Despite these directives, different presidential administrations have flip-flopped on whether and how Title X recipients should make abortion referrals.  This back-and-forth played out most recently between 2019 and 2021.  First, in 2019, HHS adopted a rule *prohibiting* Title X grantees from offering referrals for abortion as a method of family planning.  *See* 84 Fed. Reg. 7714.  Then, in 2021, HHS promulgated the opposite policy, *requiring* Title X grantees to offer abortion counseling and referrals.  *See* 86 Fed. Reg. 56,144.  The Supreme Court, for its part, has weighed in once, holding only that HHS may prohibit abortion referrals under Title X.  *See Rust v. Sullivan*, 500 U.S. 173 (1991).  The Supreme Court has never addressed—let alone upheld—a rule mandating Title X program recipients to refer women to abortion providers.

6.     Through all of this, Tennessee's place as a leading Title X provider has remained constant.  A program recipient since around Title X's enactment in 1970, Tennessee—working through its Department of Health—has built up an extensive statewide network equipped to assist

2

thousands of families with vital counseling and services each year. In recent years, HHS has granted Tennessee around $7 million annually; last year alone, these funds allowed the State to serve over 40,000 needy patients in 99 offices across all 3 Grand Divisions of the State.

7.     HHS has praised Tennessee for these efforts, including in its most recent review of Tennessee's Title X program. As part of that July 2022 review, HHS recognized that the Tennessee Health Department is "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state." (Docket Entry ("D.E.") 1-1, HHS's Tenn. Title X Program Review Report at 4.) HHS officials congratulated Tennessee "on such a wonderful review and leading a strong Title X program." (D.E. 1-2, Oct. 19, 2022 OPA Email at 1.)

8.     HHS reauthorized Tennessee's Title X grant in October 2022. That was so even though Tennessee had expressly informed HHS reviewers that, following *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), state law would prohibit most abortions moving forward; as a result, Title X staff would offer counseling and referrals only for legal pregnancy terminations. "In the end," HHS responded, "it was determined that the Tennessee Department of Health was compliant and did meet expectations as of the date of the Program Review." (D.E. 1-2, Oct. 19, 2022 OPA Email at 1.)

9.     In early 2023, however, HHS performed an abrupt about-face. Just months after approving Tennessee's program, HHS threatened to strip all of Tennessee's Title X funding. The reason? Tennessee would not commit to offering abortion counseling and referrals, which HHS now said was required. Stuck between HHS's abortion-referral requirement and the State's abortion prohibition, Health Department officials adopted a Title X policy that pregnant women receive "the opportunity to be provided information and counseling regarding all options that are

3

legal in the State of Tennessee."  (D.E. 1-3, Feb. 13, 2023 Tenn. Dep't of Health Ltr. to OPA at 1-2.)   That policy, Tennessee continued, was "in compliance with regulatory requirements for the scope of allowable practice under Tennessee law."  (*Id.* at 1.)

10.     But HHS's mind was made up.   Apparently, agency leadership had already identified Tennessee as one of two States on its target "list" for policing abortion referrals.   In March 2023, HHS terminated Tennessee's Title X grant.   The Tennessee Health Department's refusal to refer women to abortion providers was the only reason given.   As a result, the Department will lose some $ 30 million over the next five years, even though HHS deemed it the "only agency" equipped to administer Title X "without a gap in services in the state."  (D.E. 1-1, Program Review at 4.)

11.     Tennessee filed an administrative appeal of HHS's termination decision with the hopes of finding a resolution that would enable its Health Department to continue to serve tens of thousands of families through Title X.   The appeal languished with HHS.

12.     Then, in mid-September 2023, reports surfaced that HHS had already reallocated Tennessee's Title X funds to a new recipient: Planned Parenthood, the leading provider of abortions nationwide.   HHS's actions make clear that it has no intention of meaningfully considering Tennessee's appeal or preserving HHS and Tennessee's fifty-year Title X partnership.   Rather, HHS apparently values sending a pro-abortion message more than providing vital family planning services to thousands of vulnerable women and families across Tennessee.

13.     Tennessee now brings this action against HHS and other named Defendants to set aside HHS's unlawful cancellation decision and restore Tennessee's rescinded Title X funding.   Judicial intervention is necessary to ensure Tennessee may continue its 50-year track record of successfully providing family planning services to its neediest populations.

## PARTIES

**I.      Plaintiff**

14.      The State of Tennessee is a sovereign State of the United States of America.

15.      The State of Tennessee, through the Tennessee Department of Health, was a Title X grantee until March 2023, when Defendants rescinded Tennessee's Title X funds in an unlawful manner challenged by this Complaint.

**II.     Defendants**

16.      The Department of Health and Human Services (HHS) is a federal agency of the United States.  Under the Public Health Service Act, HHS is responsible for administering the Title X program nationwide.  HHS's headquarters are located in Washington, D.C.

17.      Defendant Xavier Becerra is named in his official capacity as the Secretary of HHS. Secretary Becerra oversees HHS's activities and is responsible for the implementation and enforcement of Title X of the Public Health Service Act.

18.      The Office of Population Affairs (OPA) is a federal sub-agency within HHS. Pursuant to authority delegated to it by HHS, OPA administers and directly oversees the Title X program.

19.      Defendant Jessica S. Marcella is named in her official capacity as the Deputy Assistant Secretary for OPA.  Deputy Assistant Secretary Marcella was directly involved in OPA's decisionmaking on Tennessee's Title X grant program.

20.      Together, Defendants are referred to as "HHS."

## JURISDICTION & VENUE

21.      This Court has jurisdiction under 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. § 702 (Administrative Procedure Act).

22.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

23.     This Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705-706, and its inherent equitable powers.

24.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the State of Tennessee resides in this District for purposes of the venue laws.  In addition, Defendants' challenged actions adversely affect a substantial volume of Tennessee Title X programs and employees present in this District.

