# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE,                      )
                                         )
    *Plaintiff,*                       )
                                         )
v.                                       )   Civil Action No. 3:23-cv-384
                                         )   Judge Travis R. McDonough
XAVIER BECERRA, in his official capacity )   Magistrate Judge Jill E. McCook
as Secretary of Health and Human Services; )
U.S. DEPARTMENT OF HEALTH AND            )
HUMAN SERVICES; JESSICA S. MAR-          )
CELLA, in her official capacity as Deputy )
Assistant Secretary for Population Affairs; )
and OFFICE OF POPULATION AF-             )
FAIRS,                                   )
                                         )
    *Defendants.*                      )

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION AND § 705 STAY

---

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    I.   Tennessee's 50-Year Title X Track Record ................................................................ 3

    II.  HHS's Shifting Rules on Title X and Abortion ...................................................... 3

    III. The Challenged Rescindment of Tennessee's Title X Grant ................................. 5

        A.  HHS's Approval of Tennessee's "Wonderful" Title X Program ..................... 5

        B.  HHS's Sudden Rejection of Tennessee's Same Program Months Later ................. 7

LEGAL STANDARD ............................................................................................................ 8

ARGUMENT ......................................................................................................................... 8

    I.   Tennessee Is Likely to Succeed on the Merits of Its Challenge ............................. 8

        A.  HHS's March 2023 Rescindment Decision Is Reviewable ......................... 8

        B.  HHS's March 2023 Rescindment Decision Is Unlawful ........................... 9

    II.  Tennessee Faces Irreparable Harm Absent Preliminary Relief .......................... 23

    III. Preliminary Relief Will Not Harm HHS or the Public Interest ....................... 24

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ACT, Inc. v. Worldwide Interactive Network, Inc.,*
    46 F.4th 489 (6th Cir. 2022)……….………….………………...……….24

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021)……………...…………………………….………23, 25

*Alliance for Hippocratic Med. v. FDA,*
    78 F.4th 210 (5th Cir. 2023)…………………...…………………………..20

*Am. Fed'n of Gov't Employees, AFL-CIO, Local 3090 v. Fed. Labor Relations Bd.,*
    777 F.2d 751 (D.C. Cir. 1985)……………………………………………..22

*Arangure v. Whitaker,*
    911 F.3d 333 (6th Cir. 2018)……………………...………………………16

*Bennett v. Ky. Dep't of Educ.,*
    470 U.S. 656 (1985)…………………………………………………..14

*Bond v. United States,*
    572 U.S. 844 (2014)…………………………………………………..16

*Carter v. Welles-Bowen Realty, Inc.,*
    736 F.3d 722 (6th Cir. 2013)…………………………………………17

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018)……………………………………...…14

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020)…………………………………………....19, 22

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) …………………………………...…..1, 12, 19

*Encino Motorcars v. Navarro,*
    579 U.S. 211 (2016)……… …………………………………………17

*FCC v. Fox Telev. Stations, Inc.,*
    556 U.S. 502 (2009)… …………………………………………...21, 22

*FEC v. Cruz,*
    142 S. Ct. 1638 (2022)… …………………………………...…14

*Fontem US, LLC v. FDA,*
    82 F.4th 1207 (D.C. Cir. 2023)…………………....……………………………..21

*Goldstein v. SEC,*
    451 F.3d 873 (D.C. Cir. 2006) ……………………………………………….…16

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) …………………………………………………………....13

*Haines v. Fed. Motor Carrier Safety Admin.,*
    814 F.3d 417 (6th Cir. 2016) ………………………………………………….9

*Hall v. Edgewood Partners Ins. Ctr., Inc.,*
    878 F.3d 524 (6th Cir. 2017)…… ……………………………………………....24

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022)…… …………………………………………....25

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) ……………………·…………………...· 23-24

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022)… …………………………………………....10, 12, 16, 19

*Kentucky v. Yellen,*
    67 F.4th 322 (6th Cir. 2023) ………………………………………………...12, 25

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)…… …………………………………………………15-17

*Loper Bright Enters. v. Raimondo* (No. 22-451)……...…………………………………...15

*L.W. ex rel. Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023).………………………………………………………12

*Michigan v. EPA,*
    576 U.S. 743 (2015).……………………………………………………………20

*Missouri v. Bowen,*
    813 F.2d 864 (8th Cir. 1987)…...………………………………………………9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)………… ………………………………………………...18

*Nat'l Council for Adoption v. Blinken,*
    4 F.4th 106 (D.C. Cir. 2021)…...…………………………………………..22

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
 142 S. Ct. 661 (2022)…..………………………………………………...…25

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
 567 U.S. 519 (2012)……………………………………………………….…12

*Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.,*
 960 F.3d 872 (6th Cir. 2020)……………………………………………….....17

*Obama for Am. v. Husted,*
 697 F.3d 423 (6th Cir. 2012)…..……………………………………...........…8

*Ohio v. Becerra,* --- F.4th ---,
 2023 WL 8270957 (6th Cir. Nov. 30, 2023)…………………………………...*passim*

*Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n,*
 812 F.2d 288 (6th Cir. 1987)…… …………………………………….............8

*Pennhurst State Sch. & Hosp. v. Halderman,*
 451 U.S. 1 (1981)……......…………………………….…………………….....10-11, 14

*Priorities USA v. Nessel,*
 860 Fed. Appx. 419 (6th Cir. 2021)……......……………………………….....24

*Relentless, Inc. v. U.S. Dep't of Commerce* (No. 22-1219)……………………………...…15

*Rice v. Santa Fe Elevator Corp.,*
 331 U.S. 218 (1947)………………………………………………..…………12

*Roe v. Wade,*
 410 U.S. 113 (1973)……………………………………………………..…….16

*Rosa H. v. San Elizario Indep. Sch. Dist.,*
 106 F.3d 648 (5th Cir. 1997)…………………………………………...…..…14

*Rust v. Sullivan,*
 500 U.S. 173 (1991)……………………………………………………...…….4

*Sackett v. EPA,*
 566 U.S. 120 (2012)……………………………………………………….…...9

*Shalala v. Guernsey Memorial Hosp.,*
 514 U.S. 87 (1995)……………………………………………………...…..23

*Tennessee v. Dep't of Ed.,*
 615 F. Supp. 3d 807 (E.D. Tenn. 2022)…………………………………………23

iv

*Tenn. Hosp. Ass'n v. Azar,*
  908 F.3d 1029 (6th Cir. 2018)……………………………………………..…22-23

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
  992 F.3d 350 (5th Cir. 2021)…………………………………………….....11-12

*United States v. Hansen,*
  143 S. Ct. 1932 (2023)……………………………………………….…….16

*Va. Dep't of Educ. v. Riley,*
  106 F.3d 559 (4th Cir. 1997)…………………………………………....11, 13

*Van Buren v. United States,*
  141 S. Ct. 1648 (2021)……………………………………………………16-17

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022)…………………………………………………13, 16

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury,*
  59 F.4th 1124 (11th Cir. 2023)…………………………………………10-12

*Wilson v. Comm'r of Soc. Sec.,*
  378 F.3d 541 (6th Cir. 2004)……………………………………………15

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008)………………………………………………...….8

*Wis. Cent. Ltd. v. United States,*
  138 S. Ct. 2067 (2018)…………………………………………………..18

