IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| STATE OF TENNESSEE, | ) |
| | ) |
|    *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 3:23-cv-384 |
| | ) Judge Travis R. McDonough |
| | ) Magistrate Judge Jill E. McCook |
| | ) |
| XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and OFFICE OF POPULATION AFFAIRS, | ) ) ) ) ) ) ) ) ) |
| | ) |
|    *Defendants*. | ) |

## SUPPLEMENTAL DECLARATION OF TOBI AMOSUN

I, Tobi Amosun, MD state as follows:

1. My name is Tobi Amosun, and I am over the age of 18, of sound mind, and competent to make the statements contained within this declaration.

2. I obtained a Bachelor of Science from Vanderbilt University, a Medical Doctor (MD) degree from the University of Pittsburgh and completed a residency in categorical pediatrics at the Children's Hospital of Pittsburgh.

3. I am currently a Deputy Commissioner at the Tennessee Department of Health, and I have served in that role since May 1, 2023.

4. Prior to serving in that role, I served as the Assistant Commissioner at the Tennessee Department of Health since January 19, 2021. And before that, I served as a primary care physician and medical director for a large practice in Nashville.

5. This declaration serves to supplement my prior declaration, (Docket Entry 1-5),

1

regarding the background of Tennessee's Title X program and the events giving rise to this legal action by discussing some of the harms associated with OPA's cancellation of our Title X grant.

6. This case involves OPA's March 2023 cancellation of Tennessee's Title X grant. In recent years, our Title X funding has been approximately $7.1 million annually.

7. For fifty years, our Title X program has relied on Title X grants to both serve our communities and invest in training our nearly 50 employees in delivering those family planning services. Ultimately, the closer relationships we have with those communities, the more effective those intimate family planning services are. So, for decades, our team has dedicated time to community outreach and forming relationships to maximize our program's impact.

8. This has led to sustained growth in our Title X programming and goodwill among patients, with more than 40,000 patients having been served annually in recent years. The patients we serve know and trust our name and service in their communities across the State and have come to rely on our programs to receive important family planning and health services like pregnancy testing, natural family planning, and birth control. The Department and the TFPP would suffer great reputational harm should we now need to turn away these patients from the services on which they have come to rely.

9. After OPA's most recent October 2022 review and approval of our program and abortion-referral policy, we had continued delivering Title X family planning services, training our staff, and serving our communities.

10. But in January 2023, OPA sent Tennessee a letter asking to confirm that the State's Title X program was complying with the referral and counseling mandate in HHS's 2021 Rule. (Docket Entry 1-8.) Tennessee sent OPA the current referral and counseling policy, which directed staff to refer for and counsel on "all options that are legal in the State of Tennessee." (Docket Entry 1-3). This was the same policy Tennessee had shared with OPA in the fall of 2022.

11. After an exchange of letters, (Docket Entries 1-9 and 1-10), OPA said, in a letter dated March 20, 2023 (Docket Entry 1-11), that it would end our Title X funding on March 31 due to our refusal to counsel and refer for abortions in all circumstances, even ones in which providing an abortion would be illegal in Tennessee. OPA followed through, ending our Title X funding on that March 31 scheduled date. (Docket Entry 1-12.)

12. Title X currently is operating on a 5-year competitive grant funding cycle. The next competitive grant cycle will open towards the end of 2026 for grants to begin April 1, 2027. Preparation for and completion of the competitive application takes 2-3 months. When OPA ended our grant, we had just finished the first year of the current 5-year grant cycle that began April 1, 2022. If we do not get our grant back, we will have to wait until the 2027 grant cycle before we can even reapply. Even if we do apply at that time, should OPA continue to apply its referral and counseling requirement, it is all but certain that OPA would deny us funding once again.

13. In my experience, it has been OPA's practice to disperse the entirety of Tennessee's annual Title X funding on April 1 of each calendar year.

14. As mentioned, in 2023, OPA cancelled Tennessee's 5-year Title X grant just a few days before the April 1 date for disbursing funding. This meant that Tennessee could only continue operating its 50-year-old Title X program by appropriating state monies to fill the $7 million gap that OPA's grant cancellation created.

15. Because we simply could not allow a gap in serving those in the community we have become so close with, we opted to ask the General Assembly to appropriate additional dollars to supplement our lost Title X grant. And in April 2023, the General Assembly appropriated those additional funds to allow the Department to continue our Title X program. The Department will continue to be reliant upon annual state funding to operate the Title X program unless and until a court holds OPA's grant termination to be unlawful and orders OPA to restore our federal Title X grant. While the General Assembly's appropriation is earmarked as recurring, there is no guarantee that the designation will continue or that the funds will always be available.

16. Requiring the use of state funds to fill the $7 million annual gap left by the cancellation of Tennessee's Title X grant causes significant harm to Tennessee's and the Department's interests. For one, the $7 million in family-planning funding the Department now must request limits how much we can obtain for other planned public-health initiatives. In addition, because of the State's limited budget, this vital $7 million appropriation already means the General Assembly may not use those significant funds for other projects or initiatives, whether in our Health Department or any other state agency.

17. Without receiving additional state funding for 2024 and beyond, the Department would have to shutter our fifty-year Title X program should OPA's grant cancellation stand. Currently, the Department's allocated funding will allow it to continue the Title X program until July 1, 2024.

18. Closing down the Department's longstanding family-planning program would cause significant public-health harms, as it would mean that 40,000+ individuals would no longer receive the family planning services they have come to rely upon from our program. It also would mean a loss of around 50 employees who we have trained and relied upon to deliver those services. Without funds for these employees' positions, it is likely that many of them would lose their jobs and livelihoods.

19. Although OPA might seek to fund private organizations in the place of the Department's Title X program, those entities would lack the fifty-year experience with this program, the trusted reputation in the community, and the number of trained staff and offices to fill our place, at least any time soon. OPA recognized this when it wrote in its recent review that the "Tennessee

3

Department of Health is the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services in the state of Tennessee." (Docket Entry 1-1.)

20. In addition, losing Title X grant funds deprives us of substantial federal discounts. Under federal law, a Title X grantee is eligible for 340B federal drug discounts when purchasing family planning drugs with Title X funds. The Department has historically received these discounts when purchasing family planning drugs through our Title X program. By denying us of those discounts, OPA's cancellation of our grant imposes further monetary harm.

21. OPA's action in cancelling our grant further harms Tennessee's reputation as a federal grantee and even risks future federal funding. In its March 1, 2023 letter, an OPA representative threatened to report our noncompliance with the Title X grant's purported conditions, and our grant's ultimate termination, to the Federal Awardee Performance and Integrity Information System. According to this OPA representative, terminations like Tennessee's "must be reported" even though doing so "may affect [our] ability to obtain future Federal funding." (Docket Entry 1-9.) Since April 1, 2023, we have asked OPA repeatedly whether they indeed plan to report our grant cancellation as threatened. We have not received a definite answer, being directed to several different OPA officials. Most recently, on May 30, 2023, Director of Grants and Acquisitions Management Dr. Scott Moore responded that "[a]t this time, [OPA] do[es] not intend to report any concerns regarding the award." (Docket Entry 1-17.) Dr. Moore did not provide assurance that OPA could decide to report Tennessee at a later date. The risk of being reported could negatively affect Tennessee's status in *every* future federal-funding program. Currently, the Department of Health alone receives over $1.4 billion in federal grants. (Docket Entry 1-18.) Every one of those would be implicated if the cancellation of Tennessee's Title X grant were reported.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this December 1, 2023.

/s/ _____
Dr. Tobi Amosun, MD