# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE

STATE OF TENNESSEE,

               Plaintiff,

      v.

XAVIER BECERRA, in his official capacity
as Secretary of Health and Human Services, *et
al.*,

            Defendants.

No. 3:23-cv-00384-TRM-JEM

# DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
# FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 1

I.       Title X ................................................................................................................ 1

II.      Regulatory History and the 2021 Title X Rule ................................................. 3

III.     TDH's Grant and HHS's Decision Not to Continue Funding ........................... 4

IV.      This Lawsuit ...................................................................................................... 6

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT ................................................................................................................... 7

I.       Tennessee Is Not Likely to Succeed on the Merits .......................................... 7

         A.       OPA's Decision Is Authorized by Title X. ........................................... 7

         B.       OPA's Decision is Consistent with Agency Regulations. ..................... 9

         C.       OPA's Decision Is Neither Arbitrary Nor Capricious. ........................ 11

                  1.       OPA Considered All Important Aspects of Its Decision. ......... 12

                  2.       OPA Did Not Unlawfully Change Its Position. ....................... 14

                  3.       OPA Did Not Disregard Any Reliance Interests. .................... 15

         D.       Notice-and-Comment Procedures Were Not Required. ...................... 16

         E.       OPA's Decision Does Not Implicate the Spending Clause. ............... 16

II.      Tennessee Has Not Demonstrated Irreparable Harm ..................................... 22

III.     The Public Interest Weighs Against a Preliminary Injunction ....................... 25

CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, Inc.,*
   46 F.4th 489 (6th Cir. 2022) ................................................................................ 24

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.,*
   570 U.S. 205 (2013) ..................................................................................... 9, 25

*Allina Health Servs. v. Sebelius,*
   756 F. Supp. 2d 61 (D.D.C. 2010) ........................................................................ 23

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy,*
   548 U.S. 291 (2006) ................................................................................... 17, 20

*Auer v. Robbins,*
   519 U.S. 452 (1997) ...................................................................................... 10

*Benisek v. Lamone,*
   138 S. Ct. 1942 (2018) ................................................................................... 23

*Bennett v. Kentucky Department of Education,*
   470 U.S. 656 (1985) ................................................................................... 19, 20

*Biden v. Missouri*
   595 U.S. 87 (2022) (per curiam) ....................................................................... 19, 20

*City of Arlington, Tex. v. FCC,*
   569 U.S. 290 (2013) ........................................................................................ 8

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.,*
   365 F.3d 435 (6th Cir. 2004) ............................................................................. 13

*Commonwealth v. Biden,*
   57 F.4th 545 (6th Cir. Jan. 12, 2023) ................................................................... 23

*Cornish v. Dudas,*
   540 F. Supp. 2d 61 (D.D.C. 2008) ....................................................................... 25

*CoverDyn v. Moniz,*
   68 F. Supp. 3d 34 (D.D.C. 2014) ........................................................................ 23

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   596 U.S. 212 (2022) ...................................................................................... 17

*D.T. v. Sumner Cnty. Schs.,*
   942 F.3d 324 (6th Cir. 2019) ......................................................................... 23, 24

*Dayton Area Chamber of Com. v. Becerra,*
   No. 3:23-CV-156, 2023 WL 6378423 (S.D. Ohio Sept. 29, 2023) .................................. 23

Case 3:23-cv-00384-TRM-JEM   Document 26   Filed 01/16/24   Page 3 of 32   PageID #: 363

*DHS v. Regents of the Univ. of Cal.*
140 S. Ct. 1891 (2020) ............................................................................ 16

*Dobbs v. Jackson Women's Health Organization,*
597 U.S. 215 (2022) ............................................................................ 4, 5

*FCC v. Prometheus Radio Project,*
141 S. Ct. 1150 (2021) ............................................................................ 12

*Fowler v. Benson,*
924 F.3d 247 (6th Cir. 2019) ............................................................................ 7

*Gruver v. La. Bd. of Supervisors,*
959 F.3d 178 (5th Cir. 2020) ............................................................................ 19

*Hosseini v. Nelson,*
911 F.3d 366 (6th Cir. 2018) ............................................................................ 12

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.,*
138 S. Ct. 2448 (2018) ............................................................................ 16

*Kentucky v. Yellen,*
54 F.4th 325 (6th Cir. 2022) ............................................................................ *passim*

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ............................................................................ 10

*La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.,*
335 F. Supp. 3d 1002 (M.D. Tenn. 2018) ............................................................................ 24

*Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*
140 S. Ct. 2367 (2020) ............................................................................ 11

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.,*
453 F.3d 377 (6th Cir. 2006) ............................................................................ 24

*Mayweathers v. Newland,*
314 F.3d 1062 (9th Cir. 2002) ............................................................................ 20

*Mich. Dep't of Envtl. Quality v. Browner,*
230 F.3d 181 (6th Cir. 2000) ............................................................................ 13

*Miss. Comm'n on Envtl. Quality v. E.P.A.,*
790 F.3d 138 (D.C. Cir. 2015) ............................................................................ 19

*Montford and Co. v. SEC,*
793 F.3d 76 (D.C. Cir. 2015) ............................................................................ 8

*N. Air Cargo v. U.S. Postal Serv.,*
756 F. Supp. 2d 116 (D.D.C. 2010) ............................................................................ 23

*Nat'l Fed. of Indep. Business v. Sebelius* (NFIB),
    567 U.S. 584 (2012) ........................................................................................................ 17, 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................................ 25

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023) ........................................................................................ *passim*

*Ohio v. Becerra*,
    577 F. Supp. 3d 678 (S.D. Ohio 2021) ......................................................................... 23

*Otsuka Pharm. Co. v. Burwell*,
    302 F. Supp. 3d 375 (D.D.C. 2016) .............................................................................. 16

*Otsuka Pharm. Co. v. Burwell*,
    No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) ...................................... 23

*Pennhurst State School & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ..................................................................................................... 17, 20

*Planned Parenthood Fed'n of Am., Inc. v. Heckler*,
    712 F.2d 650 (D.C. Cir. 1983) ........................................................................................ 8

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ........................................................................................................ 14

*Priorities USA v. Nessel*,
    860 F. App'x 419 (6th Cir. 2021) ................................................................................... 25

*R/T 182, LLC v. FAA*,
    519 F.3d 307 (6th Cir. 2008) ......................................................................................... 16

*Rust v. Sullivan*,
    500 U.S. 173 (1991) .......................................................................................................... 3

*Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev., No. 141823RMW*,
    2014 WL 2192052, at *3 (N.D. Cal. May 23, 2014) ..................................................... 25

*State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*,
    812 F.2d 288 (6th Cir. 1987) ......................................................................................... 23

*Valley Family Planning v. North Dakota*,
    661 F.2d 99 (8th Cir. 1981) ............................................................................................. 8

*W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ...................................................................................... 17

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................................................... 7, 22

iv

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................... 23

**Statutes**

42 U.S.C. § 300 .................................................................................................... 2, 9

42 U.S.C. § 300a-4 ..................................................................................... 2, 3, 18, 21

42 U.S.C. § 300a-7 ..................................................................................................... 9

42 U.S.C. § 802 ........................................................................................................ 21

42 U.S.C. § 1395x .................................................................................................... 20

