# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| STATE OF TENNESSEE, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 3:23-cv-384 |
| ) | Judge Travis R. McDonough |
| XAVIER BECERRA, in his official capacity ) | Magistrate Judge Jill E. McCook |
| as Secretary of Health and Human Services; ) | |
| U.S. DEPARTMENT OF HEALTH AND ) | |
| HUMAN SERVICES; JESSICA S. MAR- ) | |
| CELLA, in her official capacity as Deputy ) | |
| Assistant Secretary for Population Affairs; ) | |
| and OFFICE OF POPULATION AF- ) | |
| FAIRS, ) | |
| ) | |
| *Defendants*. ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION AND § 705 STAY**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT................................................................................................................. 1

    I.   Tennessee Is Likely to Succeed on the Merits of Its Challenge. ................................. 1

        A.  HHS's Funding Rescindment Violates the Constitution. ...................................... 1

        B.  HHS's Funding Rescindment Violates the APA...................................................... 5

    II.  Tennessee Has Shown Irreparable Harm. ................................................................... 9

    III. The Remaining Factors Favor a Preliminary Injunction. .......................................... 10

CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                                   **Page(s)**

*Bennett v. Kentucky Department of Education*,
    470 U.S. 656 (1985) ............................................................................................................. 3

*Biden v. Missouri*,
    595 U.S. 877 (2022) ............................................................................................................. 4

*Brennan v. Dickson*,
    45 F.4th 48 (D.C. Cir. 2022) ................................................................................................ 5

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ............................................................................................................. 5

*Cty. of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999).............................................................................................. 7

*Cummings v. Premier Rehab Keller, PLLC*,
    142 S. Ct. 1562 (2022) ......................................................................................................... 5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ......................................................................................................... 8

*Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (2022) ........................................................................................... 1, 3, 5, 7, 9

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ............................................................................................................. 4

*Gruver v. Louisiana Board of Supervisors*,
    959 F.3d 178 (5th Cir. 2020) ................................................................................................ 4

*Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    195 F.3d 28 (D.C. Cir. 1999) ............................................................................................... 5

*Kellogg Co. v. NLRB*,
    840 F.3d 322 (6th Cir. 2016) ............................................................................................... 7

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .............................................................................................. 10

*Kentucky v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ................................................................................................ 6

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) ..............................................................................1, 2, 3, 4

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ............................................................................................... 6

*Miss. Comm'n on Env't Quality v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015) .................................................................................. 4

*Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*,
   964 F.3d 1177 (D.C. Cir. 2020) ................................................................................ 5

*NLRB v. Int'l Hod Carriers', Union*,
   287 F.2d 605 (9th Cir. 1961) ..................................................................................... 5

*NRDC v. EPA*,
   755 F.3d 1010 (D.C. Cir. 2014) ................................................................................ 7

*Ohio v. Becerra*,
   87 F.4th 759 (6th Cir. 2023) ........................................................................1, 5, 7, 9

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ................................................................................................... 5

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ................................................................................................. 2, 7

*Tennessee v. U.S. Dep't of Educ.*,
   615 F. Supp. 3d 807 (E.D. Tenn. 2022) ............................................................. 9, 10

*Texas Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) ..................................................................................... 2

*Texas v. Becerra*,
   623 F. Supp. 3d 696 (N.D. Tex. 2022) ..................................................................... 9

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ..................................................................................... 8

*Tiger Lily, LLC v. U.S. Dep't of Housing & Urban Dev.*,
   5 F.4th 666 (6th Cir. 2021) ....................................................................................... 3

*Valley Family Planning v. North Dakota*,
   661 F.2d 99 (8th Cir. 1981) ....................................................................................... 4

*W. Virginia ex rel. Morrisey v. U.S. Dept of the Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ................................................................................. 2

**Statutes**

42 U.S.C. § 300a-4(b) .................................................................................................................. 2

Tenn. Code Ann. § 63-6-1103 ..................................................................................................... 7

**Regulations**

42 C.F.R. § 59.5(b)(6) .................................................................................................................. 6

42 C.F.R. § 59.5(b)(8) .................................................................................................................. 7

42 C.F.R. § 59.8(c) ...................................................................................................................... 8

53 Fed. Reg. 2922 (Feb. 2, 1988) ................................................................................................ 4

**Other Authorities**

*Acceptable*, Black's Law Dictionary (11th ed. 2019) ................................................................. 6

*Acceptable*, Cambridge Dictionary ............................................................................................. 6

# INTRODUCTION

HHS claims novel power to condition States' Title X funding on their counseling and referring women to receive illegal abortions. HHS's defense of that policy mostly seeks to draft off of *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023), which upheld the 2021 Title X Rule. But this case is no *Ohio* 2.0.

*First*, *Ohio* did not address Tennessee's lead Spending-Clause argument that Congress must have specified HHS's illegal-abortion condition in Title X. HHS's topline response—that Congress can delegate its condition-setting powers to agencies wholesale—would leave the Spending Clause and the Sixth Circuit's precedents interpreting it a dead letter. HHS's fallback—that Tennessee knew of the 2021 Rule before *Dobbs*—does not show that Tennessee plainly accepted HHS's extreme post-*Dobbs* position on *illegal* abortions and could not cure HHS's Spending-Clause problems in all events.

*Second*, *Ohio*'s decision on the 2021 Rule's *facial* validity does not forever shield HHS from Title X scrutiny. Tennessee's *as-applied* challenge involves a new agency action that turns on Tennessee's facts and agency record. And judged by those lights, the Rescindment suffers myriad APA defects that *Ohio* predicted would "undoubtedly" come up in a post-*Dobbs* world. 87 F.4th at 774 n.7.

Tennessee soon faces another $7 million in lost funding—a textbook irreparable injury. And the Rescindment is harming the State's programmatic, reputational, and sovereign interests. The equities favor holding HHS to the law, as well as continuing Tennessee's effective Title X program.

# ARGUMENT

## I. Tennessee Is Likely to Succeed on the Merits of Its Challenge.[1]

### A. HHS's Funding Rescindment Violates the Constitution.

The Spending Clause requires "Congress *itself*" to speak "with a 'clear voice'" when conditioning funding. *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022) (citation omitted). HHS (at 17) agrees, yet claims the Rescindment does not implicate that rule, or else satisfies it. Both are wrong.

a. HHS (at 18) first says its Rescindment involves no "funding condition" at all, just HHS's determination that continued funding "would not be in the best interest of the government." But

---

[1] HHS does not dispute this Court's power to review the Rescindment or grant Tennessee's relief.

1

HHS made that determination because of Tennessee's "noncompliance" with the 2021 Rule's abortion condition. Opp'n 22. So HHS indisputably applied its illegal-abortion condition to strip Tennessee's funding. Having done so, it cannot now sidestep Spending-Clause scrutiny with semantics, or with post hoc best-interest reasons. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). Nor is *Ohio* an out. *Ohio* had no occasion to face the Spending-Clause implications of Title X's ambiguity. Now, Tennessee's funding strip squarely presents the Spending-Clause question.

    b. HHS (at 18) next argues it satisfied the Spending Clause because Title X clearly allows HHS to add "such conditions" on Title X funding it "may determine to be appropriate." 42 U.S.C. § 300a-4(b). Translation: The only condition Congress must create is to "follow conditions prescribed by the agency." Opp'n 20. From there, HHS reasons that its 2021 Rule sufficed to clear any Spending-Clause-clear-statement hurdle. That argument fails for two independent reasons.

    *First*, circuit consensus (cited at PI Br. 11-13) holds that agencies cannot satisfy the Spending-Clause clear-statement rule through rulemaking. In each cited case, courts reasoned that only Congress acting via statute, not agencies acting via rules, can set spending conditions—no matter what rulemaking power or deference agencies might normally enjoy. *Yellen*, 54 F.4th at 354; *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021); *W. Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147-48 (11th Cir. 2023). Even spotting that the 2021 Rule disclosed HHS's 2023 illegal-abortion condition, then, the agency's Spending-Clause theory still fails.

    HHS (at 18) counters that these cases involved agencies' acting to clarify "ambiguous *statutory* funding conditions," rather than acting under an express rulemaking delegation like Title X's (which permits HHS to set "such conditions" as it "may determine to be appropriate," 42 U.S.C. § 300a-4(b)). That makes no constitutional difference. The Spending Clause gives "Congress, not the executive branch, the power to tax and spend through the exercise of its legislative power." *Morrisey*, 59 F.4th at 1147. An agency violates that rule by exercising independent condition-setting power.

    HHS (at 20-21) agrees that *Yellen*'s clear-statement rule bars agencies from "cur[ing] … vagueness" in any unclear statutory conditions Congress provides. Yet HHS reads *Yellen* as allowing agencies to conjure new conditions entirely outside Congress's statutory guardrails. That turns *Yellen* on

2

its head. If the Spending Clause clear-statement rule bars agencies from clarifying statutory conditions through regulations, it necessarily bars agencies' creating new conditions entirely.

"[T]o put 'extra icing on a cake already frosted,'" HHS's interpretation of Title X "could raise a nondelegation problem" by granting HHS "near-dictatorial power" to saddle States with whatever controversial Spending-Clause conditions HHS deems "appropriate." *Tiger Lily, LLC v. U.S. Dep't of Housing & Urban Dev.*, 5 F.4th 666, 672 (6th Cir. 2021) (citation omitted). Giving HHS "unfettered power" to tie funds to abortion "would likely require greater guidance" than Title X's boilerplate provisions set out. *Id.* (discussing provision permitting rules "necessary to prevent the introduction, transmission, or spread of communicable diseases"). Free-rein condition power would further hamper the stability integral to establishing effective programming. PI Br. 13. Again, HHS offers no response.

HHS's other attempts to distinguish *Yellen* fall flat. HHS (at 21) asserts that *Yellen*'s funding condition was "novel," but so is HHS's illegal-abortion condition, *see infra* p. 4. HHS (at 21-22) next claims that the taxing-power issue in *Yellen* was more core to "state sovereignty" by downplaying Tennessee's aim here as one to "provide[] family planning and preventive health services." Tennessee instead seeks to enforce abortion limitations to promote a "compelling" interest in protecting fetal life—a "profound moral issue" that *Dobbs* permits Tennessee to "regulate … as its citizens wish." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2240-42, 2269 (2022). HHS (at 21) cannot seriously suggest that "taxation is a core aspect of state sovereignty," but control over abortion is not. Nor did *Yellen* turn on the greater sums at stake there, foreclosing HHS's attempt (at 21-22) to read a new amount-in-controversy requirement into the Spending Clause.

Conversely, the cases HHS cites (at 19-20 & n.10) do not support its extreme Spending-Clause position. *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 666 (1985) found "[t]he requisite clarity . . . [to be] provided *by Title I*." (Emphasis added.) The Court did not adopt, and was "reluctant" to accept, the Government's argument that "any reasonable interpretation" of statutory requirements could determine "grant conditions." *Id.* at 670 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). Further, the *Bennett* regulations were more akin to "implementation details," *Yellen*, 54 F.4th at 354—something HHS cannot credibly claim for its controversial abortion

3

mandate. *Biden v. Missouri*, 595 U.S. 877 (2022) (*per curiam*), did not address the Spending Clause, period. *Gruver v. Louisiana Board of Supervisors*, 959 F.3d 178, 182-84 (5th Cir. 2020), and *Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d 138, 176, 179 (D.C. Cir. 2015), did involve the Spending-Clause clear-statement rule, but concluded that *congressionally* imposed funding conditions were not "unconstitutionally coercive" based on historical practice. But the lack of HHS's historical pedigree cuts the other way on coercion here, *infra* p. 4, as does the fact that HHS would condition "*all*" of Tennessee's Title X funding on a "dramatic alteration" of the States' right to enforce duly enacted abortion prohibitions, *see NFIB v. Sebelius*, 567 U.S. 519, 581, 584 (2012) (plurality op.).

HHS (at 19-20) resorts to a strawman by arguing that Tennessee's position would nullify "any" HHS-imposed conditions and be too "onerous" to enforce. But the fact that HHS's position might be "efficient, convenient, and useful in facilitating functions of government" cannot "save it if it is contrary to the Constitution." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 499 (2010) (cleaned up). Regardless, Tennessee does not dispute agencies' power to help carry out clear congressional conditions. But as in *Yellen*, HHS went much further than adding mere "implementation details" here by using a general delegation to set an entirely new and controversial funding condition that derogates state sovereignty. 54 F.4th at 354. If the Spending Clause bars anything, it is HHS's action here.

*Second*, HHS (at 20) is mistaken that Tennessee should have "plainly ascertain[ed]" the illegal-abortion condition prior to HHS's March 2023 Rescindment. HHS (at 21) cannot rest on Title X's "four decades" history of abortion counseling and referrals, since *Roe* blocked elective-abortion restrictions that whole post-1981 period, *see* 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988). Indeed, HHS's only pre-*Roe* guidance on abortion clarified that Title X "prohibit[s] Title X projects from in any way promoting or encouraging abortion as a method of family planning." *Id.* Nor does *Valley Family Planning v. North Dakota*, 661 F.2d 99 (8th Cir. 1981) (cited at Opp'n 8 n. 4), support that Title X rules have historically overridden state "abortion policies." *Valley Planning* held that a narrower HHS rule preempted a State from restricting abortions "necessary because of the patient's medical condition." *Id.* at 101. But Tennessee's challenge does not involve *legal* medically necessary abortions, only *illegal* elective ones. HHS's current stance—requiring abortion referrals despite legality—is unprecedented.

4

*Ohio* forecloses HHS's attempt (at 18-19) to rest notice on the 2021 Rule itself. As *Ohio* explains, when HHS issued the 2021 Rule, *Dobbs* "had not yet happened," so HHS was silent on the problem of illegal abortions. 87 F.4th at 774 n.7. The notice-and-comment proceedings HHS cites (at 18-19) underscore that point: HHS did not confront a comment citing a Louisiana law that "provid[ed] criminal penalties for abortion in the event that [*Roe*] were overturned," *id.*, further undercutting HHS's claim that the 2021 Rule resolved the illegal-abortion issue. The "contract-law analogy" employed in Spending-Clause cases counsels the same conclusion. *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1570 (2022) (citation omitted). Most relevant, Tennessee could not have reasonably known that HHS's abortion condition would operate irrespective of abortion's "supervening illegality." *Cf. NLRB v. Int'l Hod Carriers', Union*, 287 F.2d 605, 610 (9th Cir. 1961).

### B. HHS's Funding Rescindment Violates the APA.

HHS agrees (at 8 & n.5) the Rescindment is a new agency action, yet insists (at 7-9, 12) that *Ohio*'s ruling on the facial challenge to the 2021 Rule controls here. But it is blackletter administrative law that parties can independently challenge a rule's unlawful *application*, even if a rule *on its face* "does not exceed statutory authority and comports with the APA." *Brennan v. Dickson*, 45 F.4th 48, 61 (D.C. Cir. 2022).[2] *Ohio* does not empower HHS to perpetually apply the 2021 Rule as if *Dobbs* and States' now-lawful abortion restrictions never happened. Otherwise, *Ohio*'s caveat that the "impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect' of the question" for future purposes would make no sense. 87 F.4th at 774 n.7. Fresh APA scrutiny applies, and the Rescindment fails it.

#### 1. The Rescindment Exceeds HHS's Regulatory Authority.

*Title X.* *Ohio* did not consider whether Title X permitted HHS to require counseling and referral by States who generally prohibit elective abortions. Because Tennessee challenges only the permissibility of that novel application, HHS's *Ohio*-based defense (at 7-9) of the Rescindment fails.[3]

---

[2] *Accord Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 964 F.3d 1177, 1188-89 (D.C. Cir. 2020); *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999); *see also Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (emphasizing facial and as-applied distinction).
[3] With the Supreme Court teed up to inter *Chevron* this Term, the collapse of HHS's must-defer defense seems only a matter of time. Tennessee reserves the right to revisit this issue. *See* PI Br. 14 n.3.

5

*Ohio* aside, HHS barely defends its illegal-abortion interpretation on the merits. PI Br. 16-17. The easy explanation for why Congress "wrote no exceptions" into Title X for state abortion laws, Opp'n 9, is that Congress never imagined HHS would read Title X to confer illegal-abortion-mandate power—not that Congress tacitly blessed HHS's contravening most States' elective-abortion laws. *Cf. Kentucky v. Biden*, 57 F.4th 545, 553 (6th Cir. 2023) ("Congress does not hide elephants in mouseholes." (cleaned up)). HHS (at 9) asserts without support that Title X's requirement that grantees offer "acceptable" medical services "plainly refers" only to services' "medical suitability," not whether such services "are legal." The dictionary disagrees.[4] Nor does HHS explain its view (at 9) that "acceptable services" includes directing women to illegal medical procedures so long as someone else performs them. HHS's conscience-laws response (at 9) stunningly contends HHS could "coopt the abortion policies of entire state[s]" with no problem. HHS's abortion-czar take evades Tennessee's contextual point: It is implausible to think Congress protected providers' individual anti-abortion stances, yet gave HHS Title X power to override entire States' anti-abortion laws at will. PI Br. 16.

***2021 Rule.*** HHS's post hoc rationales for the 2021 regulations come too late to merit deference, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 n.6 (2019), and are wrong besides. *First*, the 2021 regulations require that all Title X services "be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law." 42 C.F.R. § 59.5(b)(6). HHS (at 10) says this provision merely expanded *who* can provide services, not *what* services are permitted. That would nullify the "allowable under state law" provision, which plainly modifies permissible *services* and not the providers. *Second*, HHS's contention (at 10-11) that "pregnancy termination" and "abortion" are the same likewise ignores the regulations' plain text and practice under state law, both of which distinguish the concepts. Neither commenters nor *Ohio* addressed the issue, *contra* Opp'n 11, since States did not previously have elective abortion bans, *supra* p. 5. *Third*, HHS (at 11) fights its referral regulation's "when feasible" provision, which modifies providers' general referral

---

[4] *See, e.g.*, *Acceptable*, Cambridge Dictionary ("able to be agreed to *or approved of*"), http://tinyurl.com/2tbunrt2; *Acceptable*, Black's Law Dictionary (11th ed. 2019) ("capable, worthy, and *sure of being favorably received*") (all emphases added).

6

duty, not just referrals in close physical proximity. *See* 42 C.F.R. § 59.5(b)(8). As Tennessee explained (at 18), it is not feasible for Title X providers to make referrals for illegal procedures. HHS's contrary account reads out the close-proximity provision entirely by requiring futile referrals to far-flung States. HHS's telehealth fallback (at 11) raises issues HHS never considered, *infra* pp. 7-8, and violates Tennessee law, *see* Tenn. Code Ann. § 63-6-1103 (requiring in-person provision of medication abortions).

## 2. The Rescindment Is Arbitrary and Capricious.

Even under "deferential" arbitrary-and-capricious review, Opp'n 12, courts cannot "'rubber stamp'" invalid agency action or rest on new counsel-created justifications. *See Kellogg Co. v. NLRB*, 840 F.3d 322, 327-28 (6th Cir. 2016) (citation omitted). Those rules bar HHS's attempt to rehabilitate the Rescindment's barebones reasoning, HHS's belated position change, or Tennessee's reliance harm.

***Important Aspects of Problem.*** HHS (at 12) cannot excuse the Rescindment's shoddy reasoning simply because the 2021 Rule is "valid" on its face. *Supra* p. 5. Anyway, HHS's post-*Dobbs* statements (at 12-13) do not show HHS considered State abortion prohibitions when it promulgated the 2021 Rule a year earlier. *See Chenery*, 318 U.S. at 87-88 (evaluating action on reasons given when taken). Indeed, *Ohio* forecloses any such claim. 87 F.4th 774 n.7. Because *Dobbs* "had not happened yet," HHS had not considered such laws "[w]hen [it] implemented" the rule. *Id.* HHS's point (at 13) that States did not hypothesize about the abortion-mandate's post-*Dobbs* problems only confirms the 2021 Rule bypassed the issue. And the "affirmative burden" to "examine key assumptions" underlying the Rescindment fell on HHS regardless. *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014).

HHS (at 13) further claims its policy judgment in favor of out-of-state referrals necessarily accounted for Tennessee's countervailing concerns, but does not say how, where, or whether *Ohio* was wrong to note otherwise. *Cf. Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021-22 (D.C. Cir. 1999) (agency must adequately explain conclusions). Likewise for HHS's inexplicable assertion (at 13-14) that the costs of States' complex post-*Dobbs* compliance obligations are "built into" a pre-*Dobbs* rule promulgated when in-state referrals were the norm. HHS (at 13-14) again touts telemedicine or an abortion "hotline" as the answer. But States' referring for that type of remote abortion care presents a seismic shift with significant public-health, legal, economic, and standard-of-care implications HHS

7

Case 3:23-cv-00384-TRM-JEM    Document 27    Filed 01/23/24    Page 12 of 17
PageID #: 404

has not acknowledged, much let adequately explained and addressed. PI Br. 19-20; *supra* p. 4.

HHS's claim (at 14) that other Title X grantees can fill the void left by Tennessee is directly contrary to HHS's earlier position that Tennessee operates "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services." D.E. 1, Program Review at 4. HHS does not acknowledge that record evidence, nor explain how it suddenly concluded the newly funded entities can provide adequate care statewide. Finally, HHS (at 14-15) does not dispute that several more States with elective-abortion restrictions may be driven out of the program—another important problem HHS has nowhere mentioned, let alone adequately addressed.

*Position Change.* HHS claims (at 15) that the State's "legal in the State of Tennessee" referral policy first appeared in its February 13 letter, ignoring the policy's date—*July 1, 2022*, D.E. 1-3, Feb. 13 Ltr., before the July 11 Program Review even began, *see* Program Review. HHS likewise ignores Dr. Amosun's undisputed testimony that, during the review, she "told [OPA] that [the] new *July 2022* protocol . . . would only direct staff to offer counseling and referrals for pregnancy terminations *that are legal in Tennessee*." D.E. 1-5, Amosun Decl. ¶ 17 (emphasis added). And HHS's program review confirms HHS knew and approved of Tennessee's policy: Under the July 2022 policy, HHS wrote, "[n]o referrals for abortion are made," but still the 2021 Rule's "expectation was **MET**." Program Review at 24 (emphasis in original). HHS (at 5 & n.2) faults Tennessee for failing to update the State's post-trigger-law policy. But the July 2022 policy never changed, meriting no update. *Compare* Amosun Decl., Ex. A (July 2022 policy), *with* Feb. 13 Ltr. (providing same policy).

*Reliance.* HHS (at 15-16) claims Tennessee's longstanding Title X program confers no reliance interests, since HHS maintained boilerplate discretion over funds. (Citing 42 C.F.R. § 59.8(c)). That reasoning runs headlong into *Regents*, where the Supreme Court "faulted DHS for not considering reliance interests" *despite* "acknowledg[ing] that DACA was a discretionary program." *Texas v. Biden*, 20 F.4th 928, 990 (5th Cir. 2021) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020)), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022). That "the referral requirement has been in effect since at least 2021" is of no moment, Opp'n 16; HHS needed to explain the new *illegal-abortion* requirement it applied it to strip Tennessee's funding in March 2023, *supra* p. 5.

8

### 3. The Rescindment Is Procedurally Invalid.

HHS (at 16) claims it merely applied the "plain language of the 2021 Rule," so no notice-and-comment was required. But the 2021 Rule could not have established HHS's policy on States' elective-abortions restrictions because there were no such restrictions in effect then. *Supra* p. 4. It was only after *Dobbs* that HHS disclosed new "duties" covering illegal abortions. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022) (citation omitted). "If that were not enough," Title X has "never been construed to preempt state abortion laws" barring elective abortions—further proof HHS's post-*Dobbs* position is "a new substantive legal standard." *Texas v. Becerra*, 623 F. Supp. 3d 696, 735 (N.D. Tex. 2022), *aff'd* 89 F.4th 529 (5th Cir. 2024). Because HHS's Rescindment "purports to expand the footprint of" Title X to cover the new context of illegal abortions, notice-and-comment was required. *Tennessee*, 615 F. Supp. 3d at 839; *accord Texas*, 623 F. Supp. 3d at 735.

## II. Tennessee Has Shown Irreparable Harm.

HHS (at 22-25) does not dispute that its abortion-referral mandate alone caused Rescindment of Tennessee's $30 million grant, nor that Tennessee will lose $7 million as soon as April 2024. HHS's claim (at 23) that "economic loss[es]" cannot constitute irreparable harm ignores the binding precedents Tennessee cited. PI Br. 23. Indeed, HHS unsuccessfully made that argument in *Ohio*, *see* HHS Br. 17 in *Ohio*, 87 F.4th 759, which instead held that Ohio's "unrecoverable" loss of "one-fifth of its Title X funding" (about $1.76 million) meant "the 2021 Rule has caused irreparable harm." 87 F.4th at 781-83. That holding—which did not turn on Ohio's total finances—also forecloses HHS's fallback (at 23-24) that Tennessee's funding gap is not irreparable given the State's overall budget. If Ohio's $1.76 million Title X loss was irreparable harm, so is Tennessee's larger loss.

HHS's "the State 'step[ped] in'" response (at 23) to Tennessee's programmatic harm would perversely punish Tennessee for supporting needy Title X patients with state funds, rather than leaving them to suffer the foreseeable "gap in services" of HHS's own making. Program Review at 4. Nor does HHS address how Tennessee's need to fill its Title X shortfall works an irreparable here-and-now deprivation of funding for Tennessee's other programs and priorities. PI Br. 24.

9

HHS's reputational-harm cases (at 24) say that unfair competition is one area where reputation-based harm is "typically presumed," not the only area where reputation-based injury occurs. HHS's grantee-reporting system cements Tennessee's reputational harm: HHS officials advised the Rescindment meant Tennessee "must be reported [by OPA] to the . . . Federal Awardee Performance and Integrity Information System," which "may affect [the State's] ability to obtain future Federal funding" (totaling over $1.4 billion for the Department of Health alone). D.E. 1-9, Mar. 1 Ltr. at 2; D.E. 1-18, Oliver Decl. Even now, HHS (at 24) refuses to disavow needing to report Tennessee.

HHS (at 25) claims not to grasp how its abortion-referral mandate is "interfering with Tennessee's interest in limiting abortion." Obviously, Tennessee seeks to limit abortion by not referring women to get abortions. HHS's assertion (at 25) that Tennessee has a sovereign interest in "passing and enforcing its laws, not in limiting abortion" ignores that state law limits abortion. *See Tennessee*, 615 F. Supp. 3d at 840-41 (collecting cases recognizing similar harms). If requiring States to promote abortion procedures they have outlawed does not implicate sovereignty, what would?

### III. The Remaining Factors Favor a Preliminary Injunction.

The balance of the equities favors an injunction. HHS (at 25) claims an injunction would cause it "inherent harm" by "preventing it from enforcing [its] regulations." But the "public's true interest" lies "in a correct application" of laws limiting agency action, which the Rescindment violates. *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022). The public interest likewise supports maintaining Title X funding for Tennessee, which HHS deemed "the only agency with the capacity, staff, and expertise to administer Title X funds with integrity and without a gap in services." Program Review 4. It was thus HHS's conclusion, not "Tennessee's suggestion," Opp'n 25, that only Tennessee's program would ensure reliable provision of public-health services. HHS's uncited claim (at 25) that "other Title X grantees" can fill Tennessee's gap belies the record and the State's Title X landscape.

### CONCLUSION

This Court should grant Tennessee's motion for a preliminary injunction and § 705 stay.

10

Respectfully submitted,

*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER* (BPR# 41054)
Director of Strategic Litigation and
Assistant Solicitor General
TRENTON MERIWETHER (BPR# 38577)
MATTHEW P. DYKSTRA* (BPR# 38237)
Assistant Attorneys General, Healthcare Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Whitney.Hermandorfer@ag.tn.gov
Trenton.Meriwether@ag.tn.gov
Matthew.Dykstra@ag.tn.gov
**Admitted Pro Hac Vice*

*Counsel for Plaintiff the State of Tennessee*

11

## CERTIFICATE OF SERVICE

   I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 23rd day of January 2024 on the following:

R. Charlie Merritt
Michael P. Clendenen
Alexandra R. Saslaw
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel: (202) 616-8098
Robert.c.merritt@usdoj.gov
Michael.p.clendenen@usdoj.gov
Alexandra.r.saslaw@usdoj.gov

*Counsel for Defendants*

              */s/ Whitney Hermandorfer*
              WHITNEY HERMANDORFER (BPR# 41054)
              Office of the Tennessee Attorney General
              P.O. Box 20207
              Nashville, Tennessee 37202
              Whitney.Hermandorfer@ag.tn.gov

              *Counsel for Plaintiff the State of Tennessee*