# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | Case No. 3:23-cv-384 |
| *Plaintiff,* | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Jill E. McCook |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity, OFFICE OF POPULATION AFFAIRS, and JESSICA S. MARCELLA, in her official capacity, | ) ) ) ) ) ) ) | |
| *Defendants.* | ) | |

---

## MEMORANDUM OPINION

---

For years, Tennessee accepted millions of dollars in federal grant funding to support its family-planning project. These funds were expressly conditioned on the project's provision of abortion counseling and referrals upon women's requests. And, for years, Tennessee willingly accepted and complied with this condition. But, following the Supreme Court's decision to overturn *Roe v. Wade*, Tennessee refused to satisfy the same condition. Tennessee still wants the federal funds, it wants them free of this condition, and it wants this Court to order a federal agency to provide that funding—all despite the disavowal of its prior agreement with the agency. For the reasons set forth below, Tennessee's motion for a preliminary injunction (Doc. 20) will be **DENIED**.

# I. BACKGROUND

## A. HHS's Abortion Counseling and Referral Regulations Before 2021

Title X of the Public Health Service Act authorizes the United States Department of Health and Human Services ("HHS") "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Grants under Title X "shall be made in accordance with such regulations as the Secretary may promulgate" and are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* § 300a-4(a)-(b). HHS typically awards these grants for a one-year period, but it may also issue "continuation awards" that allow a grantee to receive funding for a five-year period without having to reapply each year. 42 C.F.R. § 59.8(a)–(b).

Title X funds may not "be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. HHS's interpretation of this restriction has changed several times since 1980. In 1981, HHS "for the first time required nondirective 'options counsleing' [sic] on pregnancy termination (abortion) . . . when a woman with an unintended pregnancy requests information on her options, followed by referral for these services if she so requests." Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects 53 Fed. Reg. 2922 (Feb. 2, 1988). This "Counseling and Referral Rule" was in place until 1988 when HHS promulgated new regulations, commonly known as the "Gag Rule," barring Title X grantees from providing such counseling or referrals. *Id.* at 2945; Standards of Compliance for Abortion-

Related Services in Family Planning Services Projects, 65 Fed. Reg. 41270 (July 3, 2000). HHS suspended the Gag Rule in 1993 and provisionally reinstated the Counseling and Referral Rule. Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7464 (Feb. 5, 1993). HHS officially reinstated the Counseling and Referral Rule in 2000. 65 Fed. Reg. 41270. It remained in place until 2019, when HHS reinstated the ban on abortion referrals and rescinded the requirement (but did not impose a prohibition) that grantees provide nondirective counseling when requested (the "2019 Rule"). Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, 7789 (Mar. 4, 2019).

### B. The 2021 Counseling and Referral Rule

On October 7, 2021, HHS reimplemented the Counseling and Referral Rule via notice-and-comment rulemaking (the "2021 Rule").[1] 42 C.F.R. § 59.5; Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56144 (Oct. 7, 2021). The 2021 Rule largely reinstates the 2000 Rule and requires that Title X grantees provide a pregnant woman with counseling as to all her options, including "[p]renatal care and delivery; [i]nfant care, foster care, or adoption; and [p]regnancy termination." 42 C.F.R. § 59.5(a)(5)(i). "If requested to provide such information and counseling, [a grantee must] provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request."[2] Id. § 59.5(a)(5)(ii). Such a referral is limited to "providing a patient with the name, address, telephone number, and other relevant factual information . . . about an abortion

---

[1] The Court uses the phrase "Counseling and Referral Rule" to refer to the general requirement to counsel and refer for abortions that has existed in various forms since 1981 and uses the phrase "2021 Rule" to refer to the current iteration of the Counseling and Referral Rule.

[2] Though the 2021 Rule uses the term "client" rather than "woman," the Court will use the term "woman" for the sake of consistency, as it will be discussing the Rule in the context of past regulations that use the term "woman." See 42 C.F.R. § 59.5.

3

provider." 86 Fed. Reg. at 56150 (quoting 65 Fed. Reg. at 41281). A grantee "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." *Id.* The 2021 Rule went into effect on November 8, 2021, and, as a result, compliance with the 2021 Rule was a condition of Tennessee's receipt of a Title X grant in 2022.[3] 86 Fed. Reg. 56144; *Ohio v. Becerra*, 87 F.4th 759, 767 (6th Cir. 2023).

In promulgating the final 2021 Rule, HHS discussed at length why it was revoking the 2019 Rule and reimplementing the Counseling and Referral Rule. *See generally* 86 Fed. Reg. 56144. HHS noted that the 2019 Rule "interfered with the patient-provider relationship and compromised their ability to provide quality healthcare to all clients." *Id.* at 56146. HHS further found that, "the 2019 [R]ule appears to have . . . resulted in a significant loss of grantees, subrecipients, and service sites, and close to one million fewer clients served from 2018 to 2019." *Id.* at 56147. HHS detailed that, while nine states gained Title X service sites following the 2019 Rule, thirty-eight states lost service sites. *Id.* The agency observed that "the 2019 [R]ule shifted the Title X program away from its history of providing client-centered quality family-planning services and instead set limits on the patient-provider relationship and the information that could be provided to the patient by the provider." *Id.* at 56148. HHS expressed particular apprehension that "enforcement of the 2019 [R]ule raises the possibility of a two-tiered healthcare system in which those with insurance and full access to healthcare receive full medical information and referrals, while low-income populations [treated at a Title X site under

_____

[3] By this point, the Counseling and Referral Rule had been in place thirty-four of the past forty-one years (and twenty-seven of the past twenty-nine years) Tennessee had received Title X funding. There is no suggestion that Tennessee refused to comply with this condition prior to 2023.

the 2019 Rule] . . . are relegated to inferior access." *Id.* HHS directly considered the concern that the Rule would "compel[] states to adopt policies that conflict with their own laws." *Id.* at 56169. It responded that "states that object to the rule requirements or believe that there is a conflict with state law priorities are free to opt out of the federal grant program."[4] *Id.*

### C.    Tennessee's Agreement to the Counseling and Referral Rule

Since 1971, the Tennessee Department of Health ("TDH") has received grants from HHS for its Title X project. (Doc. 1, at 6.) TDH provides family-planning services at Title X facilities across the state. (*Id.*) Recently, TDH's Title X grants have totaled approximately $7.1 million annually. (*Id.* at 7.) In March 2022, HHS approved TDH's Title X grant application for the budget period of April 1, 2022, to March 31, 2023. (Doc. 1-7, at 1.) This grant was a five-year continuation award, anticipated to run through March 31, 2027. (*Id.*) The notice of award specifically stated that "[a]ll recipients must comply with the requirements regarding the provision of family planning services that can be found in the statute (Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.*) and the implementing regulations (42 C.F.R. Part 59, Subpart A)." (*Id.* at 4.) By this time, of course, these regulations included the 2021 Rule.

### D.    Tennessee's Criminalization of Abortion

Back in May 2019, Tennessee adopted a statute criminalizing all elective abortions in the event that *Roe v. Wade*, 410 U.S. 113 (1973) was overruled. *See* Human Life Protection Act,

---

[4] HHS responded to several additional concerns raised in the notice-and-comment period that are not at issue in this case. In response to the concern that the 2021 Rule violated providers' free-speech protections and conscience laws and would limit the type of providers participating in Title X, HHS noted that "objecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law." 86 Fed. Reg. at 56153–54. In response to the concern that the 2021 Rule would "result in a decrease in quality of care and would cost more to implement compared to the 2019 rule," HHS asserted that the 2021 Rule would "result in improved outcomes for all clients." *Id.* at 56,155.

2019 Tennessee Laws Pub. Ch. 351 (H.B. 1029, S.B. 1257); Tenn. Code Ann. § 39-15-213.  On June 24, 2022, the Supreme Court of the United States issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which did just that, thereby automatically triggering Tennessee's abortion-ban statute.  Tenn. Code Ann. § 39-15-213.  The statute, which became effective on August 25, 2022, provides that "a person who performs or attempts to perform an abortion commits the offense of criminal abortion . . . a Class C felony."  *Id.* § 39-15-213(b).  The statute defines "abortion" as "the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant with intent other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, to terminate an ectopic or molar pregnancy, or to remove a dead fetus."  *Id.* § 39-15-213(a)(1).  The statute does not prohibit a doctor from discussing abortion with patients or from referring patients to an abortion provider in a state where abortion is legal.  *See generally id.* § 39-15-213.

> **E.  HHS's Program Review and Tennessee's Abandonment of the 2021 Rule's Condition**

In June 2022, immediately following the *Dobbs* decision, HHS issued a memorandum stating its position that the 2021 Rule was unaffected by the *Dobbs* decision and that "Title X recipients are required to offer [counseling and referrals]" as they were before *Dobbs*.  (Doc. 1-6, at 4.)  HHS further stated that "[t]here are no geographic limits for Title X recipients making referrals for their clients" but that the referrals should be made to providers "in close physical proximity to the Title X site, *when feasible*."  (*Id.* at 5.)

From July 11, 2022, until July 15, 2022, HHS performed a program review of Tennessee's Title X project to ensure it was meeting HHS's expectations (the "July Review").  (Doc. 1-1.)  During the July Review, HHS examined TDH's official policies, observed patient

visits, and interviewed its staff. (*See id.*) HHS concluded that TDH had established policies in line with the 2021 Rule. (Doc. 1-1, at 24, 58–60.) It found that "[n]on-directive pregnancy counseling is offered by nurse practitioners" (*id.* at 24) and that "TDH service sites are allowed to provide resource lists to clients seeking information on pregnancy termination sites" (*Id.* at 60). During the July review, HHS learned that TDH's legal staff was reviewing its current policies and that TDH "expect[s] a decision on what they are allowed to provide to or say to clients seeking pregnancy termination counseling and referral." (*Id.* at 60.) HHS also noted that "[TDH] Staff are concerned they will not be allowed to provide counseling [for pregnancy termination]." (*Id.*) Tennessee asserts that, during the review, TDH informed HHS that, going forward, staff would only be able to "offer counseling and referrals for pregnancy terminations that are legal in Tennessee." (Doc. 1-5, at 3.) This policy is laid out in TDH's July 1, 2022, "Nursing Protocol," which Tennessee states is a "standard instructive guideline for nursing staff in clinical settings." (Doc. 1-4, at 2, 4.)

On October 19, 2022, Trisha Reed, an HHS Title X Project Officer, emailed Tennessee the results of the July Review. (Doc. 1-2.) Reed stated HHS had determined that, "as of the date of the Program Review [July 11 – July 15, 2022]," Tennessee was in compliance with its Title X grant requirements. (*Id.* at 1.) However, Reed noted that HHS had raised concerns during the July Review about the potential effects of Tennessee's impending abortion ban on TDH's ability to comply with the nondirective options counseling requirement. (*Id.* at 1.) Reed asked that Tennessee "update [HHS] on the policy changes in response to enactment of [Tennessee's

abortion ban].” (*Id.*) The record does not suggest that Tennessee ever provided HHS with the requested update.

On January 25, 2023, HHS sent a letter to Tennessee and all other Title X service grantees to inform them that HHS was reviewing all Title X grants “to ensure compliance with the requirements for nondirective options counseling and referral, as stated in the 2021 Title X [Rule].” (Doc. 1-8, at 1.) HHS informed grantees that they must submit their current policy “for providing nondirective options counseling and referrals within its Title X project,” as well as a written statement confirming that they were in compliance with the 2021 Rule. (*Id.*) HHS further noted that it could terminate grants of out-of-compliance grantees. (*Id.* (citing 45 C.F.R. § 75.372(a)(1)).) Tennessee responded on February 13, 2023, stating only that “[w]e believe we are in compliance with regulatory requirements *for the scope of allowable practice under Tennessee law*.” (Doc. 1-3, at 1 (emphasis added).) It also attached a copy of its Nursing Protocol, which noted that “[p]atients with positive pregnancy test must be offered the opportunity to be provided information and counseling *regarding all options that are legal in the State of Tennessee*.” (*Id.* at 2–4 (emphasis added).) Tennessee offered no further rationale to suggest it was in compliance.

On March 1, 2023, HHS sent a follow-up letter to Tennessee pointing to its noncompliance with the 2021 Rule. (Doc. 1-9.) Specifically, HHS stated that “[t]he inclusion of ‘legal in the state of Tennessee’ is not an acceptable addition to your policy as Title X recipients must still follow all Federal regulatory requirements regarding nondirective options counseling and referrals.” (*Id.* at 1.) HHS specifically noted that, to comply with the 2021 Rule, “projects are required to provide referrals upon client request, including referrals for abortion.” (*Id.* at 2.) HHS gave Tennessee until March 13, 2023, to submit an alternate protocol that complied with

the 2021 Rule. (*Id.*) HHS warned Tennessee that, if it failed to do so, its noncompliance with the terms of its Title X grant could lead to suspension or termination of the grant. (*Id.*)

Tennessee responded on March 13, 2023. (Doc. 1-10.) It noted that the 2021 Rule required counseling and referral for "pregnancy termination." (*Id.* (quoting 42 C.F.R. § 59.5(a)(5)).) Tennessee claimed that its abortion ban exempts pregnancy terminations that are done with the intent "to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus" from its definition of abortion. (*Id.* (quoting Tenn. Code Ann. § 39-15-213(a)(1)).) It concluded that it therefore "[does] not construe the phrase 'pregnancy termination' to include every possible method of 'pregnancy termination,' such as abortion." (*Id.*) In sum, Tennessee's position was that, because it was still telling patients about the narrow circumstances in which Tennessee allows pregnancy termination, it was in compliance with the 2021 Rule. (*Id.*) It made no attempt to explain how its policies satisfied the 2021 Rule's requirement to offer counseling and referrals for abortions, as that requirement had been applied for a total of nearly three and one-half decades. (*See generally id.*)

On March 20, 2023, HHS replied to Tennessee. (Doc. 1-11.) HHS stated that it "ha[d] reviewed your [March 13, 2023] statement and determined that Tennessee's policy for providing nondirective options counseling and referral within your Title X project remains not in compliance with the Title X regulatory requirements and, therefore, the terms and conditions of your grant." (*Id.* at 3.) As a result, HHS determined that "Tennessee is unable to comply with the terms and conditions of the award" (*id.* at 1) and that HHS would "not [be] providing Fiscal

Year (FY) 2023 continuation funding for the Tennessee Department of Health noncompeting continuation application" (*id.* at 3).

### F. Tennessee's Lawsuit

Tennessee filed this action on October 24, 2023 (Doc. 1) and moved for a preliminary injunction against the United States Department of Health and Human Services; Xavier Becerra, the United States Secretary of Health and Human Services; the Office of Population Affairs; and Jessica Marcella, the Deputy Assistant Secretary for Population Affairs (collectively "Defendants") on December 1, 2023 (Doc. 20). Tennessee argues that Defendants' decision not to fund its Title X grant violates both the Spending Clause of the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. (*Id.* at 3.) Tennessee's motion is ripe for the Court's review.

## II. STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court considers the following factors when evaluating a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Id.* at 542 (citations omitted).

The Sixth Circuit has noted that "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th

Cir. 2014) (citations omitted). Furthermore, the Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citation omitted).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citations omitted). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke*, 511 F.3d at 542 (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

## III.    ANALYSIS

Tennessee attempts to frame HHS's decision to terminate its Title X grant as an unexpected and unprecedented attack on its sovereignty. The truth is far less dramatic. Tennessee, a longtime Title X grantee, decided to apply for a Title X grant. At the time it accepted the grant, Tennessee knew that it would be required to abide by all HHS regulations, just as it had for decades. One of those regulations required Title X grantees to provide neutral,

medically accurate counseling and referrals for abortion if women so requested.  The Supreme

Court's issuance of the *Dobbs* decision after Tennessee agreed to that condition triggered a

Tennessee law banning abortions.  Although that newly effective statute did not prohibit doctors

from discussing abortions or referring their patients to abortion providers located where the

procedure is legal, Tennessee nevertheless decided that TDH would not comply with the 2021

Rule; it would only allow medical providers to discuss pregnancy terminations that remained

legal in Tennessee, and it would not allow counseling about, or referrals for, abortion services.

In receiving a grant from the federal government, a state commonly enters into a simple

bargain.  The state receives money in return for its agreement to comply with conditions.  If a

state does not like the conditions, it does not take the money, and the matter ends there.  But

Tennessee wants to have its cake and eat it too; it wants the federal money but does not want to

comply with the federal conditions it knowingly assumed.  The law does not support such a

result.

### A.     Likelihood of Success on the Merits

Tennessee asserts that Defendants' decision not to fund its Title X grant is unlawful

because it violates the Spending Clause of the United States Constitution and the APA.  (Doc.

21, at 16.)  Tennessee has failed to demonstrate that it has a strong likelihood of success on either

of these grounds.

#### *i.*     Spending Clause

Tennessee first argues that the 2021 Rule violates the Spending Clause because Congress

did not provide clear notice of the conditions of accepting a Title X grant.  (*Id.* at 17.)  The facts

demonstrate otherwise.

The Spending Clause allows Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. In using this power to spend, "Congress may attach conditions on the receipt of federal funds and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *S. Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (citations and internal quotation omitted). The Supreme Court has noted that this spending power functions "in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). However, "[t]he spending power is of course not unlimited." *Dole*, 483 U.S. at 207 (internal citation omitted). When a state accepts a federal grant, it must do so "voluntarily and knowingly," just like a party agreeing to the terms of a contract. *Pennhurst*, 451 U.S. at 17 (citation omitted). As such, the Supreme Court has held that "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously . . . , enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (cleaned up). To determine whether a state has notice of a condition, a court must view the relevant statute "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [grant] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

13

Title X is a grant program that exists to promote family-planning services. *See generally* 42 U.S.C. § 300a. The operative language of Title X provides that "[t]he Secretary is authorized to make grants . . . to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." *Id.* § 300a(a). The statute provides that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). Additionally, Title X grants are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* § 300a-4(b). By adding this clause, Congress made compliance with HHS regulations a clear and unambiguous condition of receiving a Title X grant. Tennessee does not dispute this fact. (*See generally* Docs. 21, 27.)

That the statute itself does not set out in detail every condition for receiving a grant is immaterial because the conditions are readily discernable from HHS regulations. The Supreme Court has found that notice of spending conditions can be provided by agency regulations. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (finding that a grantee had adequate notice that by accepting federal funding, a school may be liable for retaliation when "[t]he regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years") (citation omitted); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999) (finding a Title IX funding recipient was on notice of condition when "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond the discriminatory acts of certain nonagents"). This makes sense, as any state official seeking to identify the conditions of accepting a grant can easily find them in HHS regulations. *See Arlington*, 548 U.S. at 295–96; 42 C.F.R. § 59.5. Such

transparency allows states to "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).

The undisputed facts expose as a figment Tennessee's argument that the Counseling and Referral Rule is a "newly derived Title X condition" of which it had no notice. (Doc. 21, at 18.) Tennessee knew it was required to comply with HHS regulations, and the 2021 Rule was in place at the time Tennessee applied for and accepted Title X funding in March 2022. *See generally* 86 Fed. Reg. 56144. Tennessee's claim of unfair surprise is further undercut by the fact that the Counseling and Referral Rule had, as of March 2022, been in place twenty-seven of the last twenty-nine years and had always required counseling and referrals for abortions.[5] *See Ohio*, 87 F.4th at 765–67 (laying out the history of the Counseling and Referral Rule). During this entire period, HHS never suggested that a state's obligation to counsel and refer for abortions could be limited by a state's laws. *See generally id.* And there is no evidence that Tennessee did either. HHS did not suggest that its regulatory requirements would change if *Roe* were to be overturned. *Id.* It is Tennessee, not HHS, that has unilaterally abandoned its obligations while seeking to retain the benefits received in exchange for agreeing to those very obligations.

---

[5] As Tennessee notes, it has been a Title X grantee for this entire period. (Doc. 21, at 10.) Analyzed within the contract-law framework, this long course of dealing between Tennessee and HHS is worth considering to determine whether Tennessee had notice of the requirement that it counsel and refer for abortions. *See Miss. Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 179 (D.C. Cir. 2015) ("[T]he fact that the State has long accepted billions of dollars notwithstanding the challenged conditions may be an additional relevant factor in the contract-like analysis the Court has in mind for assessing the constitutionality of Spending Clause legislation."); *Jackson*, 544 U.S. at 183 (finding that a grantee had adequate notice when "[t]he regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years") (citation omitted).

Tennessee does not argue that the statutory requirement that a state comply with HHS regulations is unclear.[6] (*See* Doc. 21, at 17–21.) Tennessee instead argues that "Congress [cannot] use a general rulemaking delegation to funnel its constitutionally vested spending-conditions power to agencies." (*Id.* at 19.) In other words, Congress cannot make compliance with agency regulations a condition of receiving a federal grant, because those regulations are not a part of the statutory text. Despite Tennessee's claims to the contrary (*id.* at 22), this is nothing less than a facial challenge to the Title X program, and indeed to *any* statute that conditions receiving a grant on compliance with agency regulations not fully described by the authorizing statute.[7] (*Id.* at 19–21.) Tennessee cites no caselaw to support this proposition, for good reason. In *Dole*, the Supreme Court noted that it is commonplace for Congress to make compliance with agency regulations a condition for receiving a federal grant. 483 U.S. at 206 ("Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and *administrative directives*.") (emphasis added) (citations and internal quotation omitted).

---

[6] Tennessee argues that Title X's prohibition on abortion being used as a method of family planning is ambiguous and therefore it could not have had notice that it would have to counsel and refer for abortions. (Doc. 21, at 17–19.) However, the statutory provision at issue in this case is not Title X's prohibition on abortion being used as a method of family planning but rather its unambiguous requirement that grantees abide by HHS regulations.

[7] Tennessee seems to acknowledge this fact in its briefing while suggesting it meant nothing so drastic. (Doc. 27, at 9.) It states that it "does not dispute agencies' power to help carry out clear congressional conditions" but that an agency may not set "an entirely new and controversial funding condition." (*Id.*) Tennessee does not bother to explain this distinction. Congress clearly directed HHS to make grants to promote family planning services and to promulgate regulations ensuring that grants are "effectively utilized for the purposes for which made." 42 U.S.C. § 300a-4(b). It is necessary for HHS to create regulations, *i.e.*, funding conditions, to carry out the mandate given to it by Congress.

Title X is just one of many federal grant programs requiring compliance with regulations as a condition of a grant. *See, e.g.*, 42 U.S.C. § 254b(k)(3)(N) (health center grant program requiring grantees to "ensure the appropriate use of Federal funds in compliance with applicable Federal statutes, regulations, and the terms and conditions of the Federal award"); 42 U.S.C. § 1793(f)(2) (grant program providing funds for state educational agencies to serve free school breakfasts on the condition that the breakfast program "shall be carried out in accordance with applicable nutritional guidelines and regulations issued by the Secretary"); 49 U.S.C. § 5309(c)(4) (providing that grants for new and expanded rail, bus rapid transit, and ferry systems "shall be subject to all terms, conditions, requirements, and provisions that the Secretary determines to be necessary or appropriate"). If Tennessee were correct, significant parts of the federal grant system would vanish. The fact that Tennessee urges such a radical outcome weighs heavily against the Court finding a strong likelihood of success on this point.[8] [9]

---

[8] Tennessee primarily relies on *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) and *W. Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023) to support its argument that an agency cannot make an unclear statutory funding condition clear via its own interpretation. (Doc. 21, at 18–20.) However, both cases concern an unclear statutory provision that an agency tried to clarify with its own rulemaking. *See generally id.* Here, HHS is not interpreting an unclear statutory provision. Title X contains a clear requirement that grantees comply with agency regulations and a clear directive from Congress for HHS to promulgate those regulations. 42 U.S.C. § 300a-4(b). *Yellen* did not hold, nor did it even discuss, whether Congress could condition funding on compliance with agency regulations. *See generally* 54 F.4th 325. *Morrisey* is equally unhelpful to Tennessee. In *Morrisey*, the Eleventh Circuit explicitly acknowledged that Congress may require grantees to abide by "'the legal requirements in place when the grants were made' [and] [t]hese 'legal requirements' include existing regulations." 59 F.4th at 1148 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985)). That is the situation facing Tennessee here.

[9] Tennessee claims that Congress allowing HHS to promulgate regulations that a grantee must abide by runs afoul of the nondelegation doctrine. (Doc. 27, at 8.) "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "[T]he answer requires

Because applying the 2021 Rule to Tennessee does not violate the Spending Clause,

Tennessee has not made a strong showing of likelihood of success on the merits on this ground.

### ii.    APA

Tennessee next argues that HHS's decision not to continue funding its grant violates the

APA.  (Doc. 21, at 21–22.)  Specifically, Tennessee asserts that HHS's interpretation of the 2021

Rule:  (1) exceeds HHS's regulatory authority under Title X; (2) is unreasonable; (3) is arbitrary

---

construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* (citations omitted).  Additionally, pursuant to the "major questions doctrine" courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citations and internal quotation omitted).  In such "extraordinary cases," "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).

Title X does not run afoul of the nondelegation doctrine.  Title X provides that the secretary shall "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). This directive to make grants in support of voluntary family-planning programs that offer a range of acceptable and effective family-planning methods is a satisfactorily intelligible principle to support Congress's delegation.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (collecting cases in which less-than-precise standards constitute an intelligible principle, including statutes "authorizing regulation in the 'public interest'") (citations omitted).

HHS also does not "exercise powers of vast economic and political significance." *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.  In 2023, HHS awarded Title X grants to only eighty-six Title X grantees nationwide.  Office of Population Affairs, *Fiscal Year 2023 Title X Service Grant Awards*, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (last accessed Mar. 11, 2024).  Each grant had an average value of $3 million. *Id.*  This relatively modest grant-making power is far from the type of administrative power that the Supreme Court has held to violate the nondelegation doctrine. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 322 (2014) (finding a nondelegation issue when "newly [regulated] sources would face permitting costs of $147 billion"); *Brown & Williamson*, 529 U.S. at 159 (finding a nondelegation issue when "the FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy.").

and capricious; and (4) represents a new legislative rule which may only be promulgated via notice-and-comment rulemaking. (*Id.* at 22–30.)

### a. Statutory Authority

A court must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As noted above, Title X is a grant program which exists to promote family-planning services. *See generally* 42 U.S.C. § 300a. Title X provides that "[t]he Secretary is authorized to make grants . . . to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." *Id.* § 300a(a). Title X also states that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court, along with "every court to have addressed the issue," found that this language was ambiguous. 500 U.S. at 184. Applying the "*Chevron* Deference" framework, the court found that HHS's interpretation of the abortion provision was reasonable and therefore the agency acted within its authority in issuing the Gag Rule. *Id.* at 184–86. In 2023, the Sixth Circuit, finding that *Rust* controlled, held that HHS acted within its authority by issuing its 2021 Rule requiring Title X grantees to counsel and refer for abortions. *Ohio*, 87 F.4th at 770–771. Tennessee's argument that the agency's interpretation of Title X is not reasonable is a naked attempt to relitigate *Rust* and *Ohio*. (Doc. 21, at 22.) The fact that Tennessee resorts to relitigating binding precedent that explicitly decided the 2021 Rule is valid weighs against finding Tennessee is likely to succeed on this point.[10]

---

[10] Tennessee appears to argue that, because Tennessee has outlawed abortions, Title X no longer authorizes HHS to apply the 2021 Rule, even though there have been no changes to Title X

Because there is binding precedent holding that HHS has the authority to promulgate the 2021 Rule, Tennessee has not clearly demonstrated that it is likely to succeed on this basis.[11]

        **b.**      <u>HHS Regulations</u>

Tennessee argues that HHS's interpretation of the 2021 Rule as requiring all Title X grantees to counsel and refer for abortions, even if the referral must be made to an out-of-state provider, is unreasonable because it conflicts with the plain meaning of several of the Rule's provisions. (Doc. 21, at 24–25.)

The Supreme Court has instructed lower courts that in certain circumstances "a court should defer to the agency's construction of its own regulation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019). This is commonly referred to as "*Auer* Deference." *Id.* Under the *Auer* standard, "[t]he deference accorded to an agency's interpretation of its own ambiguous regulation is substantial and afforded even greater consideration than the *Chevron* deference accorded to an interpretation of an ambiguous statute." *Ohio Dep't of Medicaid v. Price*, 864 F.3d 469, 477 (6th Cir. 2017) (citation omitted). However, courts "need not defer to an agency's interpretation that is plainly erroneous or inconsistent with the regulation[s] or where there is any

---

itself. (Doc. 21, at 22–24.) Tennessee argues that "HHS's Rescindment—*and its underlying policy of applying the 2021 Rule to States who outlaw abortion*—uniquely opens a Pandora's Box of public-health and compliance challenges HHS has not answered for." (*Id.* at 24 (emphasis added).) Tennessee points to no caselaw that supports this proposition that a subsequent change in state law can effectively nullify a federal agency's prior interpretation of a statute and retroactively render it unenforceable. There is good reason why no precedent exists for such a proposition. *See generally* Respecting the Nullifying Laws of South Carolina, 11 Stat. 771 (1832). Tennessee is part of a supremely sovereign nation; it is not a signatory to a compact with, or in league with, other states. U.S. Const. art. VI, cl. 2.

[11] Tennessee also briefly invokes "avoidance" to support its argument that the 2021 Rule is no longer authorized by Title X, stating that "HHS's position uniquely presents constitutional problems, which further undercuts it reasonableness." (Doc. 21, at 23.) Tennessee does not develop this argument any further, and it is not the Court's job to try to do so on Tennessee's behalf.

other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *In re AmTrust Fin. Corp.*, 694 F.3d 741, 754–55 (6th Cir. 2012) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209–10 (2011) (internal quotation marks omitted)). And even if the "regulation is ambiguous and deference is due . . . [the Court] must be satisfied that the agency's action minimally involved a 'rational connection between the facts found and the choice made.'" *Summit Petroleum Corp. v. E.P.A*, 690 F.3d 733, 741 (6th Cir. 2012) (internal citations omitted).

"The possibility of [*Auer*] deference can arise only if a regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414. To determine if a regulation is ambiguous, a court must apply "all the standard tools of interpretation" and "carefully consider the text, structure, history, and purpose of a regulation." *Id.* at 2414–15 (citation and internal quotation omitted). If the regulation is unambiguous, a court must simply apply the regulation's plain language. *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (applying the regulation's "obvious meaning" and holding that "[b]ecause the regulation is not ambiguous . . . *Auer* deference is unwarranted").

Here, *Auer* deference to HHS's interpretation of the 2021 Rule is unnecessary, as it has a plain and unambiguous meaning. *See Kisor*, 139 S. Ct. at 2414 ("[T]he possibility of [*Auer*] deference can arise only if a regulation is genuinely ambiguous."). As explained below, HHS's interpretation of the 2021 Rule as requiring all Title X grantees to counsel and refer for abortions, even if the referral must be made to an out-of-state provider, is in line with the unambiguous meaning of the regulation.

The 2021 Rule requires that Title X grantees "[o]ffer pregnant [women] the opportunity to be provided information and counseling regarding . . . (A) Prenatal care and delivery; (B)

Infant care, foster care, or adoption; and (C) Pregnancy termination." 42 C.F.R. § 59.5(a)(5)(i). The Rule further provides that grantees, "[i]f requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request." *Id.* § 59.5(a)(5)(ii). "Pregnancy termination" is an unambiguous phrase which simply means the ending of a pregnancy. *See Termination*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/termination (defining "termination" as "end in time or existence") (last accessed Mar. 11, 2024). Abortion falls within that broad definition.[12] *See Abortion*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/abortion (defining "abortion" as "the termination of a pregnancy after, accompanied by, resulting in, or closely followed by the death of the embryo or fetus") (last accessed Mar. 11, 2024). Furthermore, HHS has made clear, in promulgating every iteration of the Counseling and Referral Rule and the Gag Rule, that it uses the term "pregnancy termination" to mean "abortion."[13] Finally, the Sixth Circuit did not distinguish between a "pregnancy termination" and an "abortion" in *Ohio*. *Ohio*, 87 F.4th at 767 (finding that the 2021

---

[12] Tennessee's abortion ban itself recognizes that abortion is encompassed by the phrase "pregnancy termination." *See* Tenn. Code Ann. § 39-15-213(a)(1) ("'Abortion' means the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman . . . .").

[13] *See* 53 Fed. Reg. at 2922–23 (noting in promulgating the Gag Rule that "[f]ew issues facing our society today are more divisive than that of abortion" and explaining that the 1981 Rule required counseling "on pregnancy termination (abortion)"); 58 Fed. Reg. at 7464 (reinstating the 1981 Rule and noting that "[u]nder these compliance standards[,] Title X projects would be required . . . to provide nondirective counseling to the patient on all options relating to her pregnancy, including abortion, and to refer her for abortion); 65 Fed. Reg. at 41270 ("Title X projects [are] required, in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on all options relating to her pregnancy, including abortion, and to refer her for abortion"); 84 Fed. Reg. at 7716–17 (noting that "[t]he 2000 regulations require Title X projects to provide abortion referral [] and nondirective counseling on abortion" and "finaliz[ing] the prohibition against using Title X funds to refer for abortion"); 86 Fed. Reg. at 56144 (noting that the agency was "readopting the 2000 regulations").

Rule "mandate[d] that Title X projects make *abortion* referrals upon request") (emphasis added).

Tennessee does not dispute this, but merely points out that the 2021 Rule uses both the terms

"pregnancy termination" and "abortion" and notes that "such differences in language typically

convey differences in meaning."[14]  (Doc. 21, at 24–25 (internal quotation and citation omitted).)

While perhaps "typically" the case, it is clear in the context of decades of HHS regulation that

the terms are synonymous as used here.

HHS's referral requirement is similarly unambiguous.  The 2021 Rule imposes a broad

requirement that "[i]f requested to provide [] information and counseling, [a grantee must]

provide neutral, factual information and nondirective counseling on each of the options, and,

referral upon request." 42 C.F.R. § 59.5(a)(5)(ii).  The Rule also requires that referrals for health

services, including abortion, be made to healthcare providers "who are in close physical

proximity to the Title X site, when feasible, in order to promote access to services and provide a

seamless continuum of care." *Id.* § 59.5(b)(8).  In context, the phrase "when feasible" plainly

means that doctors must refer patients to healthcare providers that are close to them when it is

possible to do so. *See Feasible*, MERRIAM-WEBSTER, https://www.merriam-

webster.com/dictionary/feasible (defining "feasible" as "capable of being done or carried out")

(last accessed Mar. 11, 2024.  If it is not possible for a doctor to refer a patient to a nearby

provider, perhaps because the patient lives in a remote area or because the patient lives in a state

where abortion is illegal, he may refer the patient to a provider farther away.  This interpretation

is further supported by the explanation HHS gave for why it was including this provision in the

_____

[14] Tennessee appears to argue that "pregnancy termination" in the 2021 Rule instead means
"pregnancy terminations that are allowable under state law."  (Doc. 21, at 25.)  The obvious issue
with Tennessee's reading is that it would require the Court to read in a limiting clause to narrow
the definition of "pregnancy termination" to "types of pregnancy terminations that are legal in a
given state."  Tennessee has provided no basis for the Court to do so.

2021 Rule.  HHS explained that the provision was intended to *expand* access to health services, not to limit access.  *See* 86 Fed. Reg. at 56164 ("[I]t is important for Title X clinics to provide referrals and linkages to a wide range of healthcare services to help facilitate access for Title X clients . . . .").  There is no conflict between this provision and HHS's interpretation of the 2021 Rule.

Tennessee argues that this provision, which applies to all referrals and not just abortion referrals, amounts to a total ban on referring patients to healthcare providers that are not "in close physical proximity to the Title X site."  (Doc. 21, at 25.)  Tennessee's tortured reading would destroy the plain meaning of the provision:  if a doctor at a Title X site in Cheyenne, Wyoming, found that one of her patients had cancer that required treatment at the University of Colorado Cancer Center, about a ninety minutes' drive away, then Tennessee's interpretation would sanction the doctor's refusal to refer that woman for treatment, despite the provision's stated goal of expanding access to health services.  Nothing about the regulation's language supports such an understanding.  After all, the regulation is most likely to impact underserved populations and logically would aim to increase the likelihood they receive services.  Encouraging a referral to a provider more easily accessible to that population due to proximity, it stands to reason, raises the likelihood that the patient will receive the necessary care.  A referral to an unnecessarily distant provider could accomplish the opposite.  But if the most feasible referral is to a provider some distance away, the regulation plainly contemplates such a referral.

Tennessee also suggests that this provision gives Title X providers the authority to refuse to provide referrals for any type of medical service if the provider deems that doing so is not "feasible."  (Doc. 21, at 25.)  Tennessee points to no part of the administrative record, notice of proposed rulemaking, or the 2021 Rule itself that supports its reading that "when feasible"

Case 3:23-cv-00384-TRM-JEM   Document 30   Filed 03/11/24   Page 24 of 43   PageID #: 838

allows providers to unilaterally veto the 2021 Rule's referral requirement. As noted, the provision requires referrals be made to healthcare providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." 42 C.F.R. § 59.5(b)(8). The first part of the provision, which precedes the phrase "when feasible," is concerned with the *distance* between providers, requiring referrals to providers "who are in close physical proximity to the Title X site." *Id.* The second part of the provision, following "when feasible," explains *why* nearby referrals are preferable–because they "promote access to services and provide a seamless continuum of care." *Id.* Neither of these clauses, surrounding and potentially modified by "when feasible," addresses what *kind* of referrals providers are required to make. The phrase "when feasible" modifies a preference for nearby referrals; it does not even remotely invoke the idea of whether a procedure is legal inside the state. Tennessee's interpretation of the 2021 Rule is plainly unreasonable.

Nor is it plausible to believe that HHS would draft a regulation that both requires referrals for abortions and allows providers to completely ignore that requirement if they decide, for whatever reason, it is not "feasible." If HHS sought to give providers broad discretion to refuse to refer patients for medical services, it would either do so clearly or simply eschew any mandatory conditions as to when referrals must be made. Moreover, as explained below, it is entirely "feasible" for providers to refer patients for abortions while still complying with Tennessee law.

Finally, Tennessee argues that HHS cannot require it to counsel and refer for abortions because to do so is not "allowable" under state law. (Doc. 21, at 24 (citing 42 C.F.R. § 59.5(b)(6).) The 2021 Rule requires that "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of

practice and allowable under state law, and with special training or experience in family planning." 42 C.F.R. § 59.5(b)(6). In promulgating the final 2021 Rule, HHS received comments that "were specific to advanced practice registered nurses (APRNs)." 86 Fed. Reg. at 56163. The commenters asked that the final rule specify that APRNs "be able to serve as the medical director (in states with full practice authority)." *Id.* HHS stated that it agreed and would add the phrase "allowable under state law" in order to "more clearly reflect the role of a broader range of *healthcare providers* in providing Title X services." *Id.* at 56163–64 (emphasis added). This language relates to *who* specifically may serve as a clinical services provider and has no relation to whether the *services* being provided in general are allowable under state law. HHS's interpretation of the 2021 Rule is in line with the plain meaning of this provision.

Tennessee's argument independently fails because providing counseling and referrals for abortions *is* "allowable under state law." Tennessee's abortion ban and the 2021 Rule do not conflict. Tennessee's statute contains no language whatsoever related to counseling or referral for abortions. *See generally* Tenn. Code Ann. § 39-15-213. It merely provides that "[a] person who performs or attempts to perform an abortion commits the offense of criminal abortion." *Id.* § 39-15-213(b). There is no basis for prosecuting a doctor who counsels or refers a woman for an abortion. *Id.* Abortion counseling and referral are therefore plainly "allowable under state law." Tennessee's law in no way hinders its Title X project staff from complying with the 2021 Rule.

Because HHS's interpretation is in line with the plain meaning of the 2021 Rule, Tennessee has not clearly demonstrated that it is likely to succeed on this basis.

c.        <u>Arbitrary and Capricious</u>

An agency action would "normally . . . be arbitrary and capricious if the agency has: [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ohio*, 87 F.4th at 772. "Although courts are to engage in a careful review of the facts and record, our ultimate standard of review is narrow and deferential." *Ohio*, 87 F.4th at 772 (citation and internal quotation omitted). As such, "a court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and the court must "respect [the agency's] policy choice." *Ohio*, 87 F.4th at 772.

Under the arbitrary-and-capricious standard of review, the core duty of the court is to "ensure that the agency 'articulate a rational connection between the facts found and the choice made and . . . provide something in the way of documentary support for its action.'" *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (cleaned up) (quoting *GTE Midwest, Inc. v. Fed. Commc'ns Comm'n*, 233 F.3d 341, 345 (6th Cir. 2000)). Importantly, while an agency must generally explain its reasoning, a court should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Ohio*, 87 F.4th at 775 ("As long as the agency's explanation is clear enough that its path may reasonably be discerned, we must respect its policy choice.") (internal quotations and citation omitted).

Tennessee argues that HHS's decision not to fund its Title X grant was arbitrary and capricious because HHS: (1) ignored important aspects of the problem; (2) changed its position

on what the 2021 Rule required without explanation; and (3) disregarded Tennessee's reliance

interest in receiving Title X funding.  (Doc. 21, at 25–29.)

### 1.    Ignoring Important Aspects of the Regulatory Problem

An agency action may be arbitrary and capricious if the agency "entirely failed to

consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  Tennessee argues

that, in requiring grantees to refer for abortions, HHS failed to consider four important aspects of

the regulatory problem:  (1) whether post-*Dobbs* application of the 2021 Rule to states banning

abortion is reasonable; (2) whether out-of-state referrals are medically appropriate; (3) whether

the 2021 Rule would increase compliance costs; and (4) whether this application would lead to a

reduction in the quality of care for Tennesseans.  (Doc. 21, at 26–27.)

Tennessee essentially contends that, in light of the *Dobbs* decision, HHS was required to

revisit and reconsider whether it should have promulgated the 2021 Rule in the first place.  The

Supreme Court explicitly rejected the same argument in *Auer*, 519 U.S. 452.  In *Auer*, police

sergeants challenged an overtime-pay regulation promulgated by the Secretary of Labor prior to

a Supreme Court decision that upheld the application of the Fair Labor Standards Act to public-

sector employees.  *Id.* at 454–55.  The challenge turned on whether it was arbitrary and

capricious for the agency, in the wake of the Supreme Court decision, not "to give adequate

consideration to whether it really [made] sense to apply [an agency rule] to the public sector."

*Id.* at 458.  The Supreme Court rejected the argument, holding that "where, as here, the claim is .

. . that it was 'arbitrary' and 'capricious' not to conduct amendatory rulemaking (which might

well have resulted in no change), there is no basis for the court to set aside the agency's action

prior to any application for relief addressed to the agency itself."  *Id.* at 458–59.  The court

explained that a party desiring an agency to reconsider its rule must petition the agency to amend its rule.  *Id.* (citing 5 U.S.C. § 553).

As the Sixth Circuit pointed out in *Ohio*, while "[t]he impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect' of the question now, [] judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Ohio*, 87 F.4th at 774 n.7 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020)).  The only thing HHS was required to do in refusing to fund Tennessee's grant was to determine whether TDH was out compliance with the 2021 Rule and, if so, explain why it was out of compliance.  *See Hosseini*, 911 F.3d at 371 (noting that under the arbitrary and capricious standard, an agency must "articulate a rational connection between the facts found and the choice made and . . . provide something in the way of documentary support for its action") (citation and internal quotations omitted).  HHS did just that.  It explained in both of its March 2023 letters that, as a condition of receiving a Title X grant, Tennessee was required to comply with HHS regulations.  (*See* Docs. 1-9, 1-11.)  HHS further explained that Tennessee's current policy to only counsel and refer for pregnancy-termination options that are "legal in the state of Tennessee" was not in compliance with the 2021 Rule's requirement that grantees counsel and refer for abortion.  (*See id.*)  HHS even noted how Tennessee's policy could be changed to comply with the Rule.  (*See* Doc. 1-9.)  When Tennessee refused to change its policy, HHS stated that it would not fund Tennessee's Title X grant, because "Tennessee is out of compliance with the Title X regulation requirements."  (Doc. 1-11, at 1.)  Nothing required HHS to do more.

Because HHS reasonably explained the basis for its decision, Tennessee has not demonstrated it is likely to succeed on this basis.

## 2.    Unlawful Position Change

Tennessee next argues that HHS unlawfully changed its interpretation of the 2021 Rule without explanation.  (Doc. 21, at 28.)

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citations omitted).  As such, "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted).  While a change in an agency position does not require a greater degree of justification, the agency still must "provide reasoned explanation for its action" and the agency must "display awareness that it *is* changing position."  *Id.*  "Reasoned decision making, therefore, necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent."  *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009) (citing *Fox*, 556 U.S. at 515).

Since its inception, HHS has interpreted the 2021 Rule as requiring counseling and referrals for abortion.[15]  *See* 86 Fed. Reg. at 56144 (noting that "[t]he effect of this 2021 final rule is to revoke the requirements of the 2019 regulations, including removing restrictions on nondirective options counseling and referrals for abortion services").  HHS has never suggested that this requirement could be modified by a state's abortion laws.  *See generally id.*  Post-*Dobbs*, HHS issued guidance which reaffirmed that *Roe*'s overturning did not affect what the 2021 Rule required.  (*See* Doc. 1-6, at 4 (noting that *post*-Dobbs, "per the 2021 Title X rule, Title X recipients are required to offer pregnant clients the opportunity to be provided information and

---

[15] As the Court has noted, all previous iterations of the Counseling and Referral Rule have been interpreted by both HHS and courts as concerning counseling and referrals for abortions.  *See supra* Section I.A–B.

counseling regarding [pregnancy termination]" and "referral upon request"). In finding that Tennessee was not complying with the 2021 Rule's abortion counseling and referral requirements, HHS continued to apply this same interpretation. It did not "depart from a prior policy" and was therefore not required to acknowledge it was changing course or provide an explanation for why it was changing course. *Fox*, 556 U.S. at 515.

Nevertheless, Tennessee claims that HHS unlawfully changed its interpretation of the 2021 Rule without explanation, an argument which hinges on Tennessee's unsupported view of HHS's July 2022 Review of Tennessee's Title X project. (Doc. 21, at 28.) During the review, Tennessee informed HHS that its new Nursing Protocol allowed staff only to "offer counseling and referrals for pregnancy terminations that are legal in Tennessee." (Doc. 1-5, at 3, 5.) Tennessee argues that, because the Nursing Protocol was in place during the July Review (*id.* at 7) and because HHS was aware that Tennessee's abortion ban would trigger on August 25, 2022, HHS implicitly blessed Tennessee's *future* practice of not counseling and referring for abortions. (Doc. 21, at 28.) But HHS's July Review only assessed Tennessee's compliance at the time of that review, and, at that time, Tennessee's anti-abortion law had not gone into effect. *See* Doc. 1-2, at 1 (email noting that HHS had found Tennessee in compliance "as of the date of the [July] Review"); Tenn. Code Ann. § 39-15-213 (establishing August 25, 2022, as the effective date of Tennessee's anti-abortion law). This meant that Tennessee, pursuant to the July 2022 Nursing Protocol, continued at that point to provide counseling and referrals for abortion in compliance with HHS's regulation. (*See* Doc. 1-5, at 3, 5 (noting that nurses should provide counseling on options that are "legal in the State of Tennessee")); (Doc. 1-1, at 24, 58 (summarizing the July Review's findings that "non-directive pregnancy counseling [was] offered by nurse practitioners," and noting that TDH policies required "staff to offer clients with positive

pregnancy tests all options counseling and referrals upon request").)[16]  After all, abortion was still legal in Tennessee at that time.  The July Review did not assess whether Tennessee would be in compliance in the future and certainly did not endorse or approve Tennessee's future policy of not referring for abortions.[17]

---

[16] Tennessee cites to the notes HHS made in its July Review to insinuate that Tennessee had already halted abortion referrals at the time of the Review and that HHS blessed this stance.  (*See* Doc 1, at 15 ("[HHS's] Program Review Report evaluated whether Tennessee's Health Department complied with the Referral Mandate and found '[t]his expectation was met.'  That conclusion held, [HHS] elaborated, despite '[n]o referrals for abortion [being] made.'") (quoting July Review)); (Doc 21, at 28 ("That review addressed Tennessee's abortion policy directly, concluding that . . . Tennessee was 'in compliance' with governing HHS rules, even when '[n]o referrals for abortion are made.'") (quoting July Review)); (Doc. 27, at 13 ("Under the July 2022 policy, HHS wrote, '[n]o referrals for abortion are made,' but still the 2021 Rule's 'expectation was MET.'") (quoting July Review)).)

Tellingly, Tennessee is very careful to never once assert factually that it was not providing abortion referrals at the time of the review.  If it were true, Tennessee would surely submit evidence that it had not been complying with the 2021 Rule's referral requirement.  Instead, Tennessee shapes its argument to invite a presumption that it was not providing abortion referrals.  The Court will make no such presumption, despite the efforts to befog the issue.

It is true that the July Review is not entirely clear as to what the line "[n]o referrals for abortion are made" means.  However, the Court finds it highly doubtful that it reflects a drastic and unexplained break from agency policy.  It is far more likely that this line merely embodies the expectation that Title X grantees not set up appointments for women seeking abortions.  86 Fed. Reg. at 56150 (stating that referrals for abortion are limited to "providing a patient with the name, address, telephone number, and other relevant factual information" and that a grantee "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient").  Regardless, any lack of clarity cuts against Tennessee at the preliminary-injunction phase, as Tennessee bears the burden of making a clear showing of success on the merits.  *See Pub. Int. Rsch. Grp. of Mich. (Pingam) v. Brinegar*, 517 F.2d 917, 918 (6th Cir. 1975) (finding that the district court "clearly acted within the scope of a proper exercise of discretion in refusing to grant a preliminary injunction" when "the possibility that the appellants would succeed on the merits was at best uncertain and problematical").

[17] The July Review suggests that HHS did in fact inform Tennessee that it would still be required to refer women for abortion after its abortion ban went into effect.  In assessing Tennessee's referral policy, an HHS "reviewer recommended that out-of-state abortion referral resources are available at the Hamilton site to clients who request this information for an unintended pregnancy, (insofar as this procedure will no longer be available in Tennessee)."  (Doc. 1-1, at 31.)

Tennessee also leans heavily on an October 19, 2022 email sent by Trisha Reed, an HHS Title X Project Officer, to TDH officials. (Doc. 1-2.) Tennessee points out that in this email Reed stated that Tennessee had "a wonderful review" and "a strong Title X program." (*Id.* at 1.) Tennessee again argues that, because HHS was aware of its anticipated policy that it would not counsel and refer for abortions, the email represents tacit approval of Tennessee's policy. (Doc. 21, at 28.) It does not. This email simply provides the results of the July Review and states that HHS determined that Tennessee was in compliance with HHS regulations at the time of the review—before Tennessee's anti-abortion law went into effect. The fact that Reed asked that Tennessee "update us on the policy changes [to patient counseling] in response to enactment of [Tennessee's abortion ban]," suggests that HHS had concerns over whether Tennessee continued to meet its obligations under the 2021 Rule after the state's abortion ban took effect two months prior. (Doc. 1-2, at 1.) If HHS had truly already given approval to a policy of not counseling or referring for abortions, there would be no need for an update.[18]

Because HHS did not change its position as to what the 2021 Rule required, Tennessee has not shown that it is likely to succeed on this basis.

---

[18] Tennessee also briefly argues that HHS had taken the position that states would not be required to comply with the Counseling and Referral Rule if they objected to it. (Doc. 21, at 28.) This is not the case. HHS has only ever noted that individual providers, not entire states, could qualify as objectors under applicable federal conscience laws. *See* 42 C.F.R. § 59.5(a)(5) n.2 ("Providers may separately be covered by federal statutes protecting conscience and/or civil rights."); 86 Fed. Reg. at 56153–54 (noting that "objecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law"). In promulgating the 2021 Rule, HHS explicitly acknowledged that the Rule may conflict with the preferred policies of some states but in no way suggested that those states would qualify as objectors. 86 Fed. Reg. at 56169. HHS instead noted that "states that object to the rule requirements or believe that there is a conflict with state law priorities are free to opt out of the federal grant program." *Id.*; *see also Ohio*, 87 F.4th at 774 n.8 (noting that, "[b]oth HHS and the States seem to agree that the States are not 'health care entities' entitled to conscience protection").

### 3.    Reliance Interests

The Supreme Court has noted that a change of an official agency policy or position "that does not take account of legitimate reliance on [a] prior interpretation . . . may be arbitrary, capricious [or] an abuse of discretion." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations and quotations omitted).  When the agency's official prior position has created this "reliance interest," an agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516.  Reliance interests are only created by "longstanding [agency] policies." *Encino,* 579 U.S. at 222.  Agency policies that have only existed for a short period of time do not create reliance interests that the agency is bound to consider when changing course. *Compare Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 507 (6th Cir. 2021) (holding that a two-year old agency guidance "does not qualify as longstanding" agency policy) *with Encino*, 579 U.S. at 222 (finding that a reliance interest was created by an agency guidance which had existed for thirty-three years).

An agency must only consider reliance interests when departing from a previous official position. *See Regents*, 140 S. Ct. at 1913 (noting that reliance interests must be considered "when an agency changes course").  As the Court has already determined, *see supra* Section III.A.ii.c.2., HHS never changed its position as to what the 2021 Rule required.  HHS therefore did not need to consider any reliance interest that Tennessee may have had. *See Smiley*, 517 U.S. at 742 (finding that reliance interests were not implicated because "we do not think that anything which can accurately be described as a change of official agency position has occurred here").  Furthermore, if HHS took the position that Tennessee could comply with the 2021 Rule by counseling and referring for only pregnancy terminations that were legal in Tennessee after its abortion ban had taken effect, it did so, at the earliest, on October 19, 2022, when Tennessee

received the results of the July Review.[19]  (Doc. 1-2.)  Fewer than five months later on March 1, 2023, HHS notified Tennessee that it was out of compliance with the 2021 Rule.  An agency position that has existed for only a few months is not "longstanding policy" that can create a reliance interest.  *See Breeze Smoke*, 18 F.4th at 507.

Tennessee appears to suggest it has a fifty-year-old reliance interest in receiving Title X grants simply because it has received the funding throughout this period.  (Doc. 21, at 28–29.)  A reliance interest is created only by reliance on an official agency policy or position.  *Encino*, 579 U.S. at 222.  Tennessee would only have a reliance interest in receiving Title X grants if it had been HHS's official position or policy to always give Tennessee a grant regardless of whether it complied with HHS rules.  It has never been HHS's official policy or position to simply give Tennessee money.[20]

Because Tennessee did not have a reliance interest in receiving Title X funding, Tennessee has not shown that it is likely to succeed on this basis.

### iii.       *Notice and Comment Rulemaking*

An agency action is a "legislative rule" if it "impose[s] new rights or duties and change[s] the legal status of regulated parties."  *Mann Constr., Inc. v. United State*s, 27 F.4th 1138, 1143

---

[19] Tennessee received this email a mere thirty-seven business days (or fifty-five calendar days) after its abortion ban went into effect.  Accepting Tennessee's argument would also require the Court to ignore the fact that this same email raised concerns about the effect of the ban on the 2021 Rule and asked Tennessee to provide an update.  (*See* Doc. 1-2.)

[20] The Court notes that the requirement that an agency account for reliance interests in its decision making is based largely on "the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal quotation and citation omitted).  As the Court has explained, *see supra* Section III.A.i., Tennessee has always been on notice that it must comply with agency regulations to receive Title X funding, and it was on notice that the 2021 Rule required counseling and referrals for abortions.  The rationale for considering reliance interests does not apply here.

(6th Cir. 2022) (citation omitted).  Generally, an agency may only impose a legislative rule via notice-and-comment rulemaking procedures.  *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) ("[L]egislative rules require notice and comment . . . .") (citation omitted).  However, an agency action that merely interprets or applies an existing regulation does not require notice-and-comment rulemaking.  *See id.* (noting that interpretive rules explain "pre-existing legal obligations or rights" and do not require notice and comment); *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) ("Interpretive rules do not require notice and comment . . . ."); *R/T 182, LLC v. F.A.A.*, 519 F.3d 307, 310 (6th Cir. 2008) ("We find that this is an adjudication, and therefore not subject to the notice and comment requirements of rule-making . . . .").

Tennessee argues that HHS's position that the 2021 Rule requires counseling and referrals for abortions is a new regulation which can only be promulgated via-notice-and-comment rulemaking.[21]  (Doc. 21, at 29.)  However, as noted above, *see supra* Section III.A.ii.c.2., the 2021 Rule has always required counseling and referrals for abortions.  Simply continuing to apply the 2021 Rule does not create "new rights or duties" and cannot be considered a legislative rule requiring notice-and-comment rulemaking.  *Mann*, 27 F.4th at 1143.  Tennessee has the same duties it has always had under the Rule:  to counsel and refer for abortions upon a woman's request.  Because HHS's interpretation of the 2021 Rule did not impose new duties or obligations, Tennessee has not shown that it is likely to succeed on this basis.

---

[21] Tennessee's claim here is premised on its argument that HHS's interpretation of the 2021 Rule is inconsistent with the language of the Rule itself.  (Doc. 21, at 22.)  Because the Court has found HHS has correctly interpreted the 2021 Rule, *see supra* Section III.A.ii.b., Tennessee's argument is without merit.

In sum, the Court finds that Tennessee has no chance of success on the merits. Though the Court need not analyze any other factor, it will briefly do so. *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) (holding that "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed").

## B. Irreparable Harm

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). The party seeking the injunction bears the burden of clearly showing that its "injury [is] both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation and internal quotations omitted).

Simply showing some degree of irreparable harm will occur is not enough to merit a preliminary injunction; a court must also determine the degree of harm. *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("[I]n our view, the peculiarity and size of a harm affects its weight in the equitable balance."); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (noting that courts should consider "the substantiality of the injury alleged"). When the likelihood of success on the merits is low, a plaintiff must show a high degree of irreparable harm. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("[I]n general, the likelihood of success that need be shown . . . will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.") (citation omitted); *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) ("[A] stay may be granted with either a high probability of success and some injury or vice versa.").

Here, Tennessee asserts four forms of irreparable harm: (1) the loss of Title X funding; (2) the loss of its entire Title X project; (3) harm to its reputation; and (4) harm to its "sovereign interest in limiting abortion." (Doc. 21, at 30–31.)

Tennessee first states that without an injunction it will not receive the roughly $7 million it otherwise would receive on April 1, 2024. (Doc. 21, at 30; Doc. 21-1, at 2–3.) This represents a degree of imminent and irreparable harm. *See Ohio*, 87 F.4th at 783 (finding that the loss of $1.8 million of Title X funding constituted an irreparable harm to the State of Ohio). However, in light of the Court's finding that Tennessee has very little chance of success on the merits, Tennessee must show a high degree of irreparable harm. *See Friendship Materials*, 679 F.2d at 105. This $7 million represents a very small fraction of the Federal funding that TDH receives, as Tennessee itself notes. (*See* Doc. 21, at 31 (noting that TDH currently receives Federal grants "totaling $1.4 billion").) As such, this relatively minor loss does not represent a great enough degree of irreparable harm to justify granting injunctive relief.[22][23] *See Kentucky*, 57 F.4th at

---

[22] Tennessee argues that, because the Sixth Circuit found in *Ohio* that a loss of $1.8 million represented irreparable harm, its $7.1 million loss "alone suffice[s] to support relief." (Doc. 21, at 30); (Doc. 27, at 14); *Ohio*, 87 F.4th at 783. While Tennessee is correct that this loss represents a degree of irreparable harm, that is not where the analysis ends. The Court must still assess the degree of any harm and weigh it against the other preliminary-injunction factors. Unlike in *Ohio*, Tennessee has not established that it is likely to succeed on the merits of its claims. *See id* at 780. As the Sixth Circuit has explained, the degree of irreparable harm is crucial when a plaintiff has not shown a high likelihood of success on the merits. *See Celebrezze*, 812 F.2d at 290 ("[A] stay may be granted with either a high probability of success and some injury or vice versa."). Furthermore, though the court in *Ohio* did not grapple with the size of the monetary harm, it also did not purport to overrule any of its binding precedent requiring courts to weigh the degree of irreparable harm. *See Ohio*, 87 F.4th at 780–83.

[23] Tennessee also notes that it will lose "sizable discounts under the 340B drug-purchase program," which are only available to Title X grantees. (Doc. 21, at 30; Doc. 21-1, at 4.) While Tennessee has established that this harm is likely to occur, Tennessee bears the burden of establishing the size of this monetary harm. *See Hargett*, 2 F.4th at 554 ("The party seeking a preliminary injunction bears the burden of justifying such relief."). Tennessee could surely assess how valuable these discounts have been in recent years, but it has not provided this

---

556.  This damage, on its own or in conjunction with the other harms Tennessee asserts, is not enough to justify a preliminary injunction.

Tennessee next claims that without a preliminary injunction it may lose "[its] Title X program entirely."[24]  (Doc. 21, at 30.)  This speculative loss does not establish irreparable injury.  *See D.T.*, 942 F.3d at 327 (requiring that an irreparable harm not be speculative); *Griepentrog*, 945 F.2d at 154 ("[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical.").  The Tennessee General Assembly is providing Tennessee's Title X project with the $7 million it would have otherwise received from HHS.  (Doc. 21-1, at 3.)  While Tennessee claims that "[c]ontinued state funding for the program is not guaranteed," it presents no evidence that the legislature is considering cutting funding for the Title X project.  (Doc. 21, at 31.)  To the contrary, the legislature has designated its appropriation as "recurring."  (Doc. 21-1, at 3.)

Tennessee next claims that it will suffer reputational harm if HHS reports Tennessee's violation of the terms of its grant to the Federal Awardee Performance and Integrity Information System ("FAPIIS").  (Doc. 21, at 31.)  Tennessee argues that being reported could in turn affect its ability to obtain future federal grants.  (*Id.*)  Tennessee again fails to provide any evidence suggesting this harm is likely to occur, or the extent of the harm if it were to occur.  For one, it is

---

information to the Court.  The Court therefore cannot meaningfully weigh this harm in favor of Tennessee, even crediting Tennessee's unsupported claim that these discounts are "sizable."  *See Ohio*, 87 F.4th at 783 (limiting injunctive relief to the State of Ohio because "Ohio is the only plaintiff-State that provided the requisite facts and affidavits supporting the States' assertion that the 2021 Rule would cause them to suffer the competition-based harm").

[24] Tennessee's Title X project received approximately $18.6 million in funding from April 1, 2022 to March 31, 2023.  (Doc. 1-1, at 3.)  The HHS grant represented $7.1 million of that funding.  While a loss of this funding would be significant, Tennessee has not provided evidence that the entire program will collapse if the federal portion of funding is lost.

not entirely clear that HHS intends to report Tennessee.[25]  More importantly, however,

Tennessee has provided no evidence as to how being reported would affect the grants it currently

receives or will receive in the future.  While Tennessee cites the monetary value of all the federal

grants TDH receives, it provides no evidence as to what extent these grants could be affected, if

at all.  (*Id.*)  Because Tennessee has failed to provide any such evidence, Tennessee's theory of

reputational injury is too speculative. *See Ohio*, 87 F.4th at 784 (finding that the plaintiffs'

inability to provide the "requisite facts and affidavits" supporting their theory of [reputational]

harm rendered their injury too speculative).

Finally, Tennessee claims that "HHS's interference in Tennessee's sovereign interest in

limiting abortion to promote fetal life constitutes a form of irreparable injury."  (Doc. 21, at 31

(citation and quotations omitted).)  Tennessee does not cite binding precedent that supports its

claim that impairing a state's generalized "sovereign interest" constitutes a form of irreparable

harm.[26]  The Sixth Circuit opinion that Tennessee primarily relies upon, *Priorities USA v. Nessel*,

---

[25] The parties dispute how likely it is that Tennessee will be reported.  Defendants argue that there is good reason to believe that Tennessee will not be reported.  (Doc. 26, at 30.)  Nearly a year has passed since HHS found Tennessee to be out of compliance, and HHS has still not reported Tennessee.  (*Id.*)  Furthermore, HHS's Chief Grants Management Officer informed Tennessee in May 2023 that "[a]t this time, [HHS] do[es] not intend to report any concerns regarding the award to [FAPIIS]."  (Doc. 1-17, at 1.)  There is no evidence that HHS's position has changed.  However, HHS regulations state that "[w]hen an HHS awarding agency terminates a Federal award prior to the end of the period of performance due to the non-Federal entity's material failure to comply with the Federal award terms and conditions, the HHS awarding agency *must* report the termination to . . . [FAPIIS]."  45 C.F.R. § 75.372(b) (emphasis added).  HHS's position appears to be in conflict with its own regulations.

[26] Tennessee does point to *Tennessee v. United States Department of Education*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022) to support its argument.  (Doc. 27, at 15.)  However, the court in *Tennessee* found "Plaintiffs suffered an immediate injury to their sovereign interests . . . [because] Defendants' guidance and several of Plaintiffs' statutes conflict."  *Tennessee*, 615 F. Supp. 3d at 841.  This begs the fundamental question whether, in general, a state that has subjected itself to the U.S. Constitution's Supremacy Clause can be irreparably harmed, for the purposes of Federal Rule of Civil Procedure 65, by the federal government's insistence that the

860 F. App'x 419, 423 (6th Cir. 2021), simply holds that preventing a state from "passing and enforcing its laws" represents a form of irreparable harm but says nothing about "sovereign interests" or a state's policy preferences more generally. *See Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) ("Any time a State is enjoined by a court from *effectuating statutes* enacted by representatives of its people, it suffers a form of irreparable injury.") (emphasis added) (citation and internal quotations omitted). Tennessee does not argue that HHS has prevented it from passing and enforcing its own laws (Doc. 21, at 31; Doc. 27, at 14), and it is clear that Tennessee's abortion ban and the 2021 Rule are not in conflict. *See supra* Section III.A.ii.b. It is not impossible for Tennessee to enforce its statute banning abortion while also following the 2021 Rule. It merely prefers not to.[27] Furthermore, even if a generalized harm to state sovereignty represented a form of irreparable injury, the Supreme Court has noted that "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell v. New Jersey*, 461 U.S. 773, 790 (1983). Even if HHS regulations and Tennessee law were in conflict, there would therefore be no irreparable harm.

Tennessee has established it will suffer only a small degree of irreparable harm. This is not enough to justify granting an injunction without a strong showing of likelihood of success on

---

state abide by otherwise valid federal law. Even assuming that a conflict between a federal regulation and a state statute represents an irreparable injury to a state's "sovereign interest," there is no existent conflict here between Tennessee's abortion ban and the 2021 Rule. Therefore, the Court need not decide whether Tennessee's assertion of irreparable harm must necessarily rise and fall with the likelihood of success on the merits.

[27] Tennessee asserts that it directed TDH to stop counseling and referring for abortions in order to "adhere to the State's changed abortion landscape." (Doc. 21, at 13.) Tennessee does not explain what this vague phrase means. And Tennessee never explains why it is impossible for a doctor to comply with Tennessee's abortion ban and the 2021 Rule. Tennessee instead suggests that the state now seeks to limit women's access to abortion, even outside the state.

the merits.  Tennessee has not made this showing.  *See Griepentrog*, 945 F.2d at 153–54

("[E]ven if a movant demonstrates irreparable harm that decidedly outweighs any potential harm

to the defendant if a stay is granted, he is still required to show, at a minimum, serious questions

going to the merits.") (citation and internal quotations omitted).

> ### C.      Harm to Others and Public Interest

The third and fourth factors of the preliminary-injunction analysis—harm to others and

the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556

U.S. 418, 435 (2009).  It is in the public interest to enforce legitimate laws and regulations that

implicate a matter of public importance.  *See Priorities USA*, 860 F. App'x at 423 ("[T]he public

interest necessarily weighs against enjoining a duly enacted statute, and our assessment that the

appellants will likely prevail on the merits tips the public-interest factor further in their favor.");

*Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) ("[T]he public's true interest lies in the

correct application of the law.") (citation omitted).

Both parties agree that the public interest lies in the correct application of Title X and its

regulations.  (*See* Doc. 21, at 32; Doc. 26, at 31.)  Because the Court has determined that HHS's

actions were lawful, this factor favors Defendants. [28]

---

[28] Tennessee argues that HHS's actions are not in the public interest, because its refusal to fund
Tennessee's Title X grant will "strip[] untold thousands of needy Tennesseans of their access to
vital family planning services."  (Doc. 21, at 32.)  As noted above, this harm is highly
speculative.  Moreover, HHS has determined that it is in the public interest that Title X patients
receive medically accurate information from their doctor and has further determined that this
information leads to better health outcomes.  *See generally* 86 Fed. Reg. 56144.  Unlike
Tennessee, HHS has presented evidence indicating that a Gag Rule, such as the one Tennessee is
attempting to impose on a state level, has negative health consequences.  *Id.*  This too weighs in
favor of Defendants' position.

## IV. CONCLUSION

Tennessee had two options: comply with the 2021 Rule and receive the Title X grant money or choose not to comply and forego the money. It made its choice, knowingly and voluntarily. It has no basis to force funding from HHS without meeting the obligations upon which the funding is conditioned. For the reasons stated above, Tennessee's motion for a preliminary injunction (Doc. 20) is **DENIED**.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**