## FACTUAL ALLEGATIONS

**I.     Tennessee's Nation-Leading Title X Program.**

25.     In 1970, Congress passed and President Nixon signed Title X of the Public Health Service Act, which created a limited grant program for family planning services.  *See* Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 6(c), 84 Stat. 1506-508 (codified at 42 U.S.C. § 300a *et seq.*).  Under Title X, HHS may make grants to public or private nonprofit entities so they can operate "voluntary family planning projects" offering a "broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a).

26.     Since 1971, Tennessee—through its Health Department—has received Title X grants to run its Title X program, known as the Tennessee Family Planning Program ("TFPP"). (D.E. 1-4, Goodwin Decl. ¶ 5.)  Tennessee operates Title X facilities providing services across the State.

27.     Tennessee's program has long been a standard-bearer for providing effective Title X services.  According to HHS officials, the Tennessee Health Department is "a leading expert on family planning service delivery," possessing "a strong public health infrastructure to provide

6

administrative, clinical and financial management support to a network of 124 sites providing family planning services across all 95 counties in the state." (D.E. 1-1, Program Review at 4.)

28.     In recent years, the Health Department's program has received approximately $7.1 million annually in Title X grants. (D.E. 1-4, Goodwin Decl. ¶ 6.)

29.     With those funds, the Health Department's program serves over 40,000 people—primarily Tennesseans—and employs approximately 50 employees that deliver those services. (D.E. 1-5, Amosun Decl. ¶¶ 13, 24.)

30.     TFPP is integral to the health and well-being of those individuals—and is especially important for lower-income patients. At least 75 percent of TFPP's clients are at or below the Federal Poverty Line. (D.E. 1-1, Program Review at 4.)

31.     TFPP provides a vast array of services through these funds, from abstinence and sterilization to natural family planning and fertility methods, from pregnancy testing and counseling to infertility services. (D.E. 1-4, Goodwin Decl. ¶ 7.)

32.     Even for minors, the program provides confidential services, promotes abstinence and parental involvement, and complies with all mandatory reporting laws. (*Id.* ¶ 8.)

33.     As OPA recognizes, Tennessee's Health Department "is the *only* agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state of Tennessee." (D.E. 1-1, Program Review at 4 (emphasis added).)

## II.     Title X's Abortion-Funding Prohibitions.

34.     At the time of Title X's enactment in 1970, many States outlawed elective abortions. That raised the question during Congress's debates over the law whether Title X funding provisions would "include abortion as a method of family planning." 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell).

35. Title X's supporters responded by proposing language clarifying that Title X would *not* be used to fund abortions. Specifically, since Title X's passage, Section 1008 of the statute has commanded that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Through this language, "committee members clearly intend[ed] that abortion is not to be *encouraged or promoted in any way* through" Title X. 116 Cong. Rec. 37375 (Nov. 16, 1970) (statement of Rep. Dingell) (emphasis added). "Programs which include abortion as a method of family planning are not eligible for funds allocated through this act." *Id.*

36. Title X's original "prohibition on abortion" amendment remains unchanged. And more recently, Congress has acted to strengthen the limits on Title X abortion funding. Starting in 1996, Congress has included a rider to every HHS appropriations bill directing both that Title X funds generally "shall not be expended for abortions" and that "all pregnancy counseling shall be nondirective." *E.g.*, Further Consolidated Appropriations Act, 2023, Div. H, Tit. II, 136 Stat. 4857; *accord* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321-221.

37. Title X is far from the only statute that prohibits federal funding of abortion and abortion-related activities. Indeed, in the 2023 year-end Consolidated Appropriations Act alone, Congress included no fewer than one dozen provisions barring appropriated monies and federal entities from supporting, requiring, performing, or facilitating abortions. *See* Pub. L. 117-328 (2022), 136 Stat. 4541, 4699, 4710, 4723, 4857, 4880, 4908, 4985-86, 4990, 5014, 5020, 5077. One such provision prohibits funds from flowing to global-health organizations "to motivate or coerce any person to practice abortions." 136 Stat. 4986. Another specifies that no appropriated funds for federal employees' health plans "shall be available to pay for an abortion." *Id.* at 4699.

These and other provisions across the U.S. Code mirror Title X's hard line against providing federal funds to facilitate abortions.

## III. HHS's Varying Approach to Title X and Abortion.

### A. Early Title X Interpretations

38. Throughout Title X's history, HHS has "seesawed" more than once on whether Title X may be read to prohibit, permit, or require grant recipients to engage in abortion counseling and referrals. *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1079 (9th Cir. 2020).

39. In early opinions implementing Title X, HHS construed the law as "prohibiting Title X projects *from in any way promoting or encouraging abortion* as a method of family planning." 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988) (emphasis added) (recounting prior agency opinions). Yet from the mid-1970s to the late-1980s, HHS permitted—and then in 1981 adopted guidelines requiring—Title X recipients to offer pregnant women "nondirective options counseling on pregnancy termination (abortion) . . . followed by referral for these services if she so requests." *Id.*

40. In 1988, however, HHS changed course. To more faithfully implement Title X's rule against funding programs where abortion is a method of family planning, HHS issued a final rule prohibiting Title X providers from making referrals for or counseling women regarding abortion as a method of family planning. *Id.* at 2945. Title X providers could refer pregnant clients only to "available providers that promote the welfare of mother and unborn child," and could not use this list "as an indirect means of encouraging or promoting abortion . . . [or] steering clients to providers who offer abortion as a method of family planning." *Id.* These requirements, HHS concluded, were "more consistent with" the Title X provision prohibiting abortion funding. *Id.* at 2932. HHS explained it was "simply unable to conclude that the types of counseling and

9

referral that has been required by" earlier HHS regulations "has not had the effect of promoting or encouraging abortion in violation of the statutory prohibition in section 1008." *Id.*

41.     In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court upheld HHS's no-abortion approach to Title X.   The Court reasoned that Section 1008's abortion-funding prohibition "does not speak directly to the issues of counseling [or] referral." *Id.* Citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), the Court concluded that the abortion-funding limit in HHS's 1988 rule reflected a "permissible" construction of Title X. *Rust*, 500 U.S. at 184.  The *Rust* Court further held that HHS had permissibly justified its new rule, including by explaining the agency's view that the 1988 regulations were "more in keeping with the original intent of the statute." *Id.* at 186-87.

42.     In 1993, HHS suspended the 1988 Rule.  At that point, HHS's prior guidelines from 1981 were effective, and required Title X recipients to make abortion referrals upon request from a patient.  HHS re-upped this policy in a rule entitled *Standards of Compliance for Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41,270 (July 3, 2000) ("2000 Rule").  Of course, during this time, the Supreme Court's ruling in *Roe v. Wade*, 410 U.S. 113 (1973), meant States were constitutionally required to allow abortions up to the point of viability.

**B.  HHS's Recent Title X Interpretations and the 2021 Rule.**

43.     HHS performed another Title X flip-flop between 2019 and 2021.  First, in 2019, HHS promulgated a rule ("2019 Rule") regarding proper implementation of Section 1008's abortion-funding prohibition.  *See generally Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019).  The 2019 Rule adopted many of the same requirements of the 1988 Rule upheld in *Rust*, including the bar on Title X grantees' "perform[ing], promot[ing], refer[ing] for, or support[ing] abortion as a method of family

10

planning." *Id*. at 7788-90.  This approach, HHS concluded, reflects "the best reading of" Section 1008, "which was intended to ensure that Title X funds are also not used to *encourage or promote* abortion."  *Id*. at 7777 (emphasis added).  Prior HHS regulations, the rule went on, "are inconsistent" with section 1008 "insofar as they require referral for abortion as a method of family planning." *Id.* at 7723.

44.     Two years later, HHS flipped again by promulgating a regulation that requires abortion referrals.  *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021).  HHS's 2021 Rule remains in effect today.  And it generally requires grantees like the State of Tennessee to make abortion counseling and referrals available upon patients' requests (the "Referral Mandate").  *See Provision of Abortion-Related Services in Family Planning Services Projects*, 65 Fed. Reg. 41,281 (July 3, 2000) (incorporated into the 2021 Rule by reference, *see* 86 Fed. Reg. at 56,150); *see* 42 C.F.R. § 59.5(a)(5)(i)(C) and (a)(5)(ii) (codifying Referral Mandate).[1]

45.     The Referral Mandate acknowledges that Title X provides that no funds "shall be used in programs where abortion is a method of family planning." *Id.* at 56,149.  Yet HHS claims that it may more narrowly interpret this limit to mean that Title X programs "must . . . [n]ot *provide* abortion as a method of family planning."  42 C.F.R. § 59.5(a)(5) (emphasis added).  HHS's addition of that limiting modifier "provide" in the Referral Mandate plainly deviates from the statutory text, *see* 42 U.S.C. § 300a-6, which does not contain the word:

---

[1] A coalition of States challenged the legality of HHS's 2021 Rule on several grounds.  A panel of the Sixth Circuit heard argument on the issue in October 2022, and the case remains pending decision.  *See Ohio v. Becerra*, 6th Cir. No. 21-4235 (argued Oct. 27, 2022).

11

| Text of Section 1008 | Referral Mandate's Interpretation of Section 1008 |
|---|---|
| None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning. | None of the funds appropriated under this subchapter shall be used in programs where abortion is provided as a method of family planning. |

The upshot: HHS cabins Section 1008 so that it permits Title X funds to flow to providers where abortion is a permissible method of family planning, so long as the providers do not themselves physically perform abortions.

46.      Having so limited Title X's no-abortion limit, HHS's Referral Mandate then *requires* providers to engage in abortion counseling and referrals.  Specifically, the Referral Mandate says that programs "*must* [o]ffer pregnant clients the opportunity to be provided information and counseling regarding . . . [p]regnancy termination."  42 C.F.R. § 59.5(a)(5)(i)(C) (emphasis added).  And "[i]f requested," the grant recipient must "provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request." *Id.* § 59.5(a)(5)(ii).  The regulations do not provide further information or instruction on what those terms mean or require.  But HHS interprets "pregnancy termination" and "abortion" as synonymous, thereby compelling abortion referrals and counseling in a program meant to avoid promoting abortions at all.

## C. *Dobbs* and HHS's Response

47.      As mentioned, HHS's 2021 Rule purports to require all Title X providers to make abortion referrals upon request.  Because abortion had been legal in all States during each one of HHS's prior Title X rulemakings, HHS had never previously addressed how its 2021 Referral Mandate would apply in States where abortion is generally prohibited by state law.

48.     This issue arose when, in June 2022, the U.S. Supreme Court "return[ed]" abortion regulation "to the people and their elected representatives" by holding that the federal constitution does not require States to permit abortions.  *Dobbs*, 142 S. Ct. at 2284.  The *Dobbs* decision triggered state laws across the country set to take effect if the Supreme Court were to overrule *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).  Tennessee's law—Tenn. Code Ann. § 39-15-213—was no exception, and contained a prohibition on providing elective abortions that became effective 30 days following *Dobbs*.

49.     After the Supreme Court issued the *Dobbs* decision, OPA published a FAQ memo entitled "*Dobbs v. Jackson Women's Health Organization* U.S. Supreme Court Decision: Impact on Title X Program."  (D.E. 1-6, "*Dobbs* FAQ.")

50.     In the *Dobbs* FAQ, HHS addressed whether Title X recipients can "make referrals for a client to a provider in a different state."  (*Id.* at 5.)  OPA answered in the affirmative: "There are no geographic limits for Title X recipients making referrals for their clients . . . Title X recipients have flexibility to refer clients for services across state lines if necessary."  (*Id.*)  HHS did not explain how this rule would interact with state-level prohibitions on the facilitation of abortions.

51.     Instead, OPA quoted 42 C.F.R. § 59.5(b)(8) (all emphases in original):  "Title X recipients are required to provide for coordination and use of referrals and linkages with primary healthcare providers, other providers of healthcare services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs, ***who are in close physical proximity to the Title X site, <u>when feasible</u>***, in order to promote access to services and provide a seamless continuum of care."  *Id.*  HHS did not define feasibility—or explain how referring a woman to receive a service that state law bans would be feasible for a Title X provider.

13

**IV.    HHS's Unlawful About-Face on Tennessee's Title X Funding.**

**A.  October 2022: HHS Blesses Tennessee's "Strong" Title X Program.**

52.    In March 2022, as it had for fifty years running, OPA again approved the continued funding of Tennessee's Title X grant program.  (D.E. 1-7, Mar. 2022 Notice of Award.)

53.    In July 2022, OPA performed a Program Review of TFPP to evaluate its progress shortly into the grant period.  (D.E. 1-5, Amosun Decl. ¶ 16.)

54.    At that time, Tennessee's Title X program managers raised the effect of *Dobbs* with OPA reviewers.  Specifically, Tennessee's program managers informed OPA that *Dobbs* triggered Tennessee's prohibition on elective abortions, and that this prohibition would take effect the next month.  (*Id.* ¶ 17.)  From the August 2022 trigger date on, Tennessee explained, Tennessee's Title X program would only provide counseling and referrals for pregnancy terminations that are permissible under state law.  (*Id.*)

55.    In October 2022—after Tennessee's trigger law went live—OPA emailed Tennessee's Health Department with a glowing Program Review Report.  (D.E. 1-2, Oct. 19, 2022 OPA Email; D.E. 1-1, Program Review.)  OPA's email congratulated the Department "on such a wonderful review and leading a strong Title X program."  (D.E. 1-2, Oct. 19, 2022 OPA Email at 1.)

56.    To that point, OPA had never provided Tennessee's Department of Health with written documentation warning that Tennessee was violating the Referral Mandate.  Nor did OPA inform Tennessee that its Title X providers were required to give counseling and referrals for all abortions irrespective of the legality or availability of that procedure in Tennessee.

57.    OPA had opportunities to press the point.  For example, in its email dated October 19, 2022, OPA flagged a previous concern "about patient counseling once the new state law" prohibiting abortion "was enacted on August 25th."  (*Id.* at 1.)  But "[i]n the end," the email

14

continued, "[OPA] determined that Tennessee['s] Department of Health was compliant." (*Id.*) OPA only requested that Tennessee provide an "update . . . on the policy changes" the Health Department would make in response to the new law. (*Id.*) But OPA did not provide any indication that the policy update needed to mandate that providers give counseling and referrals for all abortion services, regardless of legality and availability in the State.

58. Nor did the Program Review itself suggest that OPA would have an issue with Tennessee's changes to its policies following *Dobbs* and the effective date of the State's abortion prohibition. OPA merely noted that the Health Department's "forms, policies, etc. are under review by [the Department's] legal staff and [the Department's leadership] expect[ed] a decision on what they are allowed to provide to or say to clients seeking pregnancy termination counseling and referral." (D.E. 1-1, Program Review at 60.)

59. OPA did not suggest that there was an issue with the potential new policies. To the contrary, OPA's Program Review Report evaluated whether Tennessee's Health Department complied with the Referral Mandate and found "[t]his expectation was met." (*Id.* at 24.) That conclusion held, OPA elaborated, despite "[n]o referrals for abortion [being] made." (*Id.*)

**B. March 2023: HHS Discontinues Tennessee's Same Title X Program.**

60. At the start of 2023, OPA began "conducting a review of all Title X service grants to ensure compliance with the requirements for nondirective options counseling and referral" of the Referral Mandate, detailed in 45 C.F.R. § 59.5(a)(5). (D.E. 1-8, Jan. 25, 2023 OPA Ltr. to Tenn. Dep't of Health at 1.)

61. Based on Defendant Jessica Marcella's own statements, Tennessee was a top target for this ad hoc audit. (D.E. 1-5, Amosun Decl. ¶ 21.)

15

62.     As part of that review, OPA requested that Tennessee's Health Department submit copies of its policies for complying with counseling and referral options.  (D.E. 1-8, Jan. 25, 2023 OPA Ltr. at 1.)

63.     Tennessee's Health Department responded on February 13, 2023, attaching its "current policy regarding [the Department's] nondirective counseling to pregnant patients on the range of available options in Tennessee."  (D.E. 1-3, Feb. 13, 2023 Tenn. Dep't of Health Ltr. to OPA at 1.)  The policy states that "[p]atients with [a] positive pregnancy test must be offered the opportunity to be provided information and counseling regarding all options that are legal in the State of Tennessee."  (*Id.* at 2.)  The Department notified OPA that those policies comprised "the allowable practice[s] under Tennessee law."  (*Id.* at 1.)

64.     On March 1, OPA notified the Health Department that its policy was out of compliance because of the policy's "legal in the State of Tennessee" qualifier.  (D.E. 1-9, Mar. 1, 2023 OPA Ltr. to Tenn. Dep't of Health at 1.)

65.     According to OPA, to comply with the Referral Mandate, "Tennessee's policy must clearly state that the project will offer pregnant clients information and nondirective counseling on . . . pregnancy termination."  (*Id.* at 2.)  That is, "projects are required to provide referrals upon client request, including referrals for abortion."  (*Id.*)

66.     Thus, as HHS interprets its 2021 Rule's Referral Mandate, all Title X providers must engage in counseling and referrals for abortion services—even where abortions are illegal and, as a result, unavailable in the provider's State.  Neither HHS nor OPA provided any justification for this interpretation of Title X, nor for altering their previously expressed view that Tennessee's Title X program complied with HHS regulations notwithstanding the policy against providing abortion referrals.  *See supra* ¶ 59.

16

67.     OPA gave the Health Department until March 13 to comply with the agency's new view of Tennessee's obligations under Title X.  (D.E. 1-9, Mar. 1, 2023 OPA Ltr. at 2.)

68.     In response, the Health Department objected that "pregnancy termination" within the meaning of the Referral Mandate does not "include every possible method of 'pregnancy termination,' such as abortion."  (D.E. 1-10, Mar. 13 Tenn. Dep't of Health Ltr. to OPA.)  Rather, the Health Department argued, "[u]nder the regulation's broad and undefined [use of 'pregnancy termination'], Tennessee's nondirective policy appears to be in compliance with Title X given the standard of care in Tennessee."  (*Id.*)  Specifically, the Department asserted, "[p]ursuant to Tennessee law, Title X subgrantees' physicians can comply with this requirement by referring patients for 'terminat[ing] the pregnancy of a woman known to be pregnant' when the termination is with the intent 'to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus.'"  (*Id.* (quoting Tenn. Code Ann. § 39-15-213(a)(1) (2019) (allowing such procedures by excluding them from the definition of abortion)).)[2]

69.     OPA disagreed.  In a March 20, 2023, letter, OPA expressed the view that HHS's 2021 Rule "made clear . . . [t]he abortion counseling and referral requirements."  (D.E. 1-11, Mar. 20 OPA Ltr. to Tenn. Dep't of Health at 3 n.2 (citing 86 Fed. Reg. 56,144 (2021)).)  OPA said it "underst[ood] that in some circumstances, those referrals w[ould] need to be made out of state." (*Id.* at 3.)

70.     Relying on its interpretation, OPA "determined that Tennessee is unable to comply with the terms and conditions of the award."  (*Id.* at 1, 3.)  As a result, OPA concluded that

---

[2] In 2023, the General Assembly amended Tenn. Code Ann. § 39-15-213(a)(1) to also expressly exclude "ectopic or molar pregnancy" terminations from the abortion definition.

17

continuing Tennessee's Title X grant was "not in the best interest of the government" and, so, cut off Tennessee's Title X funding. (*Id.* at 1 (citing 42 C.F.R. § 59.8(b)).)

71. To effectuate that decision, OPA changed the closeout date of Tennessee's Title X grant to March 31, 2023, (*id.* at 3), as confirmed in a notice sent on March 31, 2023. (D.E. 1-12, Mar. 2023 Notice of Award at 3.) HHS's and OPA's decision to discontinue Tennessee's Title X grant is referred to as the "Discontinuation Decision" for the remainder of this Complaint.

72. Per the March 1, 2023, and March 20, 2023, letters, the Discontinuation Decision rested on the Health Department's purported noncompliance with the Referral Mandate in 42 C.F.R. § 59.5(a)(5). (D.E. 1-9, Mar. 1 Ltr. at 2; D.E. 1-11, Mar. 20 Ltr. at 2-3.)

73. But during the subsequent administrative appeals, *see infra* ¶¶ 76-79, OPA also justified its decision by referencing its *Dobbs* FAQ statement that "Title X recipients have flexibility to refer to clients for services across state lines if necessary." (D.E. 1-13, OPA Jx. Resp. at 2 (quoting *Dobbs* FAQ at 5).)

74. As noted above, that portion of the *Dobbs* FAQ references a separate subpart, 42 C.F.R. § 59.5(b)(8), that only requires referrals when "feasible." (*Dobbs* FAQ at 5.)

75. Thus, on information and belief, either OPA did not disclose the full basis for the Discontinuation Decision, is shifting the basis of its decision, or some combination of both.

**C. September 2023: HHS Redistributes Tennessee's Funds to Planned Parenthood.**

76. OPA was unsure whether and how Tennessee could appeal the Discontinuation Decision on behalf of its Health Department. (*See* D.E. 1-14, Apr. 4 OPA Email.) So, out of an abundance of caution, Tennessee filed administrative appeals of the Discontinuation Decision before both the OPA and the HHS's Departmental Appeals Board (DAB). Those appeals are discretionary.

18

77.     In the spring of 2023, the DAB and OPA took preliminary procedural steps to process Tennessee's appeal.  On April 27, 2023, the DAB requested OPA's position on whether the DAB could review the Discontinuation Decision.  (D.E. 1-15, DAB Jx. Request at 3.)  OPA responded a few weeks later, informing DAB that Tennessee needed to complete its informal appeal within OPA, pursuant to 42 C.F.R. Part 50, Subpart D.  (D.E. 1-13, OPA Jx. Resp. at 1.)

78.     With the good-faith hope of reaching an administrative resolution, Tennessee did not object to OPA's instruction.  (D.E. 1-16, Tenn. Jx. Resp. at 1.)  OPA has taken no further action on Tennessee's administrative appeal.

79.     Then, in mid-September 2023, and notwithstanding Tennessee's pending appeal, HHS took steps to redistribute Tennessee's Title X funds to Planned Parenthood—the United States' leading provider of abortions—and its affiliates.  HHS did not directly inform Tennessee of this decision to reallocate Tennessee's substantial Title X funds.  Rather, Tennessee became aware of this decision—and HHS's apparent pre-determination of Tennessee's appeal—only after it was reported in the press.  *See, e.g.*, Micaela A. Watts, *Tennessee's Lost Reproductive Healthcare Funding Will Go to Planned Parenthood*, Memphis Commercial Appeal (Sept. 26, 2023), https://tinyurl.com/4556mrc4; Planned Parenthood, *The Quickie: PP Tennessee Affiliate Will Receive $3.9 million in Title X Funding* (Sept. 27, 2023), https://tinyurl.com/27wjb4f3.

**IRREPARABLE HARM TO TENNESSEE**

80.     HHS's decision to discontinue Tennessee's Title X program inflicts a series of severe, irreparable harms on Tennessee.  The harms can only be remedied by a judicial order setting the termination aside and resetting the status quo prior to HHS's unlawful decision.

81. *First*, HHS's unlawful Discontinuation Decision harms Tennessee's financial and public-health interests by stripping the State of a federal grant worth over $7 million annually. (D.E. 1-5, Amosun Decl. ¶ 6; D.E. 1-4, Goodwin Decl. ¶ 6.)

82. This loss of funding impairs the State's ability to provide for the health and welfare of those within its border. (D.E. 1-5, Amosun Decl. ¶¶ 7-8, 24; D.E. 1-4, Goodwin Decl. ¶¶ 7-8.) For example, losing Title X funds necessarily requires the State to appropriate $7 million away from other healthcare programs to keep afloat the TFPP program that annually served 40,000 patients, the majority of whom are Tennesseans and lower-income individuals who would not otherwise have access to the important health services provided. Without the federal Title X funds, the program is at risk. (D.E. 1-5, Amosun Decl. ¶¶ 24-25.)

83. *Second*, HHS's unlawful Discontinuation Decision threatens the continued employment of large numbers of state employees. Together, Tennessee's Title X funds help pay for the employment of approximately 50 state employees that deliver covered services. (D.E. 1-5, Amosun Decl. ¶ 24.) The loss of funding puts the continued employment of those employees at risk. It further risks the loss of those employees' time, training, and knowledge, in which Tennessee has substantially invested.

84. *Third*, losing Title X funding means losing federal discounts for family planning drugs and devices. Title X providers receive federally sponsored discounts on such drugs and devices. Now that the Health Department is no longer a Title X provider, it is ineligible for these discounts, requiring it to plan and obtain additional resources to satisfy the increased costs. (*Id.* ¶ 25.) Paying these additional costs decreases the Health Department's ability to provide services to children with special health needs, preventive and primary care services for children, and other maternal and child health activities in other programs. (*Id.*)

85.     *Fourth*, OPA's decision risks hampering Tennessee's ability to obtain future federal funding.  Indeed, in March 2023, OPA officials threatened that the State's termination as a Title X grant recipient "must be reported [by OPA] to the . . . Federal Awardee Performance and Integrity Information System," which "may affect [the State's] ability to obtain future Federal funding."  (D.E. 1-9, Mar. 1 Ltr. at 2 (citing 45 C.F.R. § 75.372(b)).)  Although OPA later stated that it "do[es] not intend to report any concerns" at present (D.E. 1-17, OPA May 30 Email), OPA has not disavowed that it might later report Tennessee.  *See* 45 C.F.R. § 75.372(b).  This risk is substantial:  In the Health Department alone, Tennessee currently receives and plans on renewing 96 federal grants for different initiatives totaling over $1.4 billion.  (D.E. 1-18, Oliver Decl. ¶ 5, Attach. A.)

86.     Tennessee lacks adequate remedies outside of obtaining judicial relief.  In the absence of a judicial order setting aside the Discontinuation Decision, Tennessee cannot recoup lost federal funds.  Instead, the State must redirect its own funds to fill the gap, or else forfeit this longstanding public-health program.  (D.E. 1-5, Amosun Decl. ¶ 24.)  Nor can Tennessee later recover from HHS for the harm it has caused, given Defendants' sovereign immunity.

87.     Moreover, the next grant period is not until April 2027.  This timeline means that Tennessee will have to pay $28 million out of pocket over the next four years to support its strong TFPP program until it can apply again.  (*Id.* ¶ 23.)  With the January 2024 legislative session approaching, Tennessee needs clarity regarding whether HHS's previously cancelled funding will be restored or whether Tennessee will need to plug the funding gap with legislation appropriating additional state dollars to the Health Department or shut down the program altogether.

88.     So too, because Tennessee's TFPP policy remains unchanged, the State would benefit from a ruling setting aside HHS's interpretation of the Referral Mandate for future funding years.  (*Id.*)

## CLAIMS FOR RELIEF

### CLAIM I
### Violation of APA, 5 U.S.C. § 706(2)(A), (C)
### Agency Action Not in Accordance with Law and in Excess of Statutory Authority

89.     Tennessee repeats and incorporates by reference the allegations of the preceding paragraphs.

90.     HHS and OPA are federal agencies within the meaning of the APA.

91.     The Discontinuation Decision is a final agency action within the meaning of 5 U.S.C. § 704, Tennessee lacks another adequate remedy in court, and no rule requires that the State appeal to a superior agency authority prior to seeking judicial review.  Though Tennessee did initiate an optional administrative appeal, HHS's subsequent actions—including its decision to reallocate all of Tennessee's Title X funding to other entities—demonstrate that the administrative appeal is futile.

92.     The APA requires courts to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

93.     HHS's decision to terminate Tennessee's Title X grant contravenes the governing statutory provisions and HHS's own Title X regulations.

94.     *First*, the Referral Mandate is inconsistent with Section 1008, which directs that "[n]one of the funds appropriated" under Title X "shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  The Referral Mandate would force Title X

22

providers to engage in abortion referrals or counseling, rendering their programs ones "where abortion is a method of family planning." *Id.* HHS's reading of the statute contradicts Congress's plain intention that "abortion is not to be encouraged or promoted in any way through" Title X funding. 116 Cong. Rec. at 37,375 (Nov. 16, 1970). The constitutional problems presented by HHS's Referral Mandate interpretation further demonstrate that HHS's interpretation is unlawful. *See infra* ¶¶ 109-15.

95.     Because HHS's Referral Mandate is inconsistent with Section 1008, it is invalid under the APA. The Discontinuation Decision is likewise invalid and should be "set aside," 5 U.S.C. § 706(2), because OPA unquestionably issued that decision based on its conclusion that Tennessee was violating the Referral Mandate.

96.     *Rust v. Sullivan*, 500 U.S. 173 (1991), is not to the contrary. There, the Supreme Court upheld an HHS rule *prohibiting* abortion referrals. This outcome reflects the best reading of the statute, which should govern, and does not permit Title X funds to flow to abortion-related service and counseling. Although the *Rust* Court concluded that Title X was in some respects ambiguous with regard to HHS's authority to regulate abortion-adjacent issues, the Court nowhere suggested that HHS could *compel* Title X providers to make abortion referrals as a condition of program participation. Such a reading falls outside the zone of reasonable interpretation, including because it purports to resolve a policy issue of major political significance without clear congressional authority. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2608-10 (2022). HHS's interpretation thus does not reflect the permissible resolution of ambiguity for purposes of satisfying *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

97.     Alternatively, to the extent *Chevron* would permit HHS's Referral Mandate, it should be reconsidered.  *Cf. Loper Bright Enters. v. Raimondo* (U.S. No. 22-451) (cert. granted May 1, 2023) (presenting question "[w]hether the Court should overrule *Chevron*").

98.     *Second*, even if the Referral Mandate comports with Section 1008, the Discontinuation Decision violates HHS's own Title X regulations.  All relevant tools of construction show that the 2021 Rule generally, and the Referral Mandate in particular, permit the Tennessee Health Department's policy of providing counseling and referrals for pregnancy termination options that are legal in the State of Tennessee.  In reaching the contrary decision, HHS improperly interpreted its own regulations by requiring that Title X grantees like Tennessee provide counseling and referral for *all* abortion options regardless of their legality and availability in the relevant jurisdiction.

99.     Because the Discontinuation Decision also reflects an impermissible reading of HHS's regulations, it violates the APA on this independent basis and should be "set aside."  5 U.S.C. § 706(2).

## CLAIM II
### Violation of APA, 5 U.S.C. § 706(2)(A), (D)
### Agency Action Taken Without Required Procedures or Explanation

100.     Tennessee repeats and incorporates by reference the allegations of the preceding paragraphs.

101.     The APA requires courts to set aside agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

102.     As set out in Claim I, HHS's all-abortions referral interpretation is inconsistent with the regulations implementing Title X.  Those regulations plainly do not require Title X grantees to

provide counseling and referrals for pregnancy termination regardless of the legality of those procedures. *See supra* ¶¶ 93-96.

103.    HHS's all-abortions referral interpretation thus "effect[s] a substantive change in the regulations" that HHS already issued, and constitutes a new substantive rule that HHS could only promulgate through notice-and-comment rulemaking under 5 U.S.C. § 553(b). *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018). No exceptions to notice-and-comment rulemaking apply. 5 U.S.C. § 553(b).

104.    But HHS did not use notice-and-comment rulemaking procedures to promulgate its all-abortion-options rule. Instead, HHS unlawfully unveiled its new interpretation only as part of HHS's decision to terminate Tennessee's Title X funding. Because that decision reflects a new rule that did not arise from the required notice-and-comment procedures, it is unlawful and should be "set aside." 5 U.S.C. § 706(2).

105.    The APA further requires agencies to provide "reasoned explanation" for their decisionmaking. At a minimum, this directive means agencies must "offer genuine justifications for important decisions" at the time the decisions are issued. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019). Yet HHS has continued to give shifting justifications for its termination of Tennessee's Title X grant. Initially, HHS cited the 2021 Rule and the Referral Mandate as a basis for the termination. Then, in the pending administrative appeal, HHS shifted to citing the *Dobbs* FAQ and the feasibility limitation, 42 C.F.R. § 59.5(b)(8).

106.    HHS's shifting basis in existing law to justify the Discontinuation Decision indicts the legality of HHS's decision under the 2021 Rule. It also violates HHS's APA duty to provide an adequate explanation for its action. For either or both reasons, the Discontinuation Decision is invalid should be "set aside." 5 U.S.C. § 706(2).

25

## CLAIM III
## Violation of APA, 5 U.S.C. § 706(2)(B)
## Agency Action Contrary to the U.S. Constitution

107. Tennessee repeats and incorporates by reference the allegations of the preceding paragraphs.

108. The APA requires courts to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

109. The Discontinuation Decisions is unconstitutional on several dimensions.

110. *First*, HHS's decision transgresses the Spending Clause of Article I, Section 8, Clause 1 of the United States Constitution. "Spending Clause legislation" like Title X "operates based on consent: in return for federal funds, the recipients agree to comply with federally imposed conditions." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (alteration and quotation marks omitted). As a result, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* (citation omitted); *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Yet HHS's Referral Mandate is nowhere to be found in Title X. At most, HHS's reading rests on the assertion that Title X is ambiguous, and thus permits HHS to require Title X grantees to provide counseling and referrals for all abortion services regardless of their legality or availability. Ambiguous statutes, however, cannot give rise to new duties on the part of Spending Clause recipients. Nor can agencies leverage *Chevron* to impose new duties Congress did not plainly direct as part of a Spending Clause program.

111. The Discontinuation Decision also unconstitutionally rests on a condition that is unrelated to the purposes of the program—*i.e.*, requiring counseling and referrals for abortion services that are illegal and unavailable under Tennessee law. HHS's interpretation is contrary to, and in fact undermines, Title X. For one, it undermines the quality of care. *See infra* Claim IV.

26

For another, it is inconsistent with the prohibition on the use of Title X funds in "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. For these additional reasons, the Discontinuation Decision is not a lawful exercise of Congress's power under the Spending Clause. *See South Dakota*, 483 U.S. at 207.

112. In short, HHS's interpretation and associated decision expressly violate the Spending Clause by imposing unforeseen conditions far afield from Congress's Title X legislation. At a minimum, HHS's actions present serious constitutional issues that counsel against deferring to HHS's interpretation of Title X as reasonable. Either way, these Spending Clause principles support Tennessee's right to relief. *See Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022); *see also Kentucky v. Yellen*, No. 21-6108, 2023 WL 3221058, at *4 (6th Cir. May 3, 2022) (Bush, J., issuing a statement regarding the denial of en banc) ("[O]ur court decided this case based on statutory interpretation rather than invalidating the condition as unconstitutional. However, had the court taken the latter approach . . . that mode of reasoning would have changed little about the outcome of the case.").

113. *Second*, HHS's interpretation unlawfully seeks to compel abortion-related speech in violation of the First and Tenth Amendments. Congress's spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. In addition, States have First Amendment rights of their own, which includes the prerogative not to express particular messages. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219-20 (2015).

114. HHS's Referral Mandate violates both of these constitutional limits. Tennessee's employees maintain First Amendment rights not to engage in speech or conduct that facilitates abortions. Yet HHS's rule would require Tennessee to compel workers to engage in speech

27

promoting the availability of abortions, contrary to First Amendment limits. So too, HHS's regime compels Tennessee to engage in pro-abortion speech as a Title X program operator, contrary to the State's expressed interest in promoting fetal life and discouraging abortion at all stages of development.

115. HHS's interpretation and termination decision thus violate the Spending Clause and the First and Tenth Amendments, and should be "set aside" on this basis. 5 U.S.C. § 706(2).

## CLAIM IV
### Violation of APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

116. Tennessee repeats and incorporates by reference the allegations of the preceding paragraphs.

117. The APA requires courts to set aside agency action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

118. On a number of fronts, HHS acted arbitrarily and capriciously in rescinding Tennessee's Title X grant.

119. *First*, the Discontinuation Decision is a reversal from HHS's prior conclusion in the July 2022 Program Review that TFPP complied with the Referral Mandate. That reversal is unexplained and, so, arbitrary and capricious. *See FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 514-16 (2009).

120. *Second*, HHS's decision ignores Tennessee's reliance interests in Title X grant funding—funding that the State has received for over 50 years, and which supports an important, longstanding program that promotes the health of over 40,000 individuals and employs around 50 people. (D.E. 1-5, Amosun Decl. ¶ 24.) HHS's failure to consider this "important aspect of the problem" itself renders HHS's determination arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*

28

*of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). HHS's lack of consideration of Tennessee's "legitimate reliance" on its Title X funding is especially problematic here, where HHS has "changed course[]" from its prior position affirming Tennessee's Title X compliance. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

121. *Third*, OPA's March 20, 2023, letter rests on arbitrary reasoning. The letter asserts that, notwithstanding Tennessee's prohibition on abortions, the Health Department could comply with HHS's Referral Mandate by referring individuals to abortion providers out of the State. This rationale arbitrarily overlooks that requiring Title X recipients to refer individuals out of State may render Tennessee's "family planning methods and services" less "effective" by providing a referral that is impracticable for many program beneficiaries. 42 U.S.C. § 300(a).

122. So too, HHS's decision irrationally cuts off funding to what HHS has deemed to be the "only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state." (D.E. 1-1, Program Review at 4.) As a central basis for rescinding the 2019 Rule, HHS explained that the 2019 Rule had driven Title X providers from the program and left unacceptable coverage gaps across States. 86 Fed. Reg. at 56,147. Yet HHS's decision perversely inflicts this same gap in services on Tennessee residents.

123. *Fourth*, OPA failed to adequately consider and "reasonably explain[]" the lawfulness of its decision, *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)— namely, whether it permissibly interpreted the relevant regulations, including the requirement that referrals must be feasible. HHS also has failed to consider the effect of *Dobbs* and state-level prohibitions on abortion-related activity among health providers. The resulting regime risks coercing Tennessee providers to violate duly enacted state provisions governing the provision of

abortions.  To say the least, this dynamic is an "important aspect of the problem" that HHS needed to consider, but unlawfully ignored.  *State Farm*, 463 U.S. 43.

124.    *Fifth*, OPA's proffered justification—that the Discontinuation Decision rested on Tennessee's noncompliance with the Referral Mandate at 42 C.F.R. § 59.5(a)(5)—bears the hallmarks of pretextual decisionmaking.  For example, in a later filing about the decision, OPA pointed to part of the *Dobbs* FAQ that cites § 59.5(b)(8).  But that provision does not appear in the letters OPA sent to the Health Department.  "Altogether, the evidence tells a story that does not match the explanation [HHS] gave for [its] decision."  *Dep't of Commerce*, 139 S. Ct. at 2575. HHS's classic *post hoc* rationalization suggests impermissible ulterior motives underlie the Discontinuation Decision.

### CLAIM V
### Relief Under the Declaratory Judgment Act, 28 U.S.C. § 2201
### Claim for Declaratory Judgment Against All Defendants

125.    Tennessee repeats and incorporates by reference the allegations of the preceding paragraphs.

126.    The Declaratory Judgment Act provides that, "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

127.    This case presents an actual controversy.  Tennessee maintains that it is entitled to reinstatement of its prior Title X grant, as well as continued funding of its public-health programs under Title X—a sum of around $7 million annually.

128.    The controversy arises in this Court's jurisdiction, as it relates to questions of federal law.  Venue is moreover proper, as Tennessee resides in this District.  28 U.S.C. § 1291(e).

129.     Through this Complaint, the State of Tennessee has filed an appropriate pleading to have its rights declared.  This Court can resolve this controversy by declaring that Tennessee has a right to receive Title X funding notwithstanding its policy of declining to make abortion referrals as part of its Title X programming.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles the State of Tennessee to declaratory and injunctive relief.  Tennessee requests that this Court:

a)     Enter a judgment declaring, pursuant to 28 U.S.C. § 2201, that HHS's termination of Tennessee's Title X funding was unlawful and arbitrary and capricious and that Tennessee's policies entitle it to continue to receive Title X funding;

b)     Set aside HHS's March 20, 2023, final decision discontinuing Tennessee's Title X grant;

c)     Enter a preliminary injunction enjoining Defendants, and any other agency or employee of the United States, from enforcing or implementing the Discontinuation Decision;

d)     Enjoin Defendants from withholding Title X funds from Tennessee for refusing to offer counseling and referrals (including out-of-state) for abortions that are otherwise illegal under Tennessee law;

e)     Require Defendants to reinstate Tennessee's Title X funds, retroactive from March 20, 2023; and

f)     Grant any and all other relief the Court deems just and proper.

Respectfully submitted,

JONATHAN SKRMETTI (BPR# 031551)
Attorney General & Reporter

TRENTON MERIWETHER (BPR# 038577)
(Admitted to Practice in Eastern District)
MATTHEW P. DYKSTRA (BPR# 038237)*
 Assistant Attorneys General
 Office of the Tennessee Attorney General
 Healthcare Division
WHITNEY HERMANDORFER (BPR#
041054)**
 Director of Strategic Litigation and
 Assistant Solicitor General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Trenton.Meriwether@ag.tn.gov
Matthew.Dykstra@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov

*Motion for admission under LR83.5(a) pending
and *Pro Hac Vice* admission pending
 ** *Pro Hac Vice* admission pending

*Counsel for Plaintiff*

32