**Constitutions**

U.S. Const. art. I, § 8, cl. 1……………………………………………...……….10

Tenn. Const. art. I, § 36………………………………………………….6, 25

Tenn. Const., art. II, § 24…....……………………………………………...….24

**Statutes**

5 U.S.C. § 704…………………………………………………………….8-9

5 U.S.C. § 705…………………………………………………………...….8

5 U.S.C. § 706…………………………………………………8, 15, 23

42 U.S.C. § 300………………………………………………………...3, 13, 16

v

42 U.S.C. § 300a-4…………………………………………………………………...……12

42 U.S.C. § 300a-6………………………………………………….......................................3

42 U.S.C. § 300a-7……………………………………………………………………...…16

Tenn. Code Ann. § 39-15-213……………………………………………….....…6-7, 25

Tenn. Code Ann. § 63-6-203………………………………………………………...…18

Tenn. Code Ann. § 63-6-214………………………………………………………....…18

**Regulations**

42 C.F.R. § 50.406……………………………………………………………………………9

42 C.F.R. § 59.5………………………………………………………………………5, 17, 18

45 C.F.R. § 16.22………………………………………………………………….…..9

45 C.F.R. § 75.372…………………………………………………………………...24

65 Fed. Reg. 41,281 (July 3, 2000)……………………………………………...4

84 Fed. Reg. 7,714 (Mar. 4, 2019)……………………………………………………4

86 Fed. Reg. 56,144 (Oct. 7, 2021)…………………………………………..4, 11, 19-21, 23

**Other Sources**

*Black's Law Dictionary* (11th ed. 2019)…………………………………………...…18

Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*,
79 Tex. L. Rev. 1321 (2001)……………………………………………………13

Consolidated Appropriations Act, 2021, Public Law 116-260 (2020)…………………………4

Exec. Order 14076, 87 Fed. Reg. 42,053 (July 8, 2022)………………………...……….…...…7

# INTRODUCTION

Critical constitutional checks limit the federal executive's power to unilaterally force controversial policies onto the States without their consent. Among them, Congress—not agencies—must clearly set the conditions on the programs it funds, so States can in turn accept federal grants knowing what they require. Administrative-law rules likewise cabin agencies' power to push new initiatives without legislative license. These parallel guardrails protect States' rights and their citizens' liberty to pass their own policies—policies that, in light of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), may again include prohibitions on abortion that safeguard fetal life.

Defendants—HHS and others—flouted these rules by rescinding Tennessee's longstanding funding under Title X of the Public Health Service Act. Title X directs grants to States and others to provide family planning services. Relevant here, HHS has long argued—and courts have agreed—that Title X is ambiguous regarding whether HHS can require Title X grantees to engage in abortion counseling and referrals. In *Ohio v. Becerra*, that ambiguity helped HHS defeat a facial challenge to its now-operative 2021 Rule, which requires Title X grantees to counsel and refer for abortions to obtain funding. 2023 WL 8270957 (6th Cir. Nov. 30, 2023). But the Sixth Circuit flagged in *Ohio* that applying that pre-*Dobbs* rule in a post-*Dobbs* context would "undoubtedly" raise new and important issues.

This case presents the problems *Ohio* predicted, and then some. In March 2023, HHS terminated Tennessee's Title X funding—already approved to run through 2027—on account of the State's Title X abortion policies. The problem? The State's Title X program will only counsel and refer for *lawful* pregnancy terminations, not for abortions that are *illegal* to provide in the State. At first, HHS indicated that Tennessee's approach complied with the 2021 Rule and deemed Tennessee the "only" entity able to effectively provide statewide Title X programs. Yet, months later, tasked with pressing the Administration's abortion-promoting agenda, HHS did an about-face, cursorily cancelling some $30 million of Tennessee's Title X funding. Now, Tennessee must either fill that funding gap itself—

1

thus prejudicing other priorities—or watch its 50-year-old Title X program vanish alongside its neediest residents' access to vital health services.

Tennessee now sues and seeks preliminary relief, which is warranted. Tennessee has a clear likelihood of success on the merits because HHS's Rescindment patently violates the Constitution and the Administrative Procedure Act (APA). *First*, HHS cannot satisfy the Spending Clause. Under it, *Congress* must specify all funding conditions via statutory text that is *clear*. HHS fails this mandate twice over: Its condition appears only in rule the *agency* adopted, based on statutory text HHS itself claims is *ambiguous*. The Spending Clause thus means HHS cannot apply the 2021 Rule to rescind Tennessee's grant—let alone do so retroactively. Nor does HHS's application of the 2021 Rule to Tennessee pass muster under Title X, HHS regulations, or the APA. HHS's unprecedented view that it can condition States' funding on promoting illegal abortions is a bridge too far, whatever deference this Court owes, and raises important legal, public-health, and compliance problems HHS has unlawfully ignored.

The rescindment decision also inflicts immense irreparable harm. HHS already denied Tennessee $7 million in 2023 funding, and will deny the State many millions more in the years 2024-2027. Yet HHS's sovereign immunity—and its choice to disburse Tennessee's funds to others—leave Tennessee without any guarantee of eventual recovery should it ultimately prevail. Though this classic form of irreparable harm suffices for relief, it is compounded by further irreparable injury to Tennessee's reputation, grantee good standing, Title X employees and patients, and sovereign interests.

Conversely, preliminary relief would not harm HHS or the public interest. HHS deemed Tennessee the only entity equipped to broadly provide Title X services in the State—meaning the public would benefit from Tennessee's continued funding. The public interest likewise favors requiring HHS to abide by legal limits before conditioning $265 million in annual federal funding on a controversial abortion condition that contravenes myriad state laws and moral objections to terminating fetal life.

## I. Tennessee's 50-Year Title X Track Record.

In 1970, Congress passed and President Nixon signed Title X of the Public Health Service Act. Through this program, HHS may provide grants to and contract with States and other non-profits to operate "voluntary family planning projects" offering a "broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a).

Tennessee's Title X pedigree traces to the statute's passage. The State—through its Health Department—received its first grant in 1971 to run its Title X program, now known as the Tennessee Family Planning Program (TFPP). D.E. 1-5, Amosun Decl. ¶ 5. Through TFPP, around 50 state employees operate in over 100 Title X facilities in all 95 counties statewide. These providers engage in an array of family planning and health services ranging from abstinence training, to natural family planning and fertility methods, to pregnancy testing and infertility services. D.E. 1-4, Goodwin Decl. ¶ 7. All in, the program serves over 40,000 individuals each year; over 75 percent of this population qualifies as low income and depends on TFPP for vital services. Program Review at 4.

Tennessee receives around $7 million in annual Title X funding from HHS to support these efforts. Amosun Decl. ¶ 6. As HHS has acknowledged, Tennessee's consistently "strong" performance has made it a "leading" provider of Title X services. Program Review at 4; D.E. 1-2, Oct. 19, 2022 OPA Email, at 1. In the State's most recent program review, HHS deemed Tennessee's Health Department "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state of Tennessee." Program Review at 4.

## II. HHS's Shifting Rules on Title X and Abortion.

Section 1008 of Title X directs that no program funds "shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. HHS thus accepts, as it must, that Title X

3

grantees may not use federal funds to perform abortions. This clear no-abortion-funding rule tracks many other federal laws—including some covering Title X activities—prohibiting the funding or forced performance or promotion of abortions. *See* Compl. ¶ 37 (collecting examples); Consolidated Appropriations Act, 2021, Public Law 116-260, Div. H, section 507(d) (2020) (Weldon Amendment).

In *Rust v. Sullivan*, 500 U.S. 173 (1991), however, the Supreme Court concluded that Title X does not clearly answer a distinct but related question—namely, whether HHS has the power to condition grantees' funding on their fulfilling other abortion-related requirements. Without "dwell[ing]" on Title X's text, *id.* at 184, *Rust* applied *Chevron* deference to uphold HHS's 1988 rule, which *prohibited* Title X grantees from engaging in either abortion counseling or referral.

In the decades since, HHS's stance on its power over Title X grantees' abortion counseling-and-referral practices has "flipped back and forth as new administration have come into power." *Ohio* 2023 WL 8270957, at *1. Wielding *Chevron* to interpret Title X's silence on such abortion activities, HHS has alternatively claimed that Title X forbids, permits, and requires grantees to offer abortion counseling and referrals to receive continued funding for their family planning programs. Title X thus rests as an empty vessel, to be filled with whatever abortion-conditions content the current HHS sees fit to adopt.

Between 2019 and 2021 HHS executed another Title X about-face. In 2019, HHS repealed and replaced a mandatory abortion-counseling-and-referral rule it had imposed since 2000. *See Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019). Under the 2019 Rule, Title X grantees could engage in abortion counseling, but not make abortion referrals. Then, after President Biden took office, HHS promulgated a 2021 Rule that reinstated its earlier approach of mandating both abortion counseling and referrals by Title X grantees. *See Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144 (Oct. 7, 2021) (incorporating 65 Fed. Reg. 41,281 (July 3, 2000)).

4

To justify its action, HHS principally cited the 2019 Rule's "devastating" impact of driving many qualified Title X grantees from the program, which HHS said "undermined the mission" of Title X by helping fewer individuals in planning and spacing births, providing fewer preventive health services, and delivering fewer screenings for sexually transmitted infections." *Id.* at 56,147. HHS likewise leaned on the "greatly increased compliance costs for grantees" under the 2019 Rule, which HHS deemed a "diversion of funds from the core purpose of Title X." *Id.* at 56,145. Under the 2021 Rule's implementing regulations, Title X programs must "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding … [p]regnancy termination" as well as "referral upon request," 42 C.F.R. § 59.5(a)(5)(i)(C), (ii). A separate provision specifies that covered services generally must be "allowable under state law," *id.* § 59.5(b)(6), while another requires programs to provide for referrals with primary health care and other providers, "who are in close physical proximity to the Title X site, when feasible," *id.* § 59.5(b)(8).

Of course, when HHS promulgated and "implemented the 2021 Rule," the Supreme Court "had not yet" overruled *Roe*. *Ohio*, 2023 WL 8270957, at *8 n.7. So States did not have laws generally prohibiting elective abortions. HHS thus had no occasion to address how its 2021 Rule—which requires grantees to counsel and refer for abortion—would apply to States that have opted to criminalize most abortion procedures. "[U]ndoubtedly," the "impact of *Dobbs*" and States' widespread prohibition of abortions would be an "'important aspect' of the question" of how HHS may lawfully implement Title X. *Id.* Enter this case, and Tennessee's Title X troubles.

## III. The Challenged Rescindment of Tennessee's Title X Grant.

### A. HHS's Approval of Tennessee's "Wonderful" Title X Program.

The central events underlying this suit began in March 2022. At that point, the Office of Population Affairs (OPA), which administers Title X, approved Tennessee for a 5-year Title X grant to run through early 2027. D.E. 1-7, Notice of Award (showing award through March 2027). This

5

was no surprise: Tennessee's 50-year-old Title X program has grown into a national leader.

A few months later, the Supreme Court issued its decision in *Dobbs*, holding that the U.S. Constitution does not require States to permit abortions. *Dobbs* in turn triggered Tennessee's criminal abortion prohibition, which generally makes it illegal to provide abortions in the State. *See* Tenn. Code Ann. § 39-15-213. This statute aligns with a 2014 amendment to Tennessee's Constitution, which voters approved to clarify that abortion enjoys no state constitutional protection. *See* Tenn. Const. art. I, § 36. To adhere to the State's changed abortion landscape, Tennessee clarified its policy regarding when Title X providers could engage in abortion counseling and referrals. Under that post-*Dobbs* policy, the State's Title X programs would only provide counseling and referrals for pregnancy terminations permissible under state law, not for those abortions now illegal to provide within the State. *See* Amosun Decl. ¶ 17 & Ex. A at 1; App. A, Supp. Amosun Decl. ¶ 10.

Around the same time, in July 2022, OPA issued a guidance document stating that all Title X grantees must continue making abortion referrals, and could do so across state lines. D.E. 1-6, *Dobbs* FAQ, at 4-5. Separately, OPA initiated a soup-to-nuts review of Tennessee's Title X program. Amosun Decl. ¶ 16. As part of this review, Tennessee informed OPA officials of its post-*Dobbs* Title X policy. *Id.* ¶ 17. The review proceeded, and Tennessee passed with flying colors. In its Program Report, issued in October 2022, OPA praised the Tennessee Health Department as "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state." Program Review at 4. Citing Tennessee's post-*Dobbs* policy on abortion counseling and referrals, OPA specified that its counseling-and-referral expectations were "met," even though Tennessee's policy meant "[n]o referrals for abortion are made." *Id.* at 24. Officials congratulated Tennessee "on such a wonderful review and leading a strong Title X program." Oct. 19, 2022 OPA Email at 1. Tennessee continued investing in its Title X activities. Supp. Amosun Decl. ¶ 9.

**B. HHS's Sudden Rejection of Tennessee's Same Program Months Later.**

Meanwhile, *Dobbs* had prompted President Biden's Administration to issue an avalanche of aid-abortion-at-all-cost directives. Among them was an Executive Order requiring HHS to come forward with all "potential actions" it could take in response to *Roe*'s overruling. *See* Exec. Order 14076, 87 Fed. Reg. 42,053 (July 8, 2022). The order listed Title X as a chief contender to explore. *Id.*

HHS followed orders. Just months after approving Tennessee's Title X program and abortion policy, OPA initiated an audit of Tennessee's grant to ensure it complied with HHS's abortion dictates. D.E. 1-8, Jan. 25 OPA Ltr. at 1. Apparently, Tennessee's abortion laws made it a top target of OPA's newfound auditing effort. Amosun Decl. ¶ 21. As before, the State's Health Department leaders notified OPA that Tennessee's Title X program would provide counseling and referral for options, including pregnancy terminations, so long as they are legal in Tennessee. D.E. 1-3, Feb. 13 Tenn. Ltr. at 1. But this time, HHS disapproved of the policy's "legal in the State of Tennessee" qualifier. D.E. 1-9, Mar. 1 OPA Ltr. at 1. In OPA's view, the 2021 Rule meant Tennessee must counsel and refer for *abortions prohibited by state law* to receive continued funding. *Id.* No other problem was cited.

Tennessee protested that its policy, by providing counseling and referrals for all lawful forms of "pregnancy termination," satisfied the governing regulations and reflected the "allowable" practice under Tennessee law. D.E. 1-10, Mar. 13 Tenn. Ltr. (quoting Tenn. Code Ann. § 39-15-213(a)(1)). OPA responded that Tennessee should make abortion referrals "out of state" to comply. D.E. 1-11, Mar. 20 OPA Ltr. at 1, 3 n.2. Then OPA rescinded Tennessee's 2022-2027 grant on the basis that Tennessee's policy violated HHS's 2021 Rule, and thus "the terms and conditions of the award." *Id.*

Seeking HHS officials' help to salvage its 50-year-old Title X program, Tennessee requested agency review of the Rescindment. Months later, as the appeal pended untouched, news reports revealed that HHS had given Tennessee's 2023 funds—some $7 million in all—to Planned Parenthood and affiliates. Compl. ¶ 79. Tennessee then sued, and now seeks preliminary relief.

7

**LEGAL STANDARD**

Tennessee seeks a preliminary injunction under Fed. R. Civ. P. 65(c) and a stay of HHS's Rescindment Decision under 5 U.S.C. § 705. Both aim to "preserve status or rights" pending judicial review, *id.*, and require balancing whether (1) a plaintiff is "likely to succeed on the merits"; (2) the plaintiff is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) the "balance of the equities tips in [the plaintiff's] favor"; and (4) an "injunction is in the public interest." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)); *see Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) (assessing § 705).

**ARGUMENT**

Tennessee satisfies the showing for preliminary relief. Tennessee has a strong likelihood of success on the merits because HHS flagrantly violated legal limits when it rescinded Tennessee's grant. Preliminarily enjoining HHS's Rescindment pending further review would stave off further impending, irreparable harm to Tennessee without prejudicing Defendants' or the public's interests.

**I.    Tennessee Is Likely to Succeed on the Merits of Its Challenge.**

The APA directs courts to set aside "final agency action" that is unlawful. 5 U.S.C. §§ 704, 706(2). Among other limits, agencies cannot act "contrary to constitutional right," "in excess of" statutory "authority," in a manner that is "arbitrary [or] capricious," or in violation of required procedures. *Id.* Here, Tennessee seeks to invalidate HHS's March 2023 decision to rescind Tennessee's 5-year Title X grant. Tennessee is likely to succeed on the merits of its challenge, which implicates first-impression questions about HHS's power to apply its 2021 Rule under the Constitution and the APA.

**A.    HHS's March 2023 Rescindment Decision Is Reviewable.**

At the outset, the challenged Rescindment is final, reviewable agency action: Under it, HHS has denied Tennessee's payment for 2023 and cancelled HHS's obligation to provide funding for 2024 through 2027. HHS's Rescindment thus "mark[ed] the consummation of [HHS's] decisionmaking

8

process" with respect to Tennessee's Title X grant. *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (cleaned up). Nor must Tennessee further toil in its long-pending agency appeal prior to seeking judicial relief. The proceedings there were "optional,"[1] and plainly futile given HHS's choice to redirect the relevant funds to Planned Parenthood. Both factors obviate any need for administrative exhaustion. *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 426-27 (6th Cir. 2016).

### B. HHS's March 2023 Rescindment Decision Is Unlawful.

HHS's Rescindment is unlawful for at least three reasons. *First*, HHS's Rescindment violates the Constitution by imposing a new condition on funding absent from Title X itself—an argument neither *Ohio v. Becerra* nor any other court has had occasion to address in the context of a Title X grantee with funds stripped by HHS. HHS's choice to cancel Tennessee's Title X funds squarely raises this constitutional defect, which renders HHS's Rescindment invalid. *Second*, even if, as *Ohio* holds, HHS's 2021 Rule is facially permissible, HHS's novel *application* of that rule to a State where abortion is illegal is plainly not. HHS's unprecedented claim that it may condition Tennessee's funding on the State's promotion of illegal abortion procedures falls far outside any zone of permissible reading of governing statutes or regulations—an issue *Ohio* did not confront. Further, HHS's application of its 2021 Rule in this post-*Dobbs* context raises a panoply of new and important problems HHS was required to address, but unlawfully failed to consider—a glaring APA issue *Ohio* flags. *Third*, at a minimum, HHS's application of the 2021 Rule to Tennessee and other States that prohibit abortion works a seismic shift that should have advanced through notice and comment.

---

[1] The relevant HHS and Departmental Appeals Board provisions do not condition judicial review on completing agency appeals. 42 C.F.R. § 50.406(a) (providing informal appeal to HHS for those "who desire[] a review"); *Missouri v. Bowen*, 813 F.2d 864, 871 (8th Cir. 1987) (Board's agency-appeal framework does "not require a party to exhaust its administrative remedies") (emphasis omitted). The agency-appeal process also does not render HHS's Rescindment "inoperative" during review, 5 U.S.C. § 704; *see* 42 C.F.R. § 50.406(c); 45 C.F.R. § 16.22(a), (b)(1), further foreclosing any need to exhaust.

9

### 1. The Rescindment Violates the Constitution.

For decades, HHS has trumpeted Title X's ambiguity with respect to abortion counseling and referrals. This ambiguity, HHS claims, means it may require such referrals as a statutory matter. HHS's statutory argument has prevailed in *Ohio* and elsewhere. But now HHS must take the bitter with the sweet, because the Spending Clause and separation-of-powers principles plainly forbid HHS's conjuring a new spending condition from a statute it agrees is unclear. This constitutional problem was not presented in *Ohio*, which arose pre-*Dobbs* and lacked any party with a funding deprivation like Tennessee's. Nor was it at issue in *Rust* itself. So this Court is free to—and should—hold HHS to the constitutional limits its Rescindment decision implicates.

a. Most relevant here is the Spending Clause, which authorizes Congress alone to "lay and collect Taxes, … to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. With this congressional spending power comes an ability to "exert influence on the states by attaching strings to federal funding." *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023). In this way, grants under the Spending Clause function "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Kentucky v. Yellen*, 54 F.4th 325, 347-48 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

But as the Sixth Circuit recently explained in *Yellen*, the Spending Clause's contract-like status has a clear corollary: "The legitimacy of Congress'[s] power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* at 348 (quoting *Pennhurst*, 451 U.S. at 17). And because States cannot "knowingly accept conditions of which they are 'unaware'" or which they are "unable to ascertain," *id.* (citation omitted), Congress "must provide 'clear notice of the obligations a spending law entails,'" *id.* (quoting *Pennhurst*, 451 U.S. at 25). Under this "clear-statement rule," *id.* at 354, conditions on federal grants must come from

Congress, through provisions that set out the conditions "'unambiguously' and with a 'clear voice,'" *id.* at 348 (citation omitted).

If this clear-statement requirement means anything, it is that HHS cannot impose its newly derived Title X condition on Tennessee here. HHS's Rescindment purports to apply a new condition absent from Congress's funding regime, then impose that condition to strip Tenneseee of a grant it had already accepted. HHS claims statutory power to do this because Title X itself is silent, and thus "ambiguous," about abortion counseling and referrals. 86 Fed. Reg. at 56,149 (citation omitted). But an *unclear* statute by definition fails to provide the requisite *clear* congressional authorization for HHS's abortion-counseling-and-referral funding condition. Or, as the en banc Fourth Circuit put it, "[i]t is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted." *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc).[2] HHS's reading of Title X has thus backed the agency into a constitutional corner that resolves this case.

    b.    *Chevron* provides no out for HHS's Spending Clause conundrum. The Constitution, after all, "gives Congress, not the executive branch, the power to … spend through the exercise of its legislative power." *West Virginia ex rel. Morrisey*, 59 F.4th at 1147. "It follows therefore that Congress, not an executive agency, must exercise that power constitutionally." *Id.* As this Circuit and at least two others have recently held, it is therefore up to Congress, not to an agency exercising after-the-fact rulemaking authority, to place any operative conditions on States' entitlement to Spending Clause grants "directly [in] the statute." *Id.* (quoting *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) (holding that required Spending Clause clarity cannot arise in "regulations clarifying an ambiguous statute," but "must come directly from the statute")). In *Yellen*'s words,

---

[2] Judge Luttig's dissenting panel opinion was adopted in relevant part by a majority of the full Fourth Circuit upon en banc rehearing. *See Va. Dep't of Educ.*, 106 F.3d at 561.

when the Spending Clause clear-statement rule "is in play, it is insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute." 54 F.4th at 354. "Congress *itself* must have spoken with a 'clear voice.'" *Id.* (citation omitted).

This general rule against agencies' bootstrapping new funding conditions applies with even greater force where, as here, the agency's position also interferes with "state sovereign interests." *Kentucky v. Yellen*, 67 F.4th 322, 327 (6th Cir. 2023) (Bush, J., statement regarding denial of reh'g en banc). Such interests include the State's police-power prerogatives to "regulat[e] health and welfare" through limits on "the medical profession," *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023), and "protect[] fetal life," *Dobbs*, 142 S. Ct. at 2261. HHS's reading of Title X—under which it may compel a State to undermine its duly enacted abortion laws as a condition for receiving substantial funding—"supersede[s]" the "historic police powers of the States." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Given these great "implications for the balance of power between the Federal Government and the States," Congress's need to impose conditions in "clear and unmistakable terms" is at its apex, *Yellen*, 54 F.4th at 354 (citation omitted). To defer here would thus countenance unduly coercive funding, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577-78 (2012) (plurality op.), and violate the Tenth Amendment's preservation of state sovereignty.

Nor, accordingly, can Congress use a general rulemaking delegation to funnel its constitutionally vested spending-conditions power to agencies. Such a result would "be inconsistent with the Constitution's meticulous separation of powers." *West Virginia ex rel. Morrisey*, 59 F.4th at 1147 (citation omitted). It is therefore of no moment that Title X permits HHS to "subject [grants] to such conditions as … determine[d] to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." 42 U.S.C. § 300a-4(b). "Just as an agency cannot choose its own intelligible principle, it cannot provide the content that makes a funding condition ascertainable." *West Virginia ex rel. Morrisey*, 59 F.4th at 1147; *accord Tex. Educ. Agency*, 992 F.3d at 362. And besides,

as later discussed, HHS's driving States out of Title X for failure to counsel and refer for abortions state law makes illegal harms rather than helps core Title X "purposes." *Infra* p. 20.

Permitting a rulemaking and *Chevron* to govern here would hamstring the stability Spending Clause precedents seek to create. Congress's grant schemes often span decades—just as Title X does. States in turn devote substantial time and resources to building up programs in reliance on the federal funding they receive. Tennessee's Title X program, for its part, has a 50-year track record resting on a complex statewide infrastructure developed with immense effort. By requiring that Congress itself change key limitations on Tennessee and other States' funding, the Spending Clause clear-statement rule promotes stability in the carrying out of critical state-level programs. Giving HHS after-the-fact power to alter funding conditions would hamper the provision of "effective family planning methods and services" by toggling state participation on and off at will. 42 U.S.C. § 300(a). The problem is even worse in the context of Title X funding, which HHS issues in 5-year stints—meaning an HHS flip-flop (like the one between 2019 and 2021) risks punishing grantees partway through their grant performance, as HHS now seeks to do to Tennessee. *Infra* p. 21.

Enforcing the Spending Clause further vindicates vital separation-of-powers interests. In today's age, "those in the Executive Branch" increasingly seek "to use pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia v. EPA*, 142 S. Ct. 2587, 2626 (2022) (Gorsuch, J., concurring). The result reduces States' power to air and protect their interests through the Constitution's bicameral process of lawmaking—participation at the heart of the Founding-era "bargain" under which States acceded to the federal government's Supremacy Clause power. *See* Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1339 (2001). The Court's modern federalism cases likewise rest on the notion that the "political process" provides States "protection … against intrusive exercises" of federal power. *Va. Dep't of Educ.*, 106 F.3d at 567 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991)). Permitting HHS and

other agencies to cut States out of the process of determining critical conditions on federal funds explodes this scheme. Thus, whether framed as violating the Spending Clause itself or the Separation of Powers, *cf. City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018) (Executive Order violated the Separation of Powers by "direct[ing] … agencies to withhold funding that Congress had not tied to" imposed condition), HHS's action against Tennessee does not hold up.

c. At a minimum, HHS cannot constitutionally use a new abortion-mandate condition unveiled in March 2023 to retroactively rescind a 5-year grant Tennessee previously accepted in March 2022. *See* Mar. 2022 Award at 1. Again, Spending Clause conditions must be set out clearly *before* a State accepts funds, meaning the federal government cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25; *cf. Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985). Thus, even were it somehow constitutional to saddle States with surprise Title X conditions, HHS may not "unilaterally issu[e] guidelines" that "modify past agreements" as it did here. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997).

## 2. The Rescindment Violates the APA.

An agency "literally has no power to act … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 142 S. Ct. 1638, 1649 (2022). When it comes to HHS's power to mandate abortion counseling and referrals, Title X's scope is not a "blank slate." *Ohio*, 2023 WL 8270957, at *4. In *Rust*, the Supreme Court concluded that "§ 1008 is ambiguous under step one of *Chevron*" and upheld the reasonableness of HHS's 1988 prohibition on abortion-related activities by Title X grantees. *Ohio*, 2023 WL 8270957, at *5.

Whatever *Chevron* or *Rust*'s continued "vitality," neither is HHS's silver bullet. *Id.* at *4.[3]

---

[3] As the Sixth Circuit explained, there are good reasons to doubt both decisions' place in today's "doctrinal landscape." *Ohio*, 2023 WL 8270957, at *4. And indeed, the U.S. Supreme Court will soon hear argument in two cases presenting the question "[w]hether the Court should overrule *Chevron*" or at least "clarify that statutory silence concerning controversial powers expressly but narrowly granted

Tennessee brings no facial challenge to the 2021 Rule's counseling-and-referral condition. Instead, Tennessee challenges HHS's *application* of the 2021 Rule to rescind Tennessee's already approved Title X funding. Under the APA, HHS's Rescindment decision—applying a fresh 2021 Rule interpretation, in a post-*Dobbs* world, to a State that generally outlaws abortion—must independently satisfy governing statutes, regulations, and administrative-law limits. For three reasons, HHS's Rescindment cannot clear these hurdles. Neither *Chevron*, *Rust*, nor *Ohio* counsels otherwise in this unprecedented context.

### a. The Rescindment Exceeds HHS's Authority.

Agencies must abide by their governing statutes and regulations. *See* 5 U.S.C. § 706(2)(C); *Wilson v. Commr. of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004). Sometimes, these sources are ambiguous with respect to an agency's claimed power—a scenario that (at least for now) triggers assessment of whether an agency-proposed regulation warrants judicial deference under *Chevron* (for statutes) or *Auer* (for regulations). But neither framework equates to carte blanche condition-setting power. In both instances, agencies' interpretations "must 'fall within the bounds of reasonable interpretation,'" judged by the relevant provisions' "text, structure, [and] history," among other indicia. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-16 (2019) (citation omitted).

These principles preclude upholding HHS's Rescindment under *Chevron*, *Auer*, or otherwise. Applying a mandatory abortion-counseling-and-referral condition to Tennessee contravenes Title X to a degree never before seen and beyond the realm of reasonable deference. And far from sanctioning this application and HHS's Rescindment, the 2021 Rule conflicts with HHS's decision in key ways.

*Title X.* Although the Sixth Circuit upheld the 2021 Rule on its face, HHS's separate application of that rule to Tennessee is an entirely different matter. Even accepting that HHS's Rescindment is *Chevron* eligible, HHS's application of Title X to Tennessee here is "utterly unreasonable and

---

elsewhere" does not require judicial deference to an agency. *See Loper Bright Enters. v. Raimondo* (No. 22-451); *Relentless, Inc. v. U.S. Dep't of Commerce* (No. 22-1219). Tennessee thus preserves the argument that *Chevron*, and in turn *Rust*, should be overruled or at a minimum narrowed.

thus impermissible" at *Chevron*'s second step. *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006). That step requires HHS's counseling-and-referral position to clear a minefield of considerations, including the major-questions doctrine, federalism canon, Spending Clause clear-statement rule, and avoidance principles. *See Arangure v. Whitaker*, 911 F.3d 333, 339-40 (6th Cir. 2018); *see Yellen*, 54 F.4th at 353. HHS's haphazard Rescindment decision fails each:

- Major-Questions Doctrine: HHS lacks the required "clear congressional authorization" to impose conditions that override State abortion policies—an area of great "economic and political significance." *West Virginia*, 142 S. Ct. at 2608-09.

- Federalism: Title X does not provide the required "clear statement" permitting HHS to intrude on Tennessee's abortion policies, the passage of which are a "core aspect of state sovereignty." *Bond v. United States*, 572 U.S. 844, 858 (2014); *Yellen*, 54 F.4th at 354.

- Spending Clause Clear-Statement Rule: As discussed, *see supra* pp. 10-13, HHS's Rescindment also collides with the spending clause clear-statement rule.

- Avoidance: HHS's position uniquely presents constitutional problems, which further undercuts its reasonableness. *Supra* pp. 10-14.

Title X's "text, structure, [and] history" likewise contravene HHS's Rescindment position. *Kisor*, 139 S. Ct. at 2415-16. Title X allows HHS to fund grantees that offer "a broad range of *acceptable* … family planning methods." 42 U.S.C. § 300(a) (emphasis added). HHS cannot explain how counseling or referring for abortions could be "acceptable" in States where abortion is illegal. Likewise, if Title X blocks HHS from forcing individual state employees to participate in abortions, 42 U.S.C. § 300a-7(b)(2)(B), surely HHS lacks free rein to coopt the abortion policies of entire state programs.

Title X's history provides "important … context" that further undercuts HHS's action. *United States v. Hansen*, 143 S. Ct. 1932, 1943 (2023). Congress passed Title X in 1970—when all but four States *prohibited* elective abortions. *See Roe*, 410 U.S. at 140 n.37. By HHS's lights, then, Congress authorized substantial "formula grants to States" while silently empowering HHS to deny funding to nearly every State based on their abortion laws. 42 U.S.C. § 300a. This head-scratching result "underscores the implausibility of the Government's interpretation." *Van Buren v. United States*, 141 S.

16

Ct. 1648, 1661 (2021). On top of all that, HHS's Rescindment—and its underlying policy of applying the 2021 Rule to States who outlaw abortion—uniquely opens a Pandora's Box of public-health and compliance challenges HHS has not answered for. *Infra* pp. 19-20.

Compounding HHS's problems, *Chevron* applies only to positions agencies "promulgate[] in the exercise of th[eir] authority" to "make rules carrying the force of law." *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013) (citation omitted). This restriction excludes HHS's Rescindment, which came via an informal, one-off funding letter rather than via "regulation or formal adjudication." *Nat'l Wildlife Fed'n v. Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 880 (6th Cir. 2020). Independently, HHS's position "receives no *Chevron* deference" because HHS unlawfully failed to address its about-face on Tennessee's grant, which was "itself unlawful." *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016); *infra* p. 21. Absent *Chevron*, HHS loses because its application of Title X to Tennessee's case, for reasons just discussed, cannot possibly reflect the best reading of the statute.

*HHS Regulations.* HHS's Rescindment also impermissibly interprets its own 2021 Rule and implementing regulations. Even if ambiguous in some respects, HHS's application of these sources "must still be 'reasonable.'" *Kisor*, 139 S. Ct. at 2415-16. As discussed, HHS's applying the 2021 Rule to Tennessee falls outside the zone of permissibility. HHS's interpretation moreover clashes with at least three other provisions of its Title X regulations. *First*, HHS's mandate contradicts the provision of the regulations requiring all grantees to ensure that they will provide "family planning medical services" that are "allowable under state law." 42 C.F.R. § 59.5(b)(6). Tennessee's position, by ensuring Title X providers remain within the "scope of allowable practice under Tennessee law," Feb. 13 Tenn Ltr. at 1, reasonably gives credence to this state-law caveat.

*Second*, HHS's interpretation collapses the regulation's distinction between "abortions" and "pregnancy termination." The operative text specifies that Title X grantees cannot provide "abortions," yet requires counseling and referrals for "pregnancy termination." *Compare id.* § 59.5(a)(5), *with*

*id.* § 59.5(a)(5)(i)(C). Such "differences in language" typically "convey differences in meaning." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) (citation omitted). Tennessee's Title X policy was of a piece: The States vowed to counsel and refer women for "pregnancy terminations" that were lawful in Tennessee, 42 C.F.R. § 59.5(a)(5)(i)(C), just not for criminal *abortions*.

*Third*, HHS's position conflicts with Title X's separate referral regulation, *id.* § 59.5(b)(8), which requires grantees to "[p]rovide for coordination and use of referrals and linkages [with other healthcare providers and health-services projects], who are in close physical proximity to the Title X site, when feasible, in order to promote access to services…" That text sets two limits on referrals: (i) the referred-to provider must be "in close physical proximity to the Title X site," and (ii) the referral only needs to occur "when feasible." *Id.* But contrary to the first, HHS's out-of-state-referral view would implausibly force Tennessee to refer patients potentially hundreds of miles away, if not cross-country to, say, Massachusetts or California, if those States alone allowed the desired abortion method. Nor is it feasible—*i.e.*, "reasonable" or "practica[ll]" to expect—for Tennessee's Title X providers to refer women for procedures that are crimes to provide in the State. "Feasibility," *Black's Law Dictionary* 17c (11th ed. 2019). HHS's contrary position would equally support conditioning Tennessee's Title X funds on the State's referring women for unlawful abortion surgeries by unlicensed physicians. *See* Tenn. Code Ann. §§ 63-6-203(a)(1); 63-6-214(b)(12)-(14). Abortion itself is no less a crime in the eyes of Tennessee law. HHS's regime also would require Tennessee to track other States' abortion laws— a complex undertaking HHS has not acknowledged, *infra* p. 19, much less justified as feasible.

### b. The Rescindment Is Arbitrary and Capricious.

For an agency action to survive, it cannot "run[] counter to the evidence before the agency," must show a "rational connection between the facts found and the choice made," and further consider all "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). HHS's Rescindment shirked these requirements—including in ways *Ohio* teed up.

18

_Failure to Address Important Regulatory Problems._  HHS's Rescindment did not grapple with the myriad problems with requiring States to counsel and refer for abortions that their laws ban.  "When HHS implemented the 2021 Rule" initially, this scenario was merely hypothetical because the Supreme Court "had not yet" overturned _Roe_.  _Ohio_, 2023 WL 8270957, at *8 n.7.  So neither _Ohio_'s assessment of the 2021 Rule, nor any other decision, has had occasion to assess "the impact of _Dobbs_ on the Title X program."  _Id._  This case raises that question.

HHS's post-_Dobbs_ application of the 2021 Rule to State grantees who generally prohibit abortions is "undoubtedly an 'important aspect'" of the regulatory problem.  _Id._ (quoting _DHS v. Regents of the Univ. of Cal._, 140 S. Ct. 1891, 1913 (2020)).  Yet all HHS's Rescindment decision said on the topic was that the 2021 Rule might now require Tennessee to refer clients to abortion providers "out of state," where the procedure is not outlawed.  Mar. 20 Ltr. at 1.  But this elides patent problems attending such a regime.  HHS has for instance justified the 2021 Rule as "critical for the delivery" of abortions.  _Ohio_, 2023 WL 8270957, at *7 (quoting 86 Fed. Reg. at 56,154).  This justification falls apart in Tennessee, whose duly enacted laws make "deliver[ing]" such abortions illegal in most instances.  _Id._  More broadly, HHS's Rescindment intrudes on Tennessee's "core" sovereignty interests in distinct ways now that the State has exercised its constitutional prerogative to generally prohibit abortions.  _Supra_ p. 12 (quoting _Yellen_, 54 F.4th at 354).  Yet HHS's 2021 Rule purported not to "have any federalism implications."  86 Fed. Reg. at 56,168.

As for public health, HHS's position ignores that many out-of-state referrals for abortions are medically inappropriate.  Promoting them could lead to post-procedure complications and inhibit necessary follow up given the distance between provider and patient.[4]  And even out-of-state procedures can lead to in-state costs given the acknowledged need for post-medication-abortion emergency

---

[4] _Cf., e.g._, Br. of Cal. Women's Law Ctr. as _Amicus Curiae_ 30, _Dobbs_, 142 S. Ct. 2228 (noting that "many women cannot afford to return to" out-of-state providers "for follow-up appointments," and may "instead have to self-treat any after-effects or seek care at an emergency facility").

19

care—care States may be obliged to subsidize. *See, e.g.*, *Alliance for Hippocratic Med. v. FDA*, 78 F.4th 210, 230-32 (5th Cir. 2023) (reciting declaration evidence on this trend). HHS's approach will likewise require Tennessee and States like it to shoulder the "greatly increased compliance costs" of monitoring other States' shifting abortion laws to determine the options for legal referrals. 86 Fed. Reg. at 56,145 (citing such costs as basis for rescinding 2019 Rule). HHS has addressed none of these problems, which are just a sampling of defects the 2021 Rule suffers as applied in this new context.

HHS further ignores the drastic downgrade in Tennesseans' care its Rescindment will create. Shortly before its Rescindment, HHS had deemed Tennessee's Health Department "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state." Program Review at 4. It was thus incumbent on HHS to explain why requiring abortion referrals to remote out-of-state providers is worth stripping Title X services from untold thousands in state. Yet HHS ignored this clear "disadvantage[] of [its] decision[]," contrary to what "reasonable regulation ordinarily requires." *Michigan v. EPA*, 576 U.S. 743, 753 (2015).

This failure is worse still given HHS's 2021 take on Title X, which criticized the 2019 Rule's no-referral policy for driving grantees out of the program and hindering patient access to care. *See, e.g.*, 86 Fed. Reg. at 56,146-47; *accord Ohio*, 2023 WL 8270957, at *7 (reiterating HHS's reasoning). It is goose-gander arbitrariness for HHS to now ignore how its Rescindment decision risks creating these same "negative public health consequences," *id.* at 56,148, by eliminating the "only" qualified Title X provider from the State—as well as thousands of Tennesseans' access to the vital Title X-funded care they have received for decades, Program Review at 4. Nor, if HHS's position stands, will the problem be limited to Tennessee: some 14 States now prohibit most abortions.[5] Far from "increas[ing] partic-ipation by states," 86 Fed. Reg. at 56,168, as HHS predicted its 2021 Rule would, HHS's application of the 2021 Rule in today's abortion landscape will drive States from Title X in droves.

---

[5] *Tracking Abortion Bans Across the Country*, N.Y. Times (Nov. 7, 2023), https://tinyurl.com/3rnrwckh.

20

*Unlawful Position Switch.* When an agency alters policies, it must at least "display awareness that it *is* changing position." *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* This flaw pervades HHS's sudden 180-degree pivot on Tennessee's grant.

HHS officials initially approved Tennessee's grant in March 2022, and reaffirmed Tennessee's program in October 2022 after a program review. At that time, OPA had full knowledge that Tennessee's post-*Dobbs* policy would be that Title X "[p]atients with [a] positive pregnancy test must be offered the opportunity to be provided information and counseling regarding *all options that are legal in the State of Tennessee.*" *Supra* p. 6; Amosun Decl. ¶ 17; *id.* Ex. A at 1; Feb. 3, 2023 Tenn. Ltr. The agency nonetheless approved Tennessee's continued funding and noted the State's "wonderful review." Oct. 19, 2022 OPA Email at 1. That review addressed Tennessee's abortion policy directly, concluding that while it "prohibit[ed] … referring for, or supporting abortion as a method of family planning," Tennessee was "in compliance" with governing HHS rules, even when "[n]o referrals for abortion are made." Program Review at 24 & 59. But just months later—and without betraying any "awareness" of its position switch, *Fox*, 556 U.S. at 515—HHS decided that this same policy placed Tennessee out of compliance with the grant's "terms and conditions." Mar. 20 OPA Ltr. at 195.

Deepening the problem, HHS's subsequent Rescindment contradicted the 2021 Rule's assurance that "objecting … Title X grantees are not required to counsel or refer for abortions." 86 Fed. Reg. at 56,153. HHS had relied on this "pledge[]" as its principal response to "States' expressed concern" about requiring abortion-related activities over States' and providers' objections. *Ohio*, 2023 WL 8270957, at *8. Yet now confronted with Tennessee's objection, HHS insists on enforcing its new view of the 2021 Rule. The APA prohibits HHS's "[s]hifting the regulatory goalposts without explanation." *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1222 (D.C. Cir. 2023) (citation omitted).

*Disregard of Reliance Interests.* HHS also unlawfully failed to address the "legitimate reliance"

21

interests its Rescindment vitiated. *Regents*, 140 S. Ct. at 1913 (quotations omitted). Tennessee has for 50 years relied on its unbroken stream of Title X funding to build up a family planning program serving some 40,000 people annually. *Infra* p. 23. To earn its position as a "leading" Title X provider, Program Review at 4, Tennessee invested immense resources in its program—investments that continued after HHS's October 2022 favorable review. *Infra* p. 23. Patients, too, rely on Tennessee's program providers for critical family planning needs. *Id.* By pulling Tennessee's grant, HHS has thus risked decades' worth of investments, relationships, and goodwill. *See id.* HHS needed to give a "more detailed justification" to address these interests, yet ignored them. *Fox*, 556 U.S. at 515.

### c. The Rescindment Is Procedurally Invalid.

An agency may only impose or modify a legislative rule—*i.e.*, one that "create[s] legal effects" rather than explains "*pre-existing* legal obligations"—after following notice-and-comment procedures. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) (citation omitted). "Thus, unless and until it amends or repeals a valid legislative rule or regulation, an agency is bound by such a rule or regulation." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3090 v. Fed. Labor Rels. Bd.*, 777 F.2d 751, 759 (D.C. Cir. 1985). Were it otherwise, an agency "could effectively repeal legislative rules … indirectly, by adjudication, without providing affected parties any opportunity to comment on the proposed changes" or "significant explanation for their departure from their established views." *Id.*

HHS violated these APA principles, too. HHS exclusively cited the 2021 Rule as a basis for the Rescindment. But as discussed, HHS's Rescindment is "inconsistent with" the agency's "existing regulations," *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) (citation omitted), including because it requires infeasible referrals to distant, out-of-state abortion providers, *see supra* p. 19. The stark disconnect between HHS's prior notice-and-comment regulations and its action here means a new "APA rulemaking [was] required" before HHS could apply its abortion-mandate condition. *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100 (1995); *accord Tenn. Hosp. Ass'n*, 908 F.3d at 1032-

22

33. HHS's failure to follow this procedural path independently warrants setting aside the Rescindment. *See* 5 U.S.C. § 706(2)(D); *Tennessee v. Dep't of Ed.*, 615 F. Supp. 3d 807, 839-40 (E.D. Tenn. 2022) (applying this principle to vacate agency guidance), *appeal pending*, 6th Cir. No. 22-5807.

## II. Tennessee Faces Irreparable Harm Absent Preliminary Relief.

HHS's Rescindment decision will inflict irreparable harm absent relief here. *First*, Tennessee has and will continue to suffer severe financial harms. Most obviously, the State has been deprived of $7.1 million in funds for 2023, and, as it stands, will not receive nearly $30 million in future Title X funding it otherwise was owed under the 5-year grant. Amosun Decl. ¶¶ 23-24. HHS's Rescindment also denies sizeable discounts under the 340B drug-purchase program. *Id.* ¶ 25; Supp. Amosun Decl. ¶ 20; *see* 86 Fed. Reg. at 56,151 (discussing 340B). These harms will recur for several years should HHS's unlawful Rescindment stand. Supp. Amosun Decl. ¶¶ 12, 15-16; *cf. Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023) (potential loss in funding was irreparable harm). Because HHS enjoys sovereign immunity, Tennessee could not obtain damages after the fact. *Biden*, 57 F.4th at 556. And even were Tennessee to later prevail in setting aside the Rescindment, HHS's rush to reroute the State's funds to other entities leaves Tennessee with "no guarantee of eventual recovery" for past grant monies owed. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021). These severe financial harms alone suffice to support relief.[6]

*Second*, HHS's Rescindment threatens Tennessee's Title X program entirely. Supp. Amosun Decl. ¶ 17. Should the program fold, Tennessee would lose the benefit of the immense resources it has invested in setting up its "leading" services, while dozens of employees would lose their positions. *Id.* ¶ 18. The State also would suffer "loss of … goodwill" among those who have come to rely on Title X facilities to receive much needed care. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524,

---

[6] Tennessee understands that the 2024 Title X funds are likely to be disbursed on or around April 1, 2024. Supp. Amosun Decl. ¶ 13. To avoid incurring millions more in irreparable monetary harm on that date, Tennessee respectfully requests injunctive relief by **March 25, 2024**.

530 (6th Cir. 2017). It is no answer that Tennessee itself may sustain the Title X program. Continued state funding for the program is not guaranteed. *See* Supp. Amosun Decl. ¶¶ 15 & 17. And regardless, each dollar devoted to remediating HHS's unlawful action irreparably denies Tennessee funds for other programs to serve its citizens. *Id.* ¶ 16; *see* Tenn. Const., art. II, § 24 (requiring balanced budget).

*Third*, HHS's Rescindment inflicts severe reputational and sovereignty harms. HHS's position is that Tennessee violated the terms of its federal grant—a reputation-hampering pronouncement that is "precisely" the sort of injury that "constitute[s] irreparable harm." *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022). Worse, HHS has indicated that Tennessee's violation "must be reported" to the federal grantee clearinghouse. Mar. 1 OPA Ltr. at 2 (citing 45 C.F.R. § 75.372(b)). HHS has not disavowed taking that step—saying only that it does not intend to do so "[a]t this time." D.E. 1-17, May 30 OPA Email at 1. Reporting this wrongful termination would "affect [the State's] ability to obtain [any] future Federal funding," Mar. 1 OPA Ltr. at 2, including the Department's current 96 federal grants totaling $1.4 billion, D.E. 1-18, Oliver Decl. Attach. A. On top of all that, HHS's interference in Tennessee's "sovereign interest" in limiting abortion to promote fetal life constitutes a "form of irreparable injury." *Priorities USA v. Nessel*, 860 Fed. Appx. 419, 422-23 (6th Cir. 2021) (citation omitted).

## III. Preliminary Relief Will Not Harm HHS or the Public Interest.

For reasons given, Tennessee has a strong likelihood of success on the merits and faces immense and impending irreparable harm. Defendants thus "face[] a high hurdle" of showing that the remaining equitable factors "warrant withholding relief." *Biden*, 57 F.4th at 556. The equities here weigh against HHS because staying the rule would not harm the agency or the public interest. HHS itself recognized that Tennessee's Health Department was "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state." Program Review at 4. HHS's action will thus hamper the public's interest in sound health policy by

24

stripping untold thousands of needy Tennesseans of their access to vital family planning services. *Supra* pp. 19-20. HHS cannot credibly claim a countervailing public interest in Tennessee's promoting broader abortion access, given that Tennessee's citizens have voted to prohibit abortion almost entirely. *See* Tenn. Code Ann. § 39-15-213; Tenn. Const. art. I, § 36. HHS's approach would in all events generate complex public-health risks by promoting referrals to out-of-state abortionists who may not be positioned to provide adequate follow-up care. *See supra* p. 19.

Regardless, neither the Constitution nor Congress confers HHS with "the power to regulate" in the challenged manner, so it is not courts' role to "weigh [the] tradeoffs" of HHS's pursuit of "desirable ends." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022) (per curiam); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. By contrast, "the public's true interest lies in a correct application" of Title X and governing regulations. *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). That is truer still when an agency's unlawful action "threatens state sovereign interests," *Yellen*, 67 F.4th at 327 (Bush, J., statement regarding denial of reh'g en banc)—as HHS's Rescindment does here, *supra* p. 13.

## CONCLUSION

For the foregoing reasons, this Court should grant Tennessee's motion for a preliminary injunction and a stay under 5 U.S.C. § 705. Tennessee respectfully requests this Court's resolution of the instant motion by **March 25, 2024**, to preserve Tennessee's ability to benefit from a favorable decision or else seek appellate intervention prior to HHS's disbursement of Title X funds for 2024.

Respectfully submitted,

*/s/ Whitney Hermandorfer*

WHITNEY HERMANDORFER* (BPR# 41054)
Director of Strategic Litigation and
Assistant Solicitor General
TRENTON MERIWETHER (BPR# 38577)
MATTHEW P. DYKSTRA* (BPR# 38237)
Assistant Attorneys General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Whitney.Hermandorfer@ag.tn.gov
Trenton.Meriwether@ag.tn.gov
Matthew.Dykstra@ag.tn.gov
*Admitted Pro Hac Vice*

*Counsel for Plaintiff the State of Tennessee*

26

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 1st day of December 2023 on the following:

R. Charlie Merritt
Michael P. Clendenen
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel: (202) 616-8098
robert.c.merritt@usdoj.gov
Michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

/s/ *Whitney Hermandorfer*
WHITNEY HERMANDORFER* (BPR# 41054)
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Whitney.Hermandorfer@ag.tn.gov

*Counsel for Plaintiff the State of Tennessee*