Tenn. Code Ann. § 39-15-213 ........................................................................... 5, 6, 15

Tenn. Code Ann. § 39-15-213) ................................................................................... 6

**Regulations**

42 C.F.R. § 59.5 .............................................................................................. *passim*

42 C.F.R. § 59.8 .................................................................................................. 2, 16

42 C.F.R. § 59.9 ........................................................................................................ 2

42 C.F.R. §§ 59.7, 59.8 ............................................................................................. 2

45 C.F.R. § 75.300 .................................................................................................... 2

58 Fed. Reg. 7462 (Feb. 5, 1993) ............................................................................... 3

65 Fed. Reg. 41,270, 41,271 (July 3, 2000) ........................................................... 3, 10

84 Fed. Reg. 7714 (Mar. 4, 2019) .............................................................................. 3

86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021) .............................................................. 3

86 Fed. Reg. 56,144 (Oct. 7, 2021) ...................................................................... *passim*

**Other Authorities**

https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-
title-X-service-grant-awards ............................................................................... 5, 14

https://www.all-options.org/about-us .................................................................. 10, 11

Ohio and twenty other States' comments letter (May 17, 2021),
  https://perma.cc/BT6W-ZMSH ...................................................................... 11, 19

State of Tenn., The Budget Fiscal Year 2023-2024 at xix,
  https://www.tn.gov/content/dam/tn/finance/budget/documents/2024BudgetDocumentVol1.
  pdf .................................................................................................................... 24

# INTRODUCTION

Through Title X of the Public Health Service Act (PHSA), Congress authorized the Department of Health and Human Services (HHS) to award discretionary grants to fund family planning services and to issue regulations defining the terms and conditions of such grants.  In 2021, HHS issued a new rule (the 2021 Rule) that largely reinstated regulatory requirements that had been effective for much of the statutory program's history and that were in place without issue or legal challenge between 1993 and 2019.  Thereafter, the Tennessee Department of Health (TDH) accepted a Title X grant, which (like all Title X grants) was made expressly contingent on TDH's compliance with applicable statutory and regulatory requirements, including the 2021 Rule's requirement that grantees provide nondirective options counseling to pregnant patients and a referral for any option chosen by the patient, including for an abortion.  When TDH later refused to certify its compliance with these requirements and the terms of its Title X grant, HHS exercised its discretion not to continue TDH's Title X funding.  This lawsuit contends that HHS's decision was unlawful, largely reflecting Tennessee's belief that it need not follow the 2021 Rule's abortion referral provision.  But on November 30, 2023, the Sixth Circuit confirmed the permissibility of that requirement.  *See Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023).  This Court should reject Tennessee's attempted end run around that decision and deny its motion for preliminary injunctive relief.

Tennessee's claims are unlikely to succeed on the merits.  HHS's decision is fully consistent with Title X and its implementing regulations, and Tennessee's contrary arguments are largely foreclosed by *Ohio*.  Tennessee's arbitrary-and-capricious claims fail because HHS provided a reasoned explanation for declining to continue TDH's funding.  And HHS's funding decision does not pose any issue under the Spending Clause.  Finally, Tennessee cannot demonstrate that it will suffer irreparable harm in the absence of emergency relief, and the public interest weighs against the imposition of such a drastic remedy.

# BACKGROUND

## I.     Title X

Title X authorizes the HHS Secretary "to make grants to and enter into contracts with public

or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects." 42 U.S.C. § 300(a). The statute further requires that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). HHS's implementing regulations afford it broad discretion to allocate congressionally-appropriated grant funds amongst competing applicants. *See generally* 42 C.F.R. §§ 59.7, 59.8. Each notice of grant award must specify "how long HHS intends to support the project without requiring the project to recompete for funds," *id.* § 59.8(a), but in general grants are initially awarded for a one-year period, *id.* § 59.8(b). HHS also issues "continuation awards" which, while funded one year at a time, allow the recipient to receive continued support beyond the initial one-year period (typically for three to five years) without having to reenter the competitive funding process. *See id.* § 59.8(a), (b). Recipients of Title X continuation awards must submit a new application each year to receive continued funding, and all continuation awards "require a determination by HHS that continued funding is in the best interest of the government." *Id.* § 59.8(b). HHS regulations make clear that neither "the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application." *Id.* § 59.8(c).

Title X funds shall "be expended solely for the purpose for which the funds were granted in accordance with the approved application and budget" and generally applicable grant regulations. 42 C.F.R. § 59.9 (citing 45 C.F.R. part 75). Those regulations, in turn, require grantees to document and report on their receipt and use of federal funds and authorize HHS to conduct audits to ensure compliance. *See, e.g.*, 45 C.F.R. § 75.300(b) (providing that recipients are "responsible for complying with all requirements of the Federal award"); 45 C.F.R. subpart D (setting forth post-award requirements, including controls for ensuring compliance and reporting on performance; 45 C.F.R. subpart F (setting forth audit requirements). If a recipient fails to comply with the terms and conditions of a grant—including any incorporated statutory or regulatory requirements—HHS can impose appropriate remedies. *See id.* § 75.371. HHS can also decline to issue a continuation award if it finds that "continued funding is [not] in the best interest of the government." 42 C.F.R. § 59.8(b).

## II.     Regulatory History and the 2021 Title X Rule

In accordance with its statutory mandate, *see* 42 U.S.C. § 300a-4(a), HHS has issued regulations defining requirements applicable to Title X grants. These regulations have at times offered differing interpretations of Section 1008 of the PHSA, which requires that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. But for much of the Title X program's history, the agency has required (as it does now) the provision of nondirective options counseling to pregnant clients (to include counseling on abortion if requested) and referral for abortion upon request.

The agency briefly changed course in 1988 and issued a rule that strictly "prohibited the discussion of or referral for abortion." 86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021). But while that interpretation was ultimately upheld by the Supreme Court as a permissible construction of § 1008, *Rust v. Sullivan*, 500 U.S. 173 (1991), the rule was "never implemented on a nationwide basis," 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). In 1993, HHS suspended the 1988 Rule and imposed interim standards that reinstated the pre-1988 status quo. *See* 58 Fed. Reg. 7462 (Feb. 5, 1993) ("Under these compliance standards, Title X projects would be required, in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on options relating to her pregnancy, including abortion, and to refer her for abortion, if that is the option she selects."). HHS also proposed new permanent regulations, which would ultimately be finalized in 2000. *See* 65 Fed. Reg. 41,270. The 2000 Rule adopted the 1993 interim standards that had been "used by the program for virtually its entire history." *Id.* at 41,271.

The regulatory requirements set forth in the 2000 Rule—which required nondirective pregnancy options counseling and counseling on and referral for abortion upon request—remained in effect without incident until 2019, when HHS issued a new rule similar to the 1988 version. *See* 84 Fed. Reg. 7714 (Mar. 4, 2019). The 2019 Rule significantly restricted the ability of Title X projects to provide pregnancy options counseling and forbid Title X projects from referring for abortion. *Id.* In 2021, HHS revoked the 2019 Rule and replaced it with a new rule readopting, in substantial part, the 2000 Rule. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). That rule again requires that Title X projects offer

pregnant clients the opportunity to be provided information and counseling about available options, including "prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination." 42 C.F.R. § 59.5(a)(5). The project must provide neutral, factual information and nondirective counseling on each option and "referral upon request." *Id.*; *see also* 86 Fed. Reg. at 56,150 (explaining that an abortion referral may include "the name, address, telephone number, and other relevant factual information . . . about an abortion provider," and a Title X project cannot take "further affirmative action . . . to secure abortion services for the patient"). The Sixth Circuit recently found that the 2021 Rule's abortion referral requirement is a permissible interpretation of Title X and declined to award preliminary injunctive relief on that basis. *Ohio*, 87 F.4th at 772 ("it must be permissible for an administration to treat referrals either as falling inside or outside § 1008's prohibition").[1]

In June 2022, the Supreme Court issued a decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overturned prior precedent recognizing a constitutional right to abortion. In the wake of that decision, HHS clarified that the abortion counseling and referral provisions of the 2021 Rule remained in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, were still required. *See* ECF No. 1-6.

## III.     TDH's Grant and HHS's Decision Not to Continue Funding

On March 24, 2022, HHS awarded the Tennessee Department of Health (TDH) a Title X project grant. Notice of Award (ECF No. 1-7). As the award explained, funding is provided one year at a time based on an annual application, TDH's continued compliance with the grant's terms and conditions, and available appropriations. *See generally id.* The award made clear that HHS is "not obligated to make additional Federal Funds available," *id.* at 3, and that TDH "must comply with all terms and conditions outlined in the grant award," including requirements imposed by "program statutes and regulations, Executive Orders, and HHS grant administration regulations," *id.* at 5; *see also*

---

[1] The *Ohio* litigation also involved another provision of the 2021 Rule not at issue here; with respect to that provision, the Sixth Circuit determined that "the preliminary injunction factors weigh in favor of granting relief." *Ohio*, 87 F.4th at 784.

*id.* at 4. It also reiterated the requirement that TDH provide quarterly financial and annual progress reports and submit to an annual audit. *Id.* at 16.

On January 25, 2023, HHS's Office of Population Affairs (OPA) notified its grantees that it was "conducting a review of all Title X service grants to ensure compliance with the requirements for nondirective options counseling and referral" set forth in the 2021 Rule. *See* ECF No. 1-8. OPA requested that each grantee submit a copy of its policy for providing nondirective options counseling and referrals and a signed statement confirming compliance with the 2021 Rule.[2] *Id.* Except for TDH and a state entity in Oklahoma, all state Title X grantees confirmed their compliance with the 2021 Rule's abortion counseling and referral requirements.[3] TDH instead submitted a short letter attaching its "current policy regarding our nondirective counseling to pregnant patients on the range of available options in Tennessee" and attesting to its belief that the policy reflected compliance with applicable regulatory requirements. ECF No. 1-3. The policy stated that "[p]atients with positive pregnancy test[s] must be offered the opportunity to be provided information and counseling regarding all options that are legal in the State of Tennessee." *Id.* at 2. TDH did not elaborate on its state law or what counseling and referrals might be allowable, but the state had recently passed a law that outlawed abortion except in narrow circumstances. *See* Tenn. Code Ann. § 39-15-213. OPA found that TDH's response appeared to place it out of compliance with applicable Title X regulatory requirements "regarding nondirective options counseling and referrals." *See* Mar. 1 2023 Notice of Noncompliance at 1 (ECF No. 1-9).

OPA highlighted these issues and gave Tennessee additional time to provide adequate assurance of its "compliance with the Title X nondirective options counseling requirement" and a

---

[2] OPA also raised this issue with TDH individually during its annual program review. That review took place in July 2022, while Tennessee was in the process of adopting a new state law, effective August 25, 2022, prohibiting abortions. *See* Virtual Program Review at 31 (ECF No. 1-1). OPA flagged at the time that once the law went into effect, Title X projects might need to refer patients to out-of-state abortion providers to meet the requirements of the regulation. *Id.* Then, as it finalized its report in October 2022, OPA requested an update on any TDH policy changes in response to the newly effective state abortion law. *See* ECF No. 1-2.

[3] *See* https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards.

5

revised counseling policy. *Id.* at 2. OPA also provided TDH the option of submitting an "alternate compliance proposal" and offered examples of acceptable arrangements, including the use of "a telehealth partnership with another entity" or referral to a call-in hotline, to provide the requisite counseling and referral information. *See id.* TDH issued a brief final response on March 13, 2023 that reiterated TDH's belief that its policy was in compliance with regulatory requirements "given the standard of care in Tennessee." *See* ECF No. 1-10. Taking the position that the 2021 Rule does not actually require counseling on or referral for abortion, TDH stated that a Title X project in Tennessee could comply with the 2021 Rule by referring a patient for a "pregnancy termination" that, under state law, would not be considered an "abortion." *Id.* (citing Tenn. Code Ann. § 39-15-213)(a)(1)).

After receiving this submission, OPA decided not to make a continuation award to TDH. *See* OPA Decision (ECF No. 1-11). Because TDH's submissions confirmed that it was not in compliance with the governing Title X regulation, and thus the express terms of its grant, OPA determined that a continuation award was not in the best interest of the government. *Id.* at 1. OPA reiterated that "Title X recipients must follow all Federal regulatory requirements regarding nondirective options counseling and referrals, including providing referrals for abortion upon client request," and that TDH's policy of declining to provide counseling and referrals for abortions (unless such abortions themselves are permitted by state law) did not comply with the rule's plain text. *Id.* at 3. OPA also recognized that, "in some circumstances," given the state of abortion services in Tennessee, requested referrals may "need to be made out of state." *Id.* OPA provided TDH instructions for closing out its award, effective March 31, 2023. *Id.*

In April 2023, TDH filed an informal administrative appeal with OPA and an appeal with the HHS Departmental Appeals Board (DAB). The parties agreed that the DAB should postpone its review until the conclusion of the informal appeal, which remains pending. *See* ECF Nos. 1-13; 1-16.

## IV.    This Lawsuit

Tennessee filed its complaint on October 24, 2023, asserting four Administrative Procedure Act (APA) claims and one claim pursuant to the Declaratory Judgment Act. ECF No. 1. Tennessee

moved for a preliminary injunction on December 1, 2023 and seeks to reinstate TDH's Title X funding by March 25, 2024. *See* Mem. in Supp. of Pl.'s Mot. for a Prelim. Inj. 25, ECF No. 21 (PI Br.).

LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019). A plaintiff must "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

ARGUMENT

**I.      Tennessee Is Not Likely to Succeed on the Merits.**

**A.      OPA's Decision Is Authorized by Title X.**

After *Rust* and *Ohio*, it is now settled that § 1008 authorizes HHS to either forbid, permit, or require Title X programs to provide nondirective options counseling and, upon request, abortion counseling and referrals. *Rust* rejected arguments that "providing counseling and referral for abortion is either necessarily treating, or not treating, 'abortion as a method of family planning,'" and thus, as *Ohio* plainly held, it "must be permissible for an administration to treat referrals" for abortion—and, necessarily, nondirective options counseling about abortion—"either as falling inside or outside § 1008's prohibition." *Ohio*, 87 F.4th at 771-72.

Nonetheless, Tennessee contends that OPA's decision here "contravenes Title X." PI Br. 15. Tennessee is vague about which provision of Title X the decision actually "contravenes," but to the extent it is relying on § 1008, *Ohio* forecloses the argument. *See Ohio*, 87 F.4th at 771 ("*Rust*'s holding requires us to reject the States' argument that the 2021 Rule's referral requirement is contrary to law."). OPA's decision was based on the interpretation of § 1008 set forth in the 2021 Rule—*i.e.*, that Title X programs must provide, if requested, counseling on and referral for abortion. From a statutory perspective, the only relevant consideration is whether this interpretation was impermissible, and the Sixth Circuit just held that it "cannot say that it is." *Id.* at 772.

Tennessee attempts to paint OPA's application of the 2021 Rule to TDH as "an entirely different matter" because Tennessee now "generally outlaws abortion." PI Br. 15. But whatever restrictions Tennessee law might now impose on abortion access, the statutory analysis is the same. The 2021 Rule broadly and unequivocally requires that Title X providers "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding each" of their options—including "[p]regnancy termination"—and, if requested, to "provide neutral, factual information and nondirective counseling on each of the options, and referral upon request." 42 C.F.R. § 59.5(a)(5). It does not refer to or incorporate state law.[4] Nor does it limit the required counseling and referrals to procedures available within a particular state. Thus, OPA simply applied the 2021 Rule's plain text to TDH, determining that its policy of only providing pregnant clients with information, counseling, and referrals on options "legal in the State of Tennessee" placed TDH out of compliance. *See* OPA Decision at 2-3. This case does not involve OPA applying any new interpretation of Title X or its regulation to TDH; it involves TDH adopting a contrary interpretation and attempting to force it on the agency. *Cf., e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663-64 (D.C. Cir. 1983) ("It is elementary that under the Supremacy Clause . . . states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme."). Under *Rust* and *Ohio*, it is the agency's interpretation which controls,[5] not TDH's, and the so-called "minefield of considerations" that Tennessee haphazardly cites (PI Br. 16),

---

[4] Even before *Dobbs*, states could, and did, adopt "abortion policies," PI Br. 16, inconsistent with Title X regulations' broad counseling and referral provisions. *See, e.g., Valley Family Planning v. North Dakota*, 661 F.2d 99, 102 (8th Cir. 1981) (finding state law prohibiting Title X grantees from making abortion referrals was preempted by the Supremacy Clause). These federal regulatory provisions were in effect for nearly the entire history of the Title X program, and yet Defendants are not aware of any example of a state entity seeking an exception from the plain text of the governing regulation on the basis of conflicting state law.

[5] Those cases also plainly establish that HHS's interpretation is entitled to *Chevron* deference. *See Ohio*, 87 F.4th at 770-72. And although Tennessee argues otherwise, *see* PI Br. 17, HHS's application of the 2021 Rule's counseling and referral provisions to TDH is entitled to the same *Chevron* deference. *See, e.g., City of Arlington, Tex. v. FCC*, 569 U.S. 290, 306 (2013) (*Chevron* deference applies where Congress vests the agency with "general authority to administer the [statute] through rulemaking *and adjudication*, and the agency interpretation at issue was promulgated in the exercise of that authority" (emphasis added)); *Montford and Co. v. SEC*, 793 F.3d 76, 82 (D.C. Cir. 2015).

8

has no application here and offers no reprieve from those binding precedents.

Nor do the "history" or "context" of Title X, PI Br. 16, counsel departure from its text, as authoritatively interpreted by the Supreme Court and the Sixth Circuit. Title X establishes a competitive grant program that subjects all grantees to program requirements set forth in agency regulations. *Rust* and *Ohio* establish the permissibility of the abortion counseling and referral provisions relied upon by OPA in the decision challenged here. State entities that wish to receive federal Title X funds can either choose to follow those provisions or they can choose to decline the funds. *Cf. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."). But Congress wrote no exceptions into Title X based on state abortion laws—even at a time when, as Tennessee emphasizes, most states prohibited abortions, PI Br. 16.

Tennessee also cursorily invokes two additional provisions of Title X, *see id.* at 16, but finds support in neither. The requirement that grantees offer "a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)," 42 U.S.C. § 300(a), plainly refers to the medical suitability of the services being offered—not whether such services are legal in any given state. And in any event, the "methods and services" that a Title X project can provide necessarily exclude, per § 1008, abortion itself. It would be unreasonable to read this statutory provision (which says nothing about abortion, counseling, or referrals) to go beyond § 1008 and forbid grant recipients from providing the counseling and referral required by the 2021 Rule. Tennessee's argument based on 42 U.S.C. § 300a-7 similarly fails because the 2021 Rule makes clear that "providers and entities who are covered by federal conscience laws 'will not be required to counsel or refer for abortions in the Title X program.'" *Ohio*, 87 F.4th at 774. That is all § 300a-7 requires. The Rule does not "coopt the abortion policies of entire state programs," PI Br. 16, and even if it did, there would be no conflict with 42 U.S.C. § 300a-7.

## B. OPA's Decision is Consistent with Agency Regulations.

Next, Tennessee contends that OPA's funding decision "impermissibly interprets [HHS's]

2021 Rule and implementing regulations," citing three provisions with which the decision allegedly "clashes." PI Br. at 17. But an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and Tennessee has identified no such deficiency here.

First, Tennessee misunderstands 42 C.F.R. § 59.5(b)(6), which requires that each Title X project affirm that "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning." By its terms, that regulatory provision does not limit the scope of pregnancy options counseling, or accompanying referrals, that must be provided pursuant to subsection 59.5(a). Rather, the language on which Tennessee focuses was added to the 2021 Rule in response to comments advocating to expand the individuals permitted to direct Title X projects from physicians to "a broader range of healthcare providers." 86 Fed. Reg. at 56,163. The reference to state law merely incorporated state definitions of the authority of physician assistants and other similar providers to direct family planning programs. *See id.* at 56,164 (explaining that HHS was adopting a definition of "clinical services provider" that includes "physicians, physician assistants, nurse practitioners, certified nurse midwives, and registered nurses with an expanded scope of practice who are trained and *permitted by state-specific regulations to perform*" Title X services (emphasis added)). It did not give state law veto power over all other Title X regulatory requirements.

Second, Tennessee contends that the regulation's reference to "pregnancy termination," 42 C.F.R. § 59.5(a)(5)(i)(C), does not encompass "abortion." *See* PI Br. 17-18. But HHS has always been clear that its counseling and referral provisions encompass abortion. *See, e.g.*, 65 Fed. Reg. at 41,270 (2000 Rule requiring Title X projects "in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on all options relating to her pregnancy, including abortion, and to refer her for abortion, if that is the option she selects"); 86 Fed. Reg. at 56,148 (2021 Rule "allows Title X providers to provide truly nondirective counseling and refer their patients for all services desired by the client, including abortion services"). In commenting on the proposed 2021 Rule, Tennessee specifically objected that it would impermissibly subsidize

abortion by authorizing the expenditure of Title X funds at "facilities that make abortion referrals." *See* Ohio and twenty other States' comments letter at 2 (May 17, 2021), https://perma.cc/BT6W-ZMSH (States' Comment Letter). And most importantly, the Sixth Circuit did not draw the distinction that Tennessee offers here, characterizing subsection 59.5(a) as imposing a "mandate that Title X projects make abortion referrals upon request." *Ohio*, 87 F.4th at 767. There is simply no "distinction between 'abortions' and 'pregnancy termination'" in the 2021 Rule, PI Br. 17.

Tennessee's third argument again misreads the plain language of the Title X regulation. HHS requires that each project affirm that it will "[p]rovide for coordination and use of referrals and linkages" with various health care providers. 42 C.F.R. § 59.5(b)(8). These "referrals and linkages" should be with providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." *Id.* The regulation simply provides that Title X projects should attempt, where feasible, to make referrals to nearby healthcare providers. Where such close-in-proximity referrals are not feasible, providers are not prevented from making referrals to more distant entities. There is no conflict between this regulatory provision and the challenged OPA decision, which is based on subsection 59.5(a)(5)'s broad requirement that projects provide nondirective options counseling and appropriate referrals upon request. OPA recognized that this might require projects in states with restrictive abortion laws to refer out of state, but left it to the projects to ensure compliance, including by using telehealth and hotline options. But because subsection 59.5(b)(8) does not impose any limitation on a project's ability to provide referrals to providers that are not in close proximity to the site, Tennessee has identified no conflict between the challenged decision and HHS's broader Title X regulations.

### C. OPA's Decision Is Neither Arbitrary Nor Capricious.

Tennessee's arbitrary-and-capricious claims fare no better. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (citation

omitted). A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Hosseini v. Nelson*, 911 F.3d 366, 371 (6th Cir. 2018) (citation omitted). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

Tennessee argues that OPA's decision (1) did not address certain issues, (2) changed its position without acknowledgment, and (3) did not account for reliance interests. PI Br. 19–22. None of these arguments succeed.

### 1. OPA Considered All Important Aspects of Its Decision.

Tennessee asserts that OPA discontinued TDH's grant without considering "the myriad problems with requiring States to counsel and refer for abortions that their laws ban." PI Br. 19. Tennessee is incorrect. As an initial matter, OPA's decision is a straightforward application of the valid requirements of the 2021 Rule. *See supra* Part I.A; *Ohio*, 87 F.4th at 772. Because that rule requires grantees to provide abortion referrals upon request, OPA declined to continue funding TDH's grant when TDH would not certify that it would do so.[6] An agency does not act in an arbitrary and capricious manner merely by applying a valid regulation. Tennessee's argument is really a backdoor attempt at challenging the referral requirement of the 2021 Rule, which *Ohio* forecloses.

In any event, the agency has provided a valid explanation for its decision that takes into account the fact that certain states have limited access to abortion. In June 2022, HHS issued guidance that clarified the requirements of the Title X program post-*Dobbs*, including in states that limited access to abortion in the immediate wake of the *Dobbs* decision. *See* OPA Q&A (ECF No. 1-6). This document states that the abortion counseling and referral provisions of the 2021 Rule remain in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, is still required. *Id.* at 4–5. The document also notes that "[t]here are no geographic limits for Title X recipients making referrals for their

_____

[6] Consistent with the applicable standard, OPA determined that a continuation award was not in the best interests of the government. *See* OPA Decision at 1, 3.

clients," and that "Title X recipients have flexibility to refer clients for services across state lines if necessary." *Id.* at 5. HHS also clarified that counseling and referrals may be made in person or via telehealth. *Id.* In deciding not to award TDH funds, OPA further confirmed that "Title X recipients must follow all Federal regulatory requirements regarding nondirective options counseling and referrals, including providing referrals for abortion upon client request," and that "in some circumstances, those referrals will need to be made out of state." OPA Decision at 3. This explanation demonstrates that HHS considered the issue of state-law limitations on abortion access and nonetheless decided that the still-in-force referral requirements of the 2021 Rule should be applied as written. "As long as the agency's explanation is clear enough that its path may reasonably be discerned, we must respect its policy choice." *Ohio*, 87 F.4th at 775 (citations omitted).

Tennessee raises several specific points that it says OPA should have considered and did not address in its decision, although notably Tennessee does not say whether it raised any of these issues with the agency prior to this lawsuit.[7] *See Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 462 (6th Cir. 2004) ("[I]t is inappropriate for courts reviewing agency decisions to consider arguments not raised before the administrative agency involved."). First, Tennessee says that OPA's decision potentially puts patients at risk of health complications from out-of-state referrals. *See* PI Br. 19–20. But the 2021 Rule already allowed out-of-state referrals, even before *Dobbs. See* OPA Q&A at 3, 5 (discussing geographic limitations on Title X services). OPA's decision to allow or even require such referrals represents the agency's policy judgment that the benefits of such referrals outweigh any negative consequences. *See Ohio*, 87 F.4th at 775 ("[I]t is not the role of the court to 'second guess the analysis and policy judgments that undergird the agency's regulations.'" (citation omitted)).

Second, Tennessee says that OPA should have accounted for the compliance costs of monitoring changes in other states' abortion laws when making referrals. PI Br. 20. But OPA permits Title X grantees to use third parties, including the All-Options Talkline, to make referrals, so grantees

---

[7] Tennessee also did not raise any of these concerns during the notice-and-comment period for the 2021 Rule. To the extent Tennessee attempts to challenge the 2021 Rule—which OPA's decision merely applies—such arguments are waived. *See Mich. Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000).

do not need to monitor changes in other states' laws. *See* https://www.all-options.org/about-us/. Moreover, this is not a new issue; entities making referrals have always had to keep track of which providers are able to offer abortion services at the time of a referral. Some providers may cease to provide abortion services for a variety of reasons, including changes in state laws that were in effect before *Dobbs*. *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 881–900 (1992) (upholding certain abortion restrictions under the now-overruled "undue burden" standard). The cost to Title X grantees of maintaining a current record for potential referrals is already built into the regulations.

Third, pointing to OPA's 2022 program review of TDH, Tennessee argues that family planning services in the state will be reduced if TDH does not have a Title X grant. PI Br. 20. But Tennessee does not argue that TDH is the only Title X grantee or provider of family planning services in the state; indeed, Tennessee notes that HHS has redistributed some of TDH's Title X funds to Planned Parenthood. Compl. ¶ 79.[8] These non-profit providers have stepped in to provide services to clients now that TDH has refused to comply with HHS regulations. In any event, the Court should not second-guess OPA's decision to deny a continuation award to a grantee that fails to comply with applicable regulations. *See Ohio*, 87 F.4th at 775. Fourth, Tennessee argues that OPA failed to consider the possibility that enforcing the 2021 Rule's referral requirement may drive state grantees, like Tennessee, out of the Title X program altogether. PI Br. 20. Again, this is a backdoor argument against the 2021 Rule itself; OPA's decision applying the 2021 Rule cannot be considered arbitrary and capricious so long as the regulation itself is valid, and binding precedent confirms that it is. In any event, Tennessee provides no evidence of states being driven out of the Title X program en masse. Indeed, only two state entities, in Tennessee and Oklahoma, have refused to comply with the referral requirement since the 2021 Rule took effect. *See supra* p. 5.

### 2.    OPA Did Not Unlawfully Change Its Position.

Tennessee next contends that OPA unlawfully "changed positions" by declining to fund

---

[8] Converge, Inc. also receives Title X grants and provides services in Tennessee. *See* https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards.

TDH's Title X grant. PI Br. 21. This argument misses the mark because the referral requirement has been in force since the 2021 Rule was issued and the agency has never changed its position on what the Rule requires. Instead, HHS has consistently applied that requirement. *See generally* OPA Q&A at 3, 5. The referral requirement is an outgrowth of the nondirective counseling requirement, *see* 86 Fed. Reg. at 56,149-56,150, and is consistent with medical ethics dictating that a pregnant client be provided with information about all options available to her; that need for neutral, accurate information does not change merely because some states have limited access to certain services. Tennessee argues that OPA's grant to TDH in March 2022 (before the restrictions in Tenn. Code Ann. § 39-15-213 took effect) and the 2022 program review were made with OPA's understanding that TDH would only make referrals for abortions "that are legal in the State of Tennessee." PI Br. 21. But the source of that quotation is TDH's February 3, 2023 letter (ECF 1-3) in response to a direct inquiry about its compliance with the referral requirement. Immediately after that letter made clear that TDH was not in compliance, OPA issued a notice of noncompliance, and, following TDH's response that reiterated TDH's position, OPA made its decision to discontinue TDH's grant. *See supra* pp. 4-6. At no point did HHS take the position that grantees could ignore the 2021 Rule's abortion referral requirement. There has thus been no change in position.

Tennessee also argues that OPA's decision contradicts the 2021 Rule's provision that "objecting providers or Title X grantees are not required to counsel or refer for abortions." 86 Fed. Reg. at 56,153; *see* PI Br. 21. That exception is an application of conscience and religious freedom statutes. *See* 86 Fed. Reg. at 56,153. A state agency cannot claim to be an objector under those statutes.[9] HHS has not been inconsistent on this point.

### 3. OPA Did Not Disregard Any Reliance Interests.

Tennessee next argues that OPA neglected to consider reliance interests. PI Br. 21–22. But Tennessee has no legally cognizable interest in the continued receipt of Title X funding. Title X grants

---

[9] Providers who work for state grantees may, in some instances, qualify for objector status. *See* 42 CFR § 59.5(a)(5) n.2 ("*Providers* may separately be covered by federal statutes protecting conscience and/or civil rights." (emphasis added)).

only obligate HHS to provide funds to the grantee for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and HHS's Title X regulations provide that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c).  In contrast to the agency actions at issue in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020), *see* PI Br. 22, the decision here concerns only discretionary funding. *Cf. Janus v. Am. Fed'n of State, Cty., & Mun. Emps.*, 138 S. Ct. 2448, 2484 (2018) (discounting asserted reliance interests because the relevant "contract provisions . . . will expire on their own in a few years' time").  Moreover, the referral requirement has been in effect since at least 2021, and for many years prior to the 2019 Rule, and Tennessee abided by that requirement in accepting grants prior to 2023. Tennessee thus cannot claim that it now has a reliance interest in receiving grants without needing to comply with the referral requirement.

### D.     Notice-and-Comment Procedures Were Not Required.

Tennessee also briefly argues that OPA's funding decision violated the APA's procedural requirements because "a new 'APA rulemaking [was] required' before HHS could apply its abortion-mandate condition."  PI Br. 22.  But this argument provides no independent basis for invalidating the decision because, as explained above, *supra* Part I.A, that decision merely applies the plain language of the 2021 Rule to TDH.  *See, e.g.*, *Otsuka Pharm. Co. v. Burwell*, 302 F. Supp. 3d 375, 409 (D.D.C. 2016) (rejecting similar argument and holding that notice-and-comment procedures are not required so long as challenged agency adjudication is a "clarification or interpretation of the existing rules" rather than a "de facto amendment of a duly promulgated regulation") (citation omitted); *R/T 182, LLC v. FAA*, 519 F.3d 307, 310 (6th Cir. 2008) (adjudicatory proceedings are not "subject to the notice and comment requirements of rulemaking under the [APA]").

### E.     OPA's Decision Does Not Implicate the Spending Clause.

"Congress has broad power under the Spending Clause of the Constitution to set the terms

on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022); *see also Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Tennessee argues that OPA's decision not to fund a continuation award "violates the Constitution by imposing a new condition on funding absent from Title X itself" and that OPA's actions violate the "clear-statement rule" that requires that Congress set out conditions on federal funding "'unambiguously' and 'with a clear voice.'" *See* PI Br. 9-11 (quoting *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022)). But Tennessee's argument incorrectly frames the issue and erroneously relies on *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981) and the Sixth and Eleventh Circuit's recent *Pennhurst* decisions (*Kentucky*, 54 F.4th 325 and *W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023)), none of which involved the type of challenge contemplated here.

*Pennhurst* and its recent progeny reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. Just as with actual contractual obligations, a state must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.* For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed. of Indep. Business v. Sebelius* (*NFIB*), 567 U.S. 584 (2012).

Courts have applied the *Pennhurst* rule by relieving states of the obligation to comply with statutory conditions on federal funding that were not sufficiently apparent at the time of acceptance. In *Pennhurst* itself, for example, the question was whether the "bill of rights" provision of a federal statute stated an enforceable condition at all, or whether it was merely "hortatory." 451 U.S. at 15-27. Construing the statute, the Court found it "clear that the provision[]" was "intended to be hortatory, not mandatory," *id.* at 24, and thus foreclosed the plaintiffs' effort to enforce it against the state defendant. In *West Virginia* and *Kentucky*, likewise, the question was whether the plaintiff states could "ascertain" a condition that a federal statute placed on their expenditure of federal grant funds. *West Virginia*, 59 F.4th at 1140; *see Kentucky*, 54 F.4th at 348.

This case differs in significant respects from *Pennhurst* and its progeny. First, this is not a scenario where a state is seeking to avoid the enforcement of a statutory funding condition. Rather, Tennessee is challenging a federal agency's decision not to fund a discretionary grant. As explained above, HHS did not rescind or seek to recoup a grant issued to Tennessee based on a new funding condition, but instead decided not to approve a continuation award based on its determination that said award would not be in the best interest of the government. *See* OPA Decision at 1.

Moreover, *Pennhurst*, *Kentucky*, and *West Virginia* all dealt with allegedly ambiguous *statutory* funding conditions. None of those cases involved the situation here—*i.e.*, where a statute creates a federal grant program and unambiguously makes such grants subject to conditions set forth in agency regulations. Tennessee is not challenging any aspect of Title X itself but is instead challenging HHS's application of the unequivocal counseling and referral provisions in the 2021 Rule, which were just upheld by the Sixth Circuit. *See* PI Br. 9 (arguing that "HHS's Rescindment violates the Constitution by imposing a new condition on funding *absent from Title X itself*") (emphasis added). None of the cases cited by Tennessee's brief supports the notion that the Spending Clause could be used to challenge an agency's application of such a regulation to deny a discretionary grant.

Even if *Pennhurst* did apply, it would present no obstacle to the decision at issue in this case. Most importantly, *Pennhurst*'s notice requirement—*i.e.*, that a statute authorizing the provision of federal funds must "provid[e] clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [the conditions]," *Pennhurst*, 451 U.S. at 24-25—is met here. Title X is clear that "[g]rants and contracts . . . shall be made in accordance with such regulations as the Secretary may promulgate," 42 U.S.C. § 300a-4(a), and "shall be . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b). Thus, states—as all other Title X recipients—are aware that, once they accept Title X funding, they must comply with the requirements set forth by the Secretary. Those requirements include the 2021 Rule, which requires Title X grantees to provide non-directive counseling and referrals for abortion. Tennessee was well aware of that Rule, which was promulgated months prior to Tennessee receiving its Title X grant in 2022. *See* 86 Fed. Reg. at 56,144.

Indeed, Tennessee even submitted a comment on the proposed rule in 2021. *See* States' Comment Letter at 16. Any claim that TDH lacked sufficient notice of these conditions is particularly unpersuasive given that the Title X program has required non-directive counseling on all options, including abortion, for most of the program's existence.[10] *See supra* pp. 3-4.

Tennessee contends that the statute's silence with respect to abortion counseling, referral, or advocacy prohibits the Secretary from imposing any conditions related to such activity, notwithstanding Congress's express assertion that Title X grants shall be "subject to such conditions as the Secretary may determine to be appropriate," or the fact that the Sixth Circuit has applied Supreme Court precedent to uphold the condition in question. PI Br. 11–12. Presumably, then, Tennessee would argue that *any* conditions imposed by the Secretary that are not expressly addressed in detail in a statute are invalid and unenforceable. But it is not unusual or impermissible for Congress to authorize an agency to promulgate requirements on federal funding. The Supreme Court has long established that, once Congress makes clear that a condition on the use of federal funds is mandatory and enforceable, it may leave the particulars of implementing the condition to the agency charged with administering the spending program. In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Court held that the Department of Education should evaluate a state's compliance with conditions on federal funds by looking to "the statutory provisions, regulations, and other guidelines provided by the Department at that time." *Id.* at 670. And in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam), the Supreme Court considered whether a statute delegating broad authority for the HHS Secretary "to promulgate, as a condition of a facility's participation in the [Medicare and Medicaid] programs, such 'requirements as [he] finds necessary in the interest of health and safety of individuals who are furnished services in the institution,'" *id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)),

---

[10] *Cf. Gruver v. La. Bd. of Supervisors*, 959 F.3d 178, 184 (5th Cir. 2020) (rejecting Spending Clause claim when the challenged provision "has been on the books for over thirty years, all the while LSU has continued to accept federal funding"); *Miss. Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138, 179 (D.C. Cir. 2015) (noting that a state's prior acceptance of federal funding despite the challenged condition "may be an additional relevant factor . . for assessing the constitutionality of Spending Clause legislation.").

allowed the Secretary to require Medicare and Medicaid providers to mandate COVID-19 vaccinations for their employees. The Court found that it did, recognizing the wide array of conditions and requirements imposed on Medicare and Medicaid facilities under that authority.[11] *Id.* at 92-96.

Here, as in *Missouri*, the condition articulated in the statute is perfectly clear: Title X recipients must follow conditions prescribed by the agency. As the Supreme Court has historically recognized, when operating a grant program, "the Federal Government simply [cannot] prospectively resolve every possible ambiguity concerning particular applications of the requirements of" the underlying statute. *Bennett*, 470 U.S. at 669; *see also Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible"). This is particularly true where, as here, "grant recipients had an opportunity to seek clarification of the program requirements" from the agency. *Bennett*, 470 U.S. at 669. As explained above, the 2021 Rule clearly sets out conditions that recipients must follow to receive Title X funding. And those conditions were plainly ascertainable, both when TDH applied for its initial grant in 2022 and when it sought a continuation award in 2023. *See id.* at 670 (holding that "the State agreed to comply with, and its liability is determined by, the legal requirements in place when the grants were made," including "the statutory provisions, regulations, and other guidelines provided by the Department at that time").

The Sixth Circuit recently found that an ambiguous statute was unenforceable where it "fail[ed] to provide states with clear notice of a purported funding condition," notwithstanding that an agency regulation resolved that ambiguity. *Kentucky*, 54 F.4th at 347. But that case is clearly distinguishable from this one. In *Kentucky*, states challenged a provision in the American Rescue Plan Act (ARPA), which set aside $195.3 billion in stimulus funds to be distributed to states and the District of Columbia to combat the economic challenges posed by the COVID-19 pandemic, but conditioned

---

[11] In *Missouri*, the states argued that they could not be subjected to the COVID-19 vaccination requirement because it was not articulated in the statute. *See* Resp. to Application for a Stay Pending Appeal, *Becerra v. Louisiana*, Nos. 21A240, 21A241, 2021 WL 8939385, at *26-27 (U.S. Dec. 30, 2021) (citing *Pennhurst*, 451 U.S. at 17); Resp. to Application for a Stay, *Biden v. Missouri*, No. 21A240, 2021 WL 8946189, at *23-24 (U.S. Dec. 30, 2021) (citing *Arlington Cent.*, 548 U.S. at 296).

receipt of those funds on states certifying that they would comply with ARPA's "Offset Provision." 54 F.4th at 330. The Offset Provision provided that states could not use ARPA funds to "directly or indirectly offset a reduction in [their] net tax revenue" resulting from such tax cuts. *Id.* at 330-31 (quoting 42 U.S.C. § 802(c)(2)(A)). The Sixth Circuit (and other courts) interpreted this provision as "at least arguably threaten[ing] a significant intrusion upon state taxing authority." *Id.* at 329. Ultimately, the Sixth Circuit held that the Offset Provision was too vague to comply with the requirements of the Spending Clause and that an Interim Final Rule promulgated by the Treasury Department could not cure that vagueness.

As noted above, this case does not present the type of Spending Clause issue addressed in *Kentucky*. And even setting that aside, *Kentucky* does not control this case for at least two additional reasons. *First*, Title X directly authorizes the Secretary to impose conditions on Title X grant funding, whereas ARPA contained no such language. *Compare* 42 U.S.C. § 300a-4(b) (providing that grants shall be "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made"), *with* 42 U.S.C. § 802(f). Accordingly, Title X expressly put states on notice that grants would be subject to conditions set by the Secretary, including the conditions set forth in the 2021 Rule. And the Offset Provision was a novel condition on new federal funding, *Kentucky*, 54 F.4th at 356, whereas the Title X program has required nondirective counseling and referrals for approximately four decades (with two short-lived exceptions).

*Second*, the Sixth Circuit determined that the condition at issue in *Kentucky* threatened a "significant intrusion" on the states' taxing power and emphasized that "control over taxation is a core aspect of state sovereignty." 54 F.4th at 354. The Sixth Circuit went on to explain that "[f]or Congress to impose conditions in *that* area," *i.e.*, encroaching on the state taxing power, "it must do so in clear and unmistakable terms." *Id.* (emphasis in original). Tennessee tries to draw a parallel between the state taxing power and the state interests at issue here, but that argument falls short. Although providing family planning and preventive health services to citizens is an important and laudable goal, it does not represent the same type of "core aspect of state sovereignty" as the taxing power. And the

amount of funding at issue here—approximately $7 million per year—is substantially smaller than the amount subject to the Offset Provision—approximately $3.7 billion. *Compare* Notice of Award at 1, *with Kentucky*, 54 F.4th at 330. For the same reason, Tennessee's attempt to compare this case to *NFIB v. Sebelius*, where the government not only "refuse[d] to grant the new funds to States that will not accept the new conditions" but "threatened to withhold those States' existing Medicaid funds" is also unavailing. *NFIB*, 567 U.S. at 580-583.

Tennessee separately suggests that HHS "unveiled" a new condition on Title X funding in March 2023 and "retroactively rescind[ed] a 5-year grant Tennessee previously accepted in March 2022," *see* PI Br. 14, but, as explained above, that narrative mischaracterizes what happened here. First, HHS did not implement a new funding condition in March 2023. Rather, on March 20, 2023, OPA notified TDH that it recommended against granting TDH a continuation award based on the agency's assessment that such an award would not be in the best interest of the government due to TDH's noncompliance with Title X regulatory requirements set out most recently in the 2021 Rule. *See* OPA Decision at 1. Second, HHS did not "retroactively rescind" a five-year grant to TDH. HHS did not issue a five-year grant to TDH, but instead issued a one-year grant with the possibility of future continuation awards over a five-year period. *See* Notice of Award at 1. In March 2023, then, HHS did not rescind an already-awarded grant, but instead declined to issue a new continuation award. Accordingly, contrary to Tennessee's suggestion, HHS did not "unilaterally issu[e] guidelines that modify past agreements," *see* PI Br. 14, but simply followed its ordinary procedures and opted not to grant a continuation award based on TDH's noncompliance with the 2021 Rule. If anyone changed course midstream, it was TDH, which chose not to comply with the requirements that were in effect when it first applied for and accepted the Title X grant.

## II.    Tennessee Has Not Demonstrated Irreparable Harm.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Among other things, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20, 22. Tennessee fails to demonstrate such an injury that is

"both certain and immediate,' not 'speculative or theoretical.'" *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (quoting *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018)).

Tennessee advances a few theories of irreparable harm, but none is persuasive. *First*, Tennessee claims that it "has and will continue to suffer severe financial harms" absent a preliminary injunction. As an initial matter, Tennessee's argument ignores that it requests *preliminary* relief, and so the question is whether Tennessee will be irreparably harmed during the pendency of litigation—not over the course of several years. As such, Tennessee's focus on the funding that it anticipated over its original project period (i.e., until 2027) is mistaken. As is Tennessee's focus on funding for 2023 because that money is no longer available and cannot be remedied by an order of this Court. *See Dayton Area Chamber of Com. v. Becerra*, No. 3:23-CV-156, 2023 WL 6378423, at *12 (S.D. Ohio Sept. 29, 2023).

Moreover, "economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) ("agree[ing] with the District of Columbia Circuit that economic loss does not constitute irreparable harm, in and of itself" and citing *Wisconsin Gas* approvingly). And while "[t]he federal government's sovereign immunity typically makes monetary losses . . . irreparable," *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. Jan. 12, 2023), courts have recognized that "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great.'" *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (collecting cases); *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (similar). "Otherwise, a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." *CoverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

Tennessee reports that, in recent years, its Title X funding has been approximately $7.1 million annually. *See* PI Br. 23. That amount represents a tiny fraction of the state's $55.6 billion annual

budget. [12]  Given that the Title X funding represents such a small portion of the state's budget, Tennessee has not met its burden of showing that even the loss of a year's funding would be so great as to constitute irreparable harm.  Tennessee nevertheless claims that the loss of its continuation grant "threatens Tennessee's Title X program entirely," *see* PI Br. 23-24.  But that argument depends on the assumption that the Tennessee General Assembly will not step in to fill the funding gap—an assumption that makes little sense given that the General Assembly appropriated approximately $7 million in funds to continue the Title X program in April 2023, and that the appropriation "is earmarked as recurring." *See* Supp. Decl. of Tobi Amosun ¶ 15, ECF No. 21-1.  And Tennessee has offered no evidence that the General Assembly is reconsidering its position on appropriating funding for the Title X program.  To the extent that Tennessee's theory of irreparable harm turns on the notion that the state's General Assembly will suddenly decide not to appropriate additional funding for the Title X program despite earmarking that appropriation as recurring, that claim is merely "speculative" and "theoretical" rather than "certain and immediate."  *D.T.*, 942 F.3d at 327. Accordingly, Tennessee has not met its burden to show irreparable harm based on a lack of funding.

Nor has Tennessee established the requisite irreparable harm based on alleged "reputational and sovereignty harms."  PI Br. 24.  Although "reputational injury has been held to be a form of irreparable harm" in some cases, it typically arises where the reputation injury stems from "unfair competition," not just a loss of funding.  *See, e.g.*, *La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 335 F. Supp. 3d 1002, 1021 (M.D. Tenn. 2018), *aff'd*, 928 F.3d 514 (6th Cir. 2019); *see also ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006).  Moreover, Tennessee's argument depends on HHS reporting Tennessee to the Federal Awardee Performance and Integrity Information System (FAPIIS)—and an action that it has expressly stated that it does not intend to take at this time (and has not taken in the nearly ten months since HHS denied Tennessee's continuation award).  *See* May

---

[12]  *See* State of Tenn., The Budget Fiscal Year 2023-2024 at xix, https://www.tn.gov/content/dam/tn/finance/budget/documents/2024BudgetDocumentVol1.pdf.

30, 2023 OPA Email, ECF No. 1-17. Again, then, Tennessee has offered no meaningful evidence that it will suffer any reputational harm, and it has not shown that such harm is certain and immediate.

Tennessee's sovereignty argument is equally unsuccessful. First, Tennessee offers no explanation how HHS is presently interfering with Tennessee's interest in limiting abortion, nor how a preliminary injunction would remedy that harm. Second, the case cited by Tennessee speaks only of the state's "sovereign interest in passing and enforcing its laws," not in limiting abortion. *See Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021). Finally, to the extent that Tennessee intends to claim that the 2021 Rule itself harms Tennessee's interest in limiting abortion, that argument comes too late, as Tennessee willingly applied for and received Title X funding subject to the 2021 Rule. *See Agency for Int'l Dev.*, 570 U.S. at 214.

## III. The Public Interest Weighs Against a Preliminary Injunction.

The balance of hardships and the public interest weigh against issuing an injunction here. When the government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Tennessee insists that an injunction "would not harm the agency or the public interest," PI Br. 24, but that argument ignores that "[t]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop," *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.*, No. 14-1823-RMW, 2014 WL 2192052, at *3 (N.D. Cal. May 23, 2014). HHS had the authority to issue the 2021 Rule, *Ohio*, 87 F.4th at 772, and the agency determined that its counseling and referral provisions were in the public interest. An injunction frustrating the enforcement of the 2021 Rule would therefore harm the agency and the public interest. And despite Tennessee's suggestion otherwise, *see* PI Br. 24–25, other Title X grantees are capable of providing family planning services within the state and filling any gaps left by the discontinuation of Tennessee's grant, *see* Compl. ¶ 79.

## CONCLUSION

For the foregoing reasons, the Court should deny Tennessee's preliminary injunction motion.

DATED: January 16, 2024             Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

/s/ R. Charlie Merritt
MICHAEL P. CLENDENEN
R. CHARLIE MERRITT (VA Bar # 89400)
ALEXANDRA R. SASLAW
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Counsel for Defendants*