# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Kelly L. Stephens             POTTER STEWART U.S. COURTHOUSE                Tel. (513) 564-7000
Clerk                 CINCINNATI, OHIO 45202-3988                   www.ca6.uscourts.gov

Filed:  August 26, 2024

Ms. Courtney L. Dixon
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Ms. Brianne Jenna Gorod
Constitutional Accountability Center
1200 18th Street, N.W.
Suite 501
Washington, DC 20036

Mr. Philip W Hammersley
Office of the Attorney General
of Tennessee
P.O. Box 20207
Nashville, TN 37202

Ms. Whitney D. Hermandorfer
Mr. Harrison Gray Kilgore
Office of the Attorney General
of Tennessee
P.O. Box 20207
Nashville, TN 37202

Mr. Eric Nieuwenhuis Kniffin
Kniffin Law
102 S. Tejon Street
Suite 1100
Colorado Springs, CO 80903

Mr. Justin Lee Matheny
Office of the Attorney General of Mississippi
P.O. Box 220
Jackson, MS 39205-0220

Mr. Trenton Meriwether
Mr. James Matthew Rice
Office of the Attorney General of Tennessee
P.O. Box 20207
Nashville, TN 37202

Mr. Christopher Paul Schandevel
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176

Mr. Brian James Springer
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Re:  Case No. 24-5220*, State of Tennessee v. Xavier Becerra, et al*
      Originating Case No. : 3:23-cv-00384

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk


Cathryn Lovely
Deputy Clerk

cc:  Ms. LeAnna Wilson

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0199p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

―――――――――――――

STATE OF TENNESSEE,

*Plaintiff-Appellant*,

*v.*

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; OFFICE OF POPULATION AFFAIRS,

*Defendants-Appellees.*

No. 24-5220

―――――――――――――

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:23-cv-00384—Travis Randall McDonough, District Judge.

Argued: July 18, 2024

Decided and Filed: August 26, 2024

Before: GIBBONS, KETHLEDGE, and DAVIS, Circuit Judges.

―――――――――――――

## COUNSEL

**ARGUED:** Whitney D. Hermandorfer, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Courtney L. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Whitney D. Hermandorfer, J. Matthew Rice, Philip Hammersley, Harrison Gray Kilgore, Trenton Meriwether, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant. Courtney L. Dixon, Brian J. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. Justin L. Matheny, OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL, Jackson, Mississippi, Christopher P. Schandevel, ALLIANCE DEFENDING FREEDOM, Lansdowne, Virginia, Eric N. Kniffin, ETHICS & PUBLIC POLICY CENTER, Washington, D.C., Brianne J. Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amici Curiae.

DAVIS, J., delivered the opinion of the court in which GIBBONS, J., joined in full. KETHLEDGE, J. (pp. 24–31), delivered a separate opinion dissenting in part and concurring in the judgment in part.

―――――――――――――

## OPINION

―――――――――――――

DAVIS, Circuit Judge.   In 2021, the United States Department of Health and Human Services ("HHS") promulgated a rule requiring Title X grant recipients to provide neutral, nondirective counseling and referrals for abortions to patients who request it.  Tennessee, which has been a Title X recipient for over 50 years, recently outlawed most abortions in the state. After doing so, Tennessee would commit only to conducting counseling and referrals for options deemed legal in the state.  HHS considered Tennessee's commitment to be out of compliance with its regulatory requirements.  So it opted to discontinue the grant.  Tennessee filed suit to challenge HHS's action and enjoin it from closing the grant.   The district court denied Tennessee's request for preliminary injunction because it held that Tennessee does not have a strong likelihood of succeeding on the merits of its claim and that the balance of the remaining preliminary injunction factors weigh in HHS's favor.  For the reasons set forth below, we affirm.

## I.

### A.

*Factual Background.*  In 1970, Congress enacted Title X of the Public Health Service Act (alternately "the Act") to authorize HHS to award discretionary grants to fund family-planning projects.  *See* 42 U.S.C. §§ 300(a), 300a-4(a)–(b); Family Planning Services and Population Research Act, Pub. L. No. 91-572, 84 Stat. 1504, 1508 (1970).  Title X authorizes HHS to "enter into contracts with public or nonprofit private entities" to establish and operate these family-planning projects, 42 U.S.C. § 300(a), and these grants are to be "made in accordance with such regulations as the Secretary may promulgate," *id*. § 300a-4(a).  Nevertheless, Section 1008 of the Act provides that "[n]one of the funds appropriated . . . shall be used in programs where abortion is a method of family planning."  *Id*. § 300a-6.  HHS has varied in its interpretation of the limit

that § 1008 imposes on its regulatory authority.  As a result, it has vacillated from regulations requiring funded projects to provide nondirective counseling and referrals for abortion (2000–2019), to forbidding such activity (2019–2021), to requiring nondirective counseling and abortion referrals if requested by the patient (2021–present).  *See Ohio v. Becerra*, 87 F.4th 759, 765–67 (6th Cir. 2023) (summarizing the history of the Counseling and Referral rule).  Generally, HHS grants are awarded for a one-year period and any subsequent continuation awards are similarly determined one year at a time.  42 C.F.R. § 59.8(a)–(b).  When "non–Federal" entities fail to comply with the "[f]ederal statutes, regulations, or the terms and conditions" of an award, HHS is empowered to terminate the grant.  45 C.F.R. §§ 75.371(c), 75.372(a)(1).

In October 2021, HHS promulgated a rule requiring Title X programs to offer pregnant clients the opportunity to receive "neutral factual information and nondirective counseling" regarding prenatal care and delivery, infant care, foster care, adoption, and abortion.[1]  Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56144 (Oct. 7, 2021); *see also* 42 C.F.R. § 59.1 *et seq*; 42 C.F.R. § 59.5(a)(5)(i)–(ii).  The 2021 Rule also required Title X programs to provide referrals for any of these options in response to a patient request.  42 C.F.R. § 59.5(a)(5)(ii).  To comply with § 1008's prohibition of funding for programs where abortion is a method of family planning, the 2021 Rule emphasized that a referral for abortion services "may include providing a patient with the name, address, telephone number, and other relevant factual information" about a medical provider, but that a Title X project "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." *Ensuring Access*, 86 Fed. Reg. at 56150.

In March 2022, HHS awarded the Tennessee Department of Health a Title X grant for the period from April 1, 2022, through March 31, 2023.  The notice of award stated that the amount requested represented the one-year "budget period," (as opposed to the project's five-year

---

[1]Through this rule, HHS readopted the regulations in place from 2000 to 2019.  86 Fed. Reg. 56144, 56144 (Oct. 7, 2021).

period), and that it was "not obligated to make additional Federal Funds available." (R. 1-7, PageID 172).

In June 2022, the Supreme Court handed down its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), in which it held that there is no individual right under the Constitution to obtain an abortion. Following *Dobbs*, several states—Tennessee included— implemented laws that criminalized abortion in all but a few circumstances. Reasoning that *Dobbs* did not affect the Title X grant regime, in January 2023, HHS notified grantees it would be auditing their compliance with its counseling and referral regulations. HHS requested that grantees submit copies of their policies for providing neutral, nondirective options counseling and referrals for abortion services and a signed statement confirming compliance with those regulations.

Tennessee responded by submitting a letter confirming its compliance with the regulation and attaching its policy. The policy stated, in pertinent part, that Title X "[p]atients with positive pregnancy test[s] must be offered the opportunity to be provided information and counseling regarding all options that are legal in the State of Tennessee." (R. 1-3, PageID 99). The letter did not clarify which options the state deemed "legal in the State of Tennessee," but seemed to be alluding to a new law that had recently taken effect restricting abortion in the State. *See* Tenn. Code Ann. § 39-15-213. HHS notified Tennessee that its response appeared to place it out of compliance and offered Tennessee the option of submitting an "alternate compliance proposal" with specific examples of acceptable arrangements. (R. 1-9, PageID 190). For instance, HHS suggested the option of providing Title X patients with the number for a national call-in hotline where operators would supply referral information. Tennessee responded by reiterating its compliance based on its understanding of its obligations under state law and federal regulations. (R. 1-10, PageID 192 (citing Tenn. Code Ann. § 39-15-213(a)(1))). HHS disagreed with Tennessee's assertion that it was in compliance. On March 20, 2023, the agency sent the state a

No. 24-5220                    *Tennessee v. Becerra, et al.*                    Page 5

letter explaining its decision to decline to issue a Title X continuation award to the Tennessee Department of Health.[2]

## B.

*Procedural History*.  In October 2023, Tennessee brought the instant action in the United States District Court for the Eastern District of Tennessee seeking:  (1) a declaratory judgment under 28 U.S.C. § 2201 stating that HHS's termination of  the state's Title X funding was unlawful; (2) dissolution of HHS's March 20, 2023, discontinuation decision; (3) a preliminary injunction enjoining HHS and others from enforcing or implementing the discontinuation decision; (4) to enjoin HHS from withholding Title X funds based on the counseling and referral clause; (5) reinstatement of Title X funds from the date of discontinuation; and (6) any and all other relief the court deemed proper.

In November 2023, this court reviewed a similar Title X case and held that HHS's 2021 Rule was a permissible construction of the Title X statute.  *See Ohio*, 87 F.4th at 771–72.  Based in large part on our decision in *Ohio*, the district court denied Tennessee's preliminary injunction, concluding that Tennessee was not likely to succeed on the merits and that the balance of the equities and the public interest did not favor relief.  The district court further concluded that Tennessee had "no basis to force funding from HHS without meeting the obligations upon which the [Title X] funding [was] conditioned."  (R. 30, PageID 857).  Tennessee timely appealed.

## II.

We review a district court's denial of a motion for a preliminary injunction for abuse of discretion.  *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Cap., Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001).  We will find that a district court has abused its discretion when it has made "clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard."  *Id.* (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.2001)).

---

[2]HHS concluded that a continuation award was not "in the best interest of the government" based on its determination that Tennessee's Title X project was not in compliance with the Title X regulation.  (*See* R. 1-12, PageID 198 (quoting 42 C.F.R. § 59.8(b))).

Though we review de novo the question of whether a movant is likely to succeed on the merits, a district court's ultimate determination as to whether the factors weigh in favor of granting or denying preliminary injunctive relief is subject to review for abuse of discretion. *Ohio*, 87 F.4th at 768 (citing *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). Thus, absent a legal or factual error, "the district court's weighing and balancing of the equities will be overruled 'only in the rarest of cases.'" *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 858 (6th Cir. 1992) (citations omitted).

Courts consider four factors when determining whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Ohio*, 87 F.4th at 768 (citing *City of Pontiac*, 751 F.3d at 430). "Where the federal government is the defendant, as here, the third and fourth factors merge." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### III.

*Likelihood of Success on the Merits.* Tennessee first argues that it has a strong likelihood of success on the merits because HHS's discontinuation of Title X funds usurped Congress's sole Spending Clause powers and disregarded the Administrative Procedure Act's ("APA") limits.

### A.

*The Spending Clause.* Tennessee maintains that HHS's enforcement (through rescission of funding) of the 2021 Rule's counseling and referral requirements violated the Spending Clause of the United States Constitution. It argues that HHS's imposition of these requirements usurped Congress's exclusive authority to regulate Title X funding. The Spending Clause empowers Congress to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8. It grants Congress the broad power to "set the terms" for when and to whom it will disburse federal funds. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). As it regards funds disbursed to

individual states, Congress's spending power operates like a contract; "in return for federal funds," states must agree to "comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

As a result, Congress's legitimacy to legislate under the spending power depends on (1) whether Congress's conditions on its grants of federal funds are unambiguous; and (2) "whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* Because the district court reasonably concluded that Congress unambiguously authorized HHS to regulate Title X eligibility; the conditions of the grant were unambiguous; and Tennessee knowingly and voluntarily accepted the grant's terms, we find that the district court did not abuse its discretion in concluding that Tennessee is unlikely to succeed on the merits of its Spending Clause claim.

### 1.

*Unambiguous Statutory Authorization*. Tennessee argues that Congress did not unambiguously place counseling and referral requirements in Title X and did not grant HHS the authority to add these conditions. Therefore, these conditions violate the Spending Clause. Tennessee's arguments here mirror the state of Oklahoma's challenge to HHS's counseling and referral requirements which it asserted in *Oklahoma v. United States Department of Health & Human Servs.*, 107 F.4th 1209, 1217 (10th Cir. 2024). Under similar facts, the state of Oklahoma also argued that Title X's ambiguity prevented HHS from imposing counseling and referral requirements on grant recipients. Like Tennessee, Oklahoma argued that because the Supreme Court, in *Rust v. Sullivan*, 500 U.S. 173 (1991), held that § 1008's language barring usage of federal funds "in programs where abortion is a method of family planning" is ambiguous, then "Congress's silence on counseling and referrals render[ed] Title X ambiguous for purposes of the spending power." *Oklahoma*, 107 F.4th at 1218 (quoting 42 U.S.C. § 300a-6). The *Oklahoma* court rejected these arguments because it found that Congress's instructions to HHS to determine eligibility for Title X grants likely did not violate the spending powers. *Id.* (citing 42 U.S.C. § 300a-4(a); § 300a-4(b)). We agree.

To begin, as the *Oklahoma* court recognized, Congress's charge to HHS to promulgate eligibility requirements for Title X funds is explicit; "Grants . . . made under this subchapter shall

be made in accordance with such regulations as the Secretary may promulgate" and "shall be payable . . . subject to such conditions as the Secretary may determine to be appropriate" so they are "effectively utilized for the purposes for which made."  42 U.S.C. § 300a-4(a)–(b).  In this way, Congress both imposed on the Secretary the responsibility to fashion conditions and alerted grant recipients to the existence of conditions for funding.  As to the former, the Supreme Court, in recognition of the fact that Congress is unable to "prospectively resolve every possible ambiguity concerning particular applications of requirements," has permitted such delegations. *Bennett v. Kentucky Dep't. of Educ.*, 470 U.S. 656, 669 (1985).  True, the statutory language does not illuminate the nature of any such conditions on the grant.  But these questions can be resolved by looking to both statutes *and* an agency's authorized regulations.  In *Bennett* that meant looking to the statute's language indicating that Title I education funds could not be used to supplant state and local funds for public schools, along with the Department of Education's ("DOE") regulations specifying the measures that states and local grant recipients were required to take to assure compliance with the grant.  When the DOE issued a final order, demanding that Kentucky repay funds that it purportedly used to supplant state educational funding "in violation of statutory and regulatory requirements," the state challenged the action as a violation of the Spending Clause.  *Id.* at 663.  Though the Court of Appeals had found that "the statute and regulations concerning supplanting were not unambiguous," *id.* (cleaned up), the Supreme Court upheld the agency action; Kentucky had agreed to but failed to comply with the conditions for the grant as set forth in the statute and regulations, so the DOE could pursue this statutory remedy.  *See Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 183 (2005) (crediting Title IX's implementing regulations as well as circuit precedent interpreting the statute with placing grant recipients on notice of potential liability for retaliatory actions).

Here, Title X "unambiguously authorized HHS to impose conditions for federal grants" to ensure that the funds issued will be efficaciously put to use for their intended purpose. *Oklahoma*, 107 F.4th at 1219 (citing 42 U.S.C. § 300a-4(b); 86 Fed. Reg. 56144, 56154 (Oct. 7, 2021)).  This clear delegation of authority to HHS, viewed in combination with HHS's 2021 counseling and referral regulation, are sufficient for notice purposes under the Spending Clause.

Resisting this conclusion, Tennessee argues that *Rust*'s holding that § 1008 is ambiguous as it relates to counseling and referrals for abortions, precluded HHS from requiring counseling and referrals and violated the Spending Clause.  But as discussed, the Supreme Court has long recognized Congress's power to authorize agencies to issue grants and leave the minutia of its spending programs to be clarified through regulations and other guidelines—even in the face of statutory ambiguity.  *Id.* at 1218 (citing *Bennett*, 470 U.S. at 670 ("We agree with the [agency] that the [state grantee] clearly violated *existing* statutory *and regulatory provisions . . . .*") (emphasis added) (collecting cases[3]).  Again, Title X authorizes HHS "to make grants . . . to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services."  42 U.S.C. § 300a(a).  It directs that these grants "shall be made in accordance with such regulations as the Secretary may promulgate."  *Id.* § 300a-4(a).  And Congress made the disbursement of grant funds "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made."  *Id.* § 300a-4(b).  These clauses, in addition to HHS's regulations explaining the importance of nondirective counseling and referrals for Title X services, foreclose Tennessee's arguments.  *See Bennett*, 470 U.S. at 670.  Congress made compliance with HHS's requirements a clear and unambiguous condition of receiving a Title X grant.  *See* 86 Fed. Reg. 56144, 56154 (Oct. 7, 2021).  Moreover, we agree with our concurring colleague that Congress's inclusion of a yearly appropriations rider which expressly contemplates nondirective pregnancy counseling lends further support for the notion that HHS acted within its authority in setting that condition for funding—a fact that has implications for both the Spending Clause and APA analysis.  *See* Omnibus Consol. Rescissions and Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, 444 (Mar. 15, 2022).

Tennessee's reliance on *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) and *West Virginia ex rel. Morrisey v. U.S. Department of Treasury*, 59 F.4th 1124 (11th Cir. 2023) does not increase

---

[3]*See id.* (reviewing the spending power based on both the "the statutory provisions" *and* "the regulations . . . and other guidelines provided by the [the agency] at th[e] time" that funding had been accepted); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (finding an agencies' unambiguous regulations satisfied the notice requirements under the spending power); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Congress . . . has repeatedly employed the spending power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative directives*.'" (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980))).

its likelihood of success on the merits.  It insists that these two cases support its proposition that, in the face of an ambiguous statute, regulations alone generally cannot establish conditions. Specifically, Tennessee argues that HHS was barred from resolving § 1008's ambiguity through its own interpretations.  But *Yellen*, which grappled with a vague rather than an ambiguous statute, did not reach a holding on the broader question of whether Congress could condition funding on compliance with agency regulations.  54 F.4th at 353.  Indeed, in *Yellen*, the Department of Treasury argued that statutory language alone sufficiently placed states on notice of its conditions for funding.  *Id.*  And in *Morrisey*,[4] the Eleventh Circuit found that grantees were subject to regulations and legal requirements in place when the grants were made.  59 F.4th at 1148 (acknowledging that Congress may require grantees to abide by "'the legal requirements in place when the grants were made' [and] [t]hese 'legal requirements' include existing regulations.") (quoting *Bennett*, 470 U.S. at 670).  Thus, because § 1008 is situated among other provisions of Title X that clearly instruct HHS to determine the eligibility requirements, the district court did not err in concluding that Congress's delegation to HHS would not violate the Spending Clause.

## 2.

*Voluntarily and Knowingly*.  The district court likely also did not err in determining that Tennessee voluntarily and knowingly agreed to HHS's requirement for nondirective counseling and referrals.  Despite Congress's broad powers to set the unambiguous terms of its grants, it may not do so in a manner that "surprise[es] participating States with post acceptance or 'retroactive' conditions."  *Pennhurst*, 451 U.S. at 25.  As discussed above, this means that HHS's decision to discontinue Tennessee's grant based on the state's refusal to adhere to the counseling and referral conditions would violate the Spending Clause if it imposed new requirements *after* Tennessee's acceptance of the grant.  *See Bennett*, 470 U.S. at 670 ("[L]iability is determined by[] the legal requirements in place when the grants were made.").  But HHS issued the

---

[4]In addition to *Morrisey*'s nonbinding effect on our jurisprudence, the circumstances there differ from this case in two important ways.  In an effort to resolve the ambiguity of a tax offset provision in a stimulus act which potentially implicated states' sovereign tax authority, the Treasury Department created an entirely new regulatory framework.  The HHS did no such action.  Second, the Treasury Department's regulatory framework changed the fundamental function of the relevant statute.  The HHS's counseling and referral requirements here do not have such a fundamental effect on the application of the grant program.  *See Oklahoma*, 107 F.4th at 1219.

No. 24-5220             *Tennessee v. Becerra, et al.*            Page 11

nondirective counseling and referral requirements in 2021, which then went into effect on November 8, 2021—several months before Tennessee accepted its Title X grant award in March 2022. *See* 86 Fed. Reg. 56144 *and* (R. 1-7, PageID 170). Moreover, as the district court aptly observed, the Counseling and Referral Rule has been in place in all but two of the last twenty-nine years. As a decades-long recipient of Title X funds, Tennessee was aware of this fact. So Tennessee was on clear notice of the 2021 Rule and voluntarily agreed to its requirements when it accepted the grant. *See Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015) ("[T]he fact that the State has long accepted billions of dollars notwithstanding the challenged conditions may be an additional relevant factor in the contract-like analysis the Court has in mind for assessing the constitutionality of Spending Clause legislation.").

Tennessee points out that HHS issued the 2021 Rule at a time when the law of the land stated that women had a constitutional right to obtain an abortion. Thus, there was no possibility that the state's adherence to the Rule might conflict with a law banning the procedure. But after the Supreme Court's decision in *Dobbs*, Tennessee criminalized the procedure in all but the narrowest of cases. It argues that this "supervening illegality" of abortions in the state demonstrated a clear and permissible public policy statement on an issue within the domain of its own sovereignty. This critical shift in circumstances, according to Tennessee, rendered inadequate any notice of the Rule it had received pre-criminalization because the 2021 Rule did not contemplate such a scenario. (ECF 20, Appellant's Br. 30). But to the extent that Tennessee argues that the 2021 Rule is "silent" regarding its obligations post-*Dobbs*, HHS provided detailed guidance on how its *nondirective* counseling and referral requirements remained unchanged and active. Consistent with § 1008, HHS reiterated that Title X projects "may not take further affirmative action . . . to secure abortion services for the patient." (R. 1-6, PageID 165 (citing 65 Fed. Reg. at 41281)). And after Tennessee raised compliance concerns following its criminalization of abortion, HHS offered Tennessee the opportunity to submit an "alternate compliance proposal," which included the option to use a national call-in hotline where third-party operators would supply the requisite information. (R. 1-9, PageID 190). Thus, given that *Dobbs* did not address what, if any, effect the decision might have on Title X's underlying program requirements, the district court did not err in determining that Tennessee voluntarily and knowingly agreed to the conditions when accepting its grant award.

**3.**

*Tennessee's Sovereignty*.    Tennessee also asserts that HHS's 2021 Rule violates the spending power because it infringes on Tennessee's state sovereignty.  It suggests that the 2021 Rule's counseling and referral requirements compel Tennessee to undermine its own state criminal abortion laws.  But like *Oklahoma*, Tennessee may not use its state criminal laws to "dictate eligibility requirements" for Title X grants.  *Oklahoma*, 107 F.4th at 1220 (citing *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983) ("Although Congress is free to permit the states to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states.")).  The 2021 Rule makes no reference to incorporating state law and does not limit compliance with its requirements to the procedures available within a given state.  And Tennessee was free to voluntarily relinquish the grants for any reason, especially if it determined that the requirements would violate its state laws.  (R. 1-9, PageID 190); *see also Rust*, 500 U.S. at 199 n.5 ("The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy.")).  Instead, Tennessee decided to accept the grant, subject to the 2021 Rule's counseling and referral requirements.

In addition, Tennessee's suggestion that the 2021 Rule violates the Spending Clause by impairing its general police powers to regulate "health and welfare" through "limits on the medical profession" is unsubstantiated.  Thus, we find that the district court did not err in its conclusions that Title X and HHS's regulations did not violate the spending power and that Tennessee voluntarily and knowingly accepted its grant conditions.  Tennessee is not likely to succeed on its Spending Clause claims.

**B.**

*Tennessee's APA Challenge*.    Tennessee next argues that HHS's decision to discontinue funding its grant violated the APA.  Specifically, Tennessee asserts that HHS's action to enforce the 2021 Rule:  (1) exceeded HHS's regulatory authority under Title X; (2) is unreasonable; (3) is arbitrary and capricious; and (4) represents a new legislative rule which may only be promulgated via notice-and-comment rulemaking.

1.

*Compliance with Title X.*    Tennessee maintains that HHS has misinterpreted § 1008's prohibition on the use of Title X funds for "programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.  It argues that the best reading of that provision, according to its text and history, is that it bars HHS from conditioning Title X funding on grantees' counseling or referring for abortion services.   This court must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

Several states raised similar arguments before this court in *Ohio*, 87 F.4th at 770–75.  In *Ohio*, we held that HHS's application of the 2021 Rule was within its statutory authority.  *Id.*  In deciding *Ohio*, we relied on the Supreme Court's conclusion in *Rust*, that § 1008 is indeed ambiguous with respect to nondirective counseling and referral options under *Chevron* step one and that given this ambiguity, under *Chevron* step two, HHS's "reasoned analysis" for proscribing such actions was a permissible construction of Title X.  *Rust*, 500 U.S. at 187; *see also Chevron*, *U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Thus, in reviewing HHS's 2021 Rule requiring nondirective counseling and referral in *Ohio*, we held that HHS's action also "must" have been permissible under *Chevron*'s step two analysis so long as HHS adequately explained its choice.  *Ohio*, 87 F.4th at 772.  In other words, because *Rust* held that a permissible construction of § 1008 permitted HHS to promulgate regulations banning counseling and referrals for abortion, we held that HHS's subsequent promulgation of a rule going the opposite way also "*must*" have been permissible so long as it adequately explained its choice.  *Id*. at 722.  We also concluded that HHS's reasoned analysis was sufficient to establish that the 2021 Rule is not arbitrary and capricious—regardless of whether it represents the best reading of the statute.

Since our decision in *Ohio*, *Chevron* deference has fallen.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  Consequently, given *Rust*'s and *Ohio*'s application of *Chevron* deference to HHS's actions relating to the provisions of neutral, nondirective

No. 24-5220　　　　　　　　*Tennessee v. Becerra, et al.*　　　　　　　　Page 14

counseling[5] and referrals in those cases, Tennessee challenges their precedential effect. However, the extent to which *Loper Bright* undermines the validity of prior cases that were decided using *Chevron* deference depends on several factors not addressed by the parties in their briefing. In its guidance to lower courts, the Court broadly stated that it "do[es] not call into question prior cases that relied on the *Chevron* framework." *Id*. And it further explained that "[t]he holdings of those cases that specific agency actions are lawful . . . are still subject to statutory stare decisis despite [its] change in interpretive methodology." *Id*. (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008)). So, while *Loper Bright* opens the door to new challenges based on *new* agency actions interpreting statutes, it forecloses new challenges based on specific agency actions that were already resolved via *Chevron* deference analysis. *See id*. Unremarked upon was whether statutory stare decisis includes Circuit court precedent. *See id*.; *see also* Amy Coney Barrett, *Statutory Stare Decisis in the Court of Appeals,* 73 Geo. Wash. L. Rev. 317 (2005). For instance, here, Tennessee's argument involves the same "specific agency action"[6] challenged in *Ohio*—the HHS's application of its 2021 Rule interpreting § 1008 to require nondirective counseling and referral options. In *Ohio*, we concluded that the 2021 Rule was lawful. Regardless of whether *Ohio* binds us,[7] like the *Oklahoma* court, we find its conclusion upholding the 2021 Rule—and by extension its enforcement against Tennessee here—persuasive. *Ohio* relied on *Rust* for its determination that HHS acted within statutory authority in treating referrals as falling outside of § 1008's restriction on using funds for programs in which abortion is a "method of family planning." We have held that we are bound by precedent "unless a Supreme Court decision 'mandates modification' of our precedent." *RLR Investments, LLC v. City of Pigeon Forge, Tenn.*, 4 F.4th 380, 390 (2021) (quoting *United States v. Moody,* 206 F.3d 609, 615 (6th Cir. 2000)). A fair reading of *Loper Bright* leads us to conclude

---

[5]The states declined to challenge the counseling requirement included in the 2021 Rule in *Ohio v. Becerra*, 87 F.4th 759, 773 (6th Cir. 2023).

[6]"'[A]gency action' includes the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551.

[7]In *Metropolitan Hospital v. U.S. Department of Health and Human Services*, we concluded that statutory stare decisis attaches to our own cases interpreting statutes in relation to their application under the APA only when such prior decisions were based on a finding that the terms of the statute were unambiguous and therefore left no room for agency discretion. 712 F.3d 248, 255–56 (6th Cir. 2013) (citing *Nat'l Cable and Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)).

that the district court did not improperly accede to the holdings in *Rust* and our earlier decision in *Ohio*. The Supreme Court cautioned litigants hoping to rehash or relitigate previously settled issues decided on *Chevron* that "[m]ere reliance on *Chevron* cannot constitute a special justification for overruling such a holding." *Loper Bright*, 144 S. Ct. at 2273 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) (cleaned up)). To argue as much, the Court continued, would "at best," be "just an argument that the precedent was wrongly decided." *Id*. And this, as the majority concluded, is "not enough to justify overruling a statutory precedent." *Id*.

Here, Tennessee argues that *Loper Bright* abrogated the precedential effect of *Rust* and *Ohio* because they relied on *Chevron*. But this is exactly the conclusion that *Loper Bright* rejected; *Loper Bright* does not dictate abandonment of *Rust* or *Ohio* because it does not "call into question prior cases that relied on *Chevron*." *Id*. And, even if the "specific agency action" in *Rust* was HHS's 1988 Rule *prohibiting* counseling and referral requirements pursuant to § 1008, our own circuit precedent addressed the inverse specific agency action and specifically affirmed HHS's authority under Title X to *require* nondirective counseling and referral options. *See Ohio*, 87. F.4th at 772. In short, abandoning *Rust* and *Ohio* based on their reliance on *Chevron*, is unwarranted. Alternatively, Tennessee argues *Ohio* and *Rust* are distinguishable because they only involved facial challenges to § 1008. Tennessee asserts that its claim is an as-applied challenge because it disputes HHS's decision to discontinue its Title X funding based on the state's refusal to unqualifiedly confirm its commitment to give neutral nondirective counseling and referrals after passing a law banning abortion post-*Dobbs*. But this as-applied distinction is less meaningful where, as discussed above, *Dobbs* did not address its effect on Title X's underlying program requirements or HHS's enforcement of such requirements. *See Dobbs*, 597 U.S. at 231. In other words, despite the change in circumstances, Tennessee's claim centers on its challenge of HHS's statutory authority to apply the 2021 Rule. *See* 42 U.S.C. § 300a-4(b). Notably, the counseling and referral requirements were unambiguously in place before Tennessee accepted its grant award and before it changed its own laws. As such, Tennessee's arguments amount to whether the counseling and referral requirements were legal as per the limitation contained in § 1008. Because this is the same issue addressed in *Rust* and *Ohio*, it has likely been foreclosed. Nevertheless, while the district court must ultimately determine whether HHS's

actions complied with Title X, we confine our inquiry to whether the district court erred in its tentative conclusion. *See Oklahoma*, 107 F.4th at 1226. And even if we accept that *Ohio* is no longer binding, we agree with its conclusion that the 2021 Rule is lawful.

Applying *Loper Bright*, the best reading of § 1008 permits both neutral, non-directive counseling and referrals. As noted earlier, Congress's yearly spending rider presumes the provision of such counseling, specifically instructing—like the 2021 Rule—that all pregnancy counseling must be non-directive. Requiring grantees to follow up with additional information to those who request it, in the form of names, addresses, and phone numbers of health care providers, is a natural outgrowth of that counseling. And short of that, HHS has granted Tennessee the option of merely providing patients with a hotline number where they can obtain such health care provider information. Under either scenario, the grant recipient's role is informational only. It neither recommends nor promotes any particular pregnancy care option, while, at the same time, it promotes HHS's stated intention to advance a patient-centered approach. In this light, it seems quite a stretch to say that merely supplying to patients health provider information or a means to obtain such information elevates a grantee's actions to the status of having abortion as a method of family planning. Even accepting the dissent's definition of the term "method," the provision of such information cannot be characterized as a deliberate or systematic action toward a particular end. Offering a list of phone numbers is simply too attenuated an act to characterize an entire program as one that conclusively offers abortion as a "method of family planning." For this reason, Tennessee is unlikely to succeed on its claim that the 2021 Rule violates the APA. The 2021 Rule's counseling and referral requirement is consistent with the meaning of § 1008.

Tennessee also relies on a series of other arguments to attack HHS's authority based on § 1008's ambiguity. For instance, it argues that because of § 1008's ambiguity, HHS's actions implicated the major-questions doctrine, which requires agencies to have "clear congressional authorization" before making major policy decisions. *W. Virginia v. EPA*, 597 U.S. 697, 722 (2022). But, given the limited scope of HHS's authority under Title X, the doctrine is likely not implicated. Title X describes HHS's authority to "make grants to and enter into contracts with public or nonprofit private entities to assist in establishment and operation of voluntary family

planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  42 U.S.C. § 300(a).  We agree with the district court's conclusion that this language sets forth a sufficiently intelligible principle supporting Congress's delegation.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).  And as the district court accurately observed, HHS does not "exercise powers of vast economic and political significance."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021).  It issued only eighty-six Title X grants in 2023 with an average award value of $3 million.  Office of Population Affairs, *Fiscal Year 2023 Title X Service Grant Awards*, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-servicegrantees/fy2023-title-X-service-grant-awards (last accessed Aug. 16, 2024).  Given this relatively circumscribed grant-making authority, it is unlikely that HHS has run afoul of the non-delegation doctrine here and we see no reason to disturb the district court's conclusion on this point.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000) (finding nondelegation problem where "the FDA . . . asserted jurisdiction to regulate an industry constituting a significant portion of the American economy.").

## 2.

*Compliance with HHS Regulations*.  Tennessee next argues that HHS's actions are inconsistent with its own regulations because program services must be "allowable under state law" and referrals must be made to service providers "in close physical proximity."  (ECF 20, Appellant's Br. 44 (citing 42 C.F.R. § 59.5(b)(6)); (*id.* at 45 (citing 42 C.F.R. § 59.5(b)(8))).

*Allowable Under State Law*.  "[A] fundamental canon of statutory construction is that when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear."  *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, 32 F.4th 548, 557 (6th Cir. 2022) (citations and quotations omitted).  42 C.F.R. § 59.5(b)(6) states that Title X projects must "[p]rovide that family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and *allowable under state law*, and with special training or experience in family planning."  (emphasis added).  Tennessee first argues that the plain meaning of § 59.5(b)(6) is that its Title X project may not

No. 24-5220                    *Tennessee v. Becerra, et al.*                    Page 18

encompass services relating to abortions because the procedure is not allowable under state law in Tennessee. But as the district court correctly concluded, Tennessee's interpretation does not reflect the plain meaning of the regulation. There is no indication that the *nondirective* options for counseling and the *neutral* information required by the Rule are not "allowable under state law" in Tennessee. Though Tennessee law prohibits a person from performing an abortion, the law "contains no language whatsoever related to counseling or referral[s]," and does not overlap with § 59.5(b)(6). (R. 30, PageID 840); *see* Tenn. Code Ann. § 39-15-213. Indeed, HHS's commentary accompanying the 2021 Rule indicates HHS included the "allowable under state law" phrase to "more clearly reflect the role of a broader range of *healthcare providers* in providing Title X services." 86 Fed. Reg. at 56163–64 (emphasis added). Thus, this provision addresses "*who*" may qualify as a clinical services provider, not the types of *services* provided under Title X programs. In short, because Tennessee law does not prohibit mere abortion-related counseling or referrals, we find no conflict between § 59.5(b)(6) and Tennessee law. The district court did not err in this regard.

*Close Physical Proximity*. Tennessee next argues that 42 C.F.R. § 59.5(b)(8)'s mandate to provide services close to patients, conflicts with its need to refer patients to out-of-state providers due to its laws criminalizing abortions. Section 59.5(b)(8) requires Title X projects to "[p]rovide for coordination and use of referrals and linkages with [other health-care entities], *who are in close physical proximity to the Title X site, when feasible*, in order to promote access to services and provide a seamless continuum of care." (emphasis added). However, the phrase "when feasible" in this provision plainly modifies the requirement to refer to providers "in close physical proximity to the Title X site." *Id.* Thus, as the district court again correctly determined, the regulation only requires that Title X projects refer patients to nearby healthcare providers "when it is possible to do so." When such close-in-proximity referrals are not possible, it permits the referral to be made "to a provider farther away." (R. 30, PageID 837–39 (quoting 42 C.F.R. § 59.5(b)(8)); 86 Fed. Reg. at 56164 (explaining that "referrals are to be to providers in close proximity to the Title X site when feasible"). This regulation does not require a referral to a provider within the state. The district court did not err.

### 3.

Finally, Tennessee contends that HHS's counseling and referral conditions are arbitrary and capricious because the agency failed to consider several "important aspect[s]" of its requirement. (ECF 20, Appellant's Br. 47 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983))).

*Federalism Concerns.* First, Tennessee asserts that HHS ignored federalism concerns because its decision to discontinue Tennessee's grant award did not consider the effect of *Dobbs* on counseling and referral requirements. But as discussed above, HHS issued extensive guidance about the effect of *Dobbs* on the requirements regarding counseling and referrals. Though Tennessee is correct that the 2021 Rule did not contemplate *Dobbs*, that case did not address the power of the agency to set conditions on federal grants. 597 U.S. at 231. And as the Supreme Court has previously noted, "[t]he recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy." *Rust*, U.S. at 199 n.5. The district court did not err here.

*Unlawful Position Switch*. Tennessee argues that the rescindment was an "unlawful position switch," because it came only months after HHS approved Tennessee's Title X program with "full awareness the State's post-*Dobbs* policy that '[n]o referrals for abortion are made.'" (ECF 20, Appellant's Br. 50 (quoting (R. 1-1, PageID 56))). Tennessee points to HHS's July 2022 program review of its Title X project to support its argument that the agency unlawfully changed positions. However, the July 2022 program review indicated that there would be a follow-up if Tennessee changed its counseling and referral policies in response to the abortion restriction that was soon to take effect. And regardless, the counseling and referral requirements have been in place since 2021, before Tennessee applied for and received Title X funds.

*Reliance Interests.* Lastly, Tennessee argues that the rescindment overlooked Tennessee's legitimate reliance interests in the grant award because it has been receiving Title X funding for 50 years. And the rescindment was procedurally invalid because HHS was required to undertake notice-and-comment rulemaking procedures to impose "new requirements" on Tennessee's Title X project. (ECF 20, Appellant's Br. 53 (quoting *Nat'l Council for Adoption v. Blinken*, 4 F.4th

106, 114 (D.C. Cir. 2021) (citation omitted)).  But Tennessee's notice-and-comment arguments fail because HHS did not impose any "new" requirements on grantees.  Furthermore, Tennessee likely has no legally cognizable reliance interest in the receipt of a *discretionary* funding award on the conditions that it prefers.  *Cf. Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).  HHS's regulations make clear that Title X grants provide funding for one year with the option of issuing noncompetitive continuation grants for additional years.  42 C.F.R. § 59.8(b).  HHS was not obligated to award more.  *Id.* § 59.8(c).  The district court did not err in this regard.

## IV.

*Irreparable Harm*.  Tennessee argues that it will face irreparable harm without an injunction because the rescindment:  (1) will cause Tennessee severe financial losses that it cannot later recover; (2) threatens the viability of Tennessee's Title X program; (3) causes irreparable reputational harm impacting its ability to secure future federal grants; and (4) interferes with its "sovereign interest" in setting its own abortion laws.  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages."  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)).  Tennessee bears the burden of showing that its injuries are both "certain and immediate" and not "speculative or theoretical."  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation omitted).  However, finding harm is not enough for Tennessee to satisfy its burden here.  It is "the peculiarity and size of a harm" that "affects its weight in the equitable balance."  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).  For instance, when the likelihood of success on the merits is low, plaintiffs must inversely show a higher degree of harm to warrant an injunction.  *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("[I]n general, the likelihood of success that need be shown . . . will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.") (citation omitted).

The district court satisfied itself that Tennessee's harm was insufficient to warrant a preliminary injunction because its claims failed to establish a high degree of harm. Tennessee says the court abused its discretion because Tennessee believes it will suffer severe financial, reputational, and sovereign harm. Specifically, it argues that its loss of $7 million in federal Title X funds will cause irreparable harm because the funds are unrecoverable, and this court in *Ohio* has similarly found lower amounts of lost federal funds sufficient to compel an injunction. 87 F.4th at 782–83. But there, the state of Ohio lost one-fifth of its Title X funding because of HHS's contested rule change. *Id.* Moreover, the court found that Ohio established that it was likely to succeed on the merits of one of its claims, further warranting an injunction. Tennessee's situation is different. Unlike Ohio, Tennessee lost its funding because it refused to comply with requirements established before it accepted the grant and declined to proceed with HHS's proffered alternative. There was no intervening rule change. We agree with the district court that Tennessee likely will not succeed on the merits. So, while Tennessee's complaints may demonstrate some degree of harm, the state was required to show a *higher degree* of harm than what was asserted here. *See Friendship Materials*, 679 F.2d at 105.

Second, there is no indication that Tennessee will lose its Title X program because of the lack of federal funding. Irreparable injury cannot be speculative. *See D.T.*, 942 F.3d at 327 (requiring that irreparable harm not be speculative); *see also Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) ("[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical."). As it currently stands, the Tennessee legislature has already provided the state's Title X project with the $7 million it would have otherwise received from HHS. (R. 21-1, PageID 335, ¶15). The Tennessee legislature earmarked the appropriations to fund its Title X project as "recurring." (R. 21-1, PageID 335, ¶15). Because this suggests that Tennessee's family planning program will continue to be funded—at least in the near-term—Tennessee's arguments that it will lose its program based on a lack of federal funding amount to speculation.

Tennessee's next claim, that it will suffer irreparable reputational harm, is similarly unpersuasive. Tennessee argues that because HHS is required to report its termination of Tennessee's grant to the federal grantee clearinghouse, the Federal Awardee Performance and

Integrity Information System ("FAPIIS"), HHS's actions threaten Tennessee's "ability to obtain [any] future Federal funding." (*see* R. 1-9, PageID 190). Tennessee cites *ACT, Inc. v. Worldwide Interactive Network, Inc*., 46 F.4th 489, 503–04 (6th Cir. 2022), for the proposition that its possible reported status is the type of reputational damage that "constitute[s] irreparable harm" because it is "likely to occur" and "difficult to quantify monetarily." (ECF 20, Appellant's Br. 56). But Tennessee provided no evidence as to how being reported would "affect the grants it currently receives or will receive in the future." (R. 30, PageID 854 (citing *ACT, Inc.*, 46 F.4th at 503–04). True, the inclusion in FAPIIS "may" affect a grantee's ability to obtain future federal funding, (*see* R. 1-9, PageID 190). But Tennessee does not do its part to establish the evidence of how FAPIIS inclusion has hurt grantees "in the past" or that it "is likely to occur again." *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). Thus, because Tennessee does not provide the "requisite facts and affidavits" supporting its theory of reputational harm, *Ohio*, 87 F.4th at 784, we agree with the district court that Tennessee's reputational-injury claim is too speculative.

Last, Tennessee claims that HHS's interference with its "sovereign interest" in setting its abortion laws constitutes a form of irreparable injury. (ECF 20, Appellant's Br. 56–57 (citing *Maryland*, 567 U.S. at 1303)). However, we have already concluded that there is no direct conflict between HHS's counseling and referrals requirement and Tennessee's recent abortion criminalization laws. Moreover, as discussed above, Tennessee was free to voluntarily relinquish the grants for any reason, especially if it determined the requirements would violate its state laws. (R. 1-9, PageID 190); *see also Rust*, 500 U.S. at 199 n.5. Thus, because the district court thoroughly addressed each of Tennessee's arguments regarding irreparable harm and correctly found them insufficient, we find that the district court did not abuse its discretion here.

## V.

*The Public Interest*. Tennessee argues that declining to issue an injunction harms the public interest because it deprives Tennesseans of family planning services and generates new public-health risks. "[T]he public's true interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) (citation omitted); *see also Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021) ("[T]he public interest necessarily weighs

against enjoining a duly enacted statute, and our assessment that the appellants will likely prevail on the merits tips the public-interest factor further in their favor.").

The district court found that this factor favored HHS because the court found HHS's actions lawful, and both parties had agreed that the public interest lies in the correct application of Title X and its regulations. Because we similarly find that HHS's actions were lawful, we find no abuse of discretion here.

## VI.

Tennessee cannot demonstrate how HHS's decision to discontinue its Title X grant due to the state's failure to comply with the 2021 Rule's requirements regarding counseling and referral for abortions, violated the Spending Clause or the APA. As a result, Tennessee is unable to prove the likelihood of its claims succeeding on the merits. The district court thoroughly assessed the balance of interests and found that they did not support granting an injunction. The district court's handling of Tennessee's claims in denying the motion for a preliminary injunction was consistent with this court's precedent and did not constitute an abuse of discretion. Because the majority of the preliminary injunction factors do not favor Tennessee's position, we find that the balance of the equities weighs in favor of denying a preliminary injunction.

For the reasons above, we **AFFIRM** the judgment of the district court.

No. 24-5220                    *Tennessee v. Becerra, et al.*                    Page 24

---

## DISSENTING IN PART / CONCURRING IN THE JUDGMENT IN PART

---

KETHLEDGE, Circuit Judge, dissenting in part and concurring in the judgment in part. Tennessee should succeed on its claim under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), that HHS's abortion-referral requirement is contrary to law. The relevant law here is § 1008 of Title X, which provides that "[n]one of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Yet HHS's 2021 Rule specifies—as a condition of Title X funding—that recipients must, upon a patient's request, provide referrals to abortion providers. The question, then, is whether HHS's abortion-referral requirement makes Tennessee's program one in which "abortion is a method of family planning[,]" in violation of § 1008.

A threshold issue is whether authority definitively to interpret § 1008 lies with the courts or with HHS. In *Rust v. Sullivan*, 500 U.S. 173, 184 (1991), the Supreme Court said the agency had that authority, under the Court's decision seven years earlier in *Chevron, U.S.A. Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837 (1984). *Rust* was a *Chevron* case down to its bones: in the first sentence of its analysis, the Court said that "[w]e need not dwell on the plain language of" § 1008 because that "language is ambiguous." 500 U.S. at 184. The Court then described the question before it as "whether the agency's answer is based on a permissible construction of the statute." *Id*. (quoting *Chevron*, 467 U.S. at 842-43). The agency's answer there was the opposite of its answer here: in its 1988 Rule, HHS stated that, under § 1008, a "Title X project may *not* provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." *Id*. at 179 (quoting 42 C.F.R. § 59.8(a)(1) (1989)) (emphasis added). The Court then deferred to that interpretation and deemed the 1988 Rule lawful.

No. 24-5220                          *Tennessee v. Becerra, et al.*                          Page 25

In the decades since, HHS has gone back and forth as to whether Title X programs may or even must provide abortion counseling and referrals.  The 2021 Rule at issue here takes the "must provide" approach.  Last year, our court acknowledged that *Chevron* and hence *Rust* remained binding precedent—even though the Supreme Court had recently granted certiorari to consider whether to overrule *Chevron*.  *See Ohio v. Becerra*, 87 F.4th 759, 769 (6th Cir. 2023); *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (mem.).  Accordingly, we held, "*Rust*'s holding requires us to reject the States' argument that the 2021 Rule's referral requirement is contrary to law."  *Ohio*, 87 F.4th at 771.

During the pendency of this appeal, however, the Supreme Court overruled *Chevron*.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  In *Loper Bright*, the Court observed what the Court in *Chevron* had not:  that § 706 of the Administrative Procedure Act "directs that, '[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'"  *Id*. at 2302 (quoting 5 U.S.C. § 706).   Hence, the Court observed, the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury v. Madison*, 1 Cranch 137, 177 (1803):  that courts decide legal questions by applying their own judgment."  *Loper Bright*, 144 S. Ct. at 2261.  Thus—in agency cases as in any other case of statutory interpretation—the court must identify the statute's "single, best meaning" rather than merely a permissible one.  *Id*. at 2266.  And in agency cases specifically, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."  *Id*. at 2273.

Whether HHS "has acted within its statutory authority" is precisely the question presented here.  Yet the Department of Justice (as counsel for HHS) insists that, in answering that question, *Loper Bright* is of no moment whatever.  Specifically, before argument, the Department opposed supplemental briefing as to the effect of *Loper Bright* upon our decision in this appeal.  Instead, the Department merely asserted that, in *Rust*, the Court concluded that § 1008 "'does not speak' ["directly" is the next word in *Rust*] to 'counseling' or 'referral'"—as if, even after *Loper Bright*, the judicial task was therefore at an end.  Dep't. of Justice 28(j)

Letter of July 3, 2024 (citing *Rust*, 500 U.S. at 184).  And at oral argument, the agency's counsel repeatedly refused to answer questions about what § 1008 means—instead asserting (again) that we remain bound by *Rust*.  Oral Arg. at 20:00-26:45, 33:30-36:20.  In support, the Department emphasizes one sentence from *Loper Bright*—in which the Court said its decision did "not call into question prior cases that relied on the *Chevron* framework."  144 S. Ct. at 2273.  So in the Department of Justice's view, apparently, *Chevron* lives on in perpetuity as to any statute that the Supreme Court has ever deemed ambiguous under that doctrine.

But the Department studiously overlooks the *extent* to which lower courts remain bound by the Court's "prior cases that relied on the *Chevron* framework."  *Id*.  And in the very next sentence of *Loper Bright*, the Chief Justice was surpassingly clear in defining that extent:  "The holdings of those cases *that specific agency actions are lawful*—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology."  *Id*. (emphasis added).

The "specific agency action" held lawful in *Rust* was the 1988 Rule, which has since been rescinded.  Thus, in this appeal, we have no occasion to defer to that holding.  Instead, we "must exercise [our] independent judgment in deciding whether [the] agency has acted within its statutory authority, as the APA requires."  *Id*.  We would therefore contravene *Loper Bright* if we deferred to the agency's interpretation of § 1008 in the 2021 Rule.  (And to say the agency actually interpreted § 1008 is generous, since in the Rule the agency nowhere deigns to interpret it.)

So our court must determine for itself whether the 2021 Rule's abortion-referral requirement is contrary to law.  Again, § 1008 provides:  "None of the funds appropriated in this title shall be used in programs where abortion is a method of family planning."  I have no quarrel with HHS's definition of "family planning"—under the prior administration's 2019 Rule and the 2021 Rule alike—as a process by which individuals can determine "the number and spacing" of their children.  *See* 42 C.F.R. § 59.1 (2019); 42 C.F.R. § 59.1 (2021).  And the word "where," as used in § 1008, pretty clearly means "in which[.]"  *See* Bryan A. Garner, *Garner's Modern American Usage* 856 (3d ed. 2009); *Webster's Third New International Dictionary (Unabridged)* 2602 (1971).  A "method," in turn, is not merely a means of obtaining a particular end, but a

"regular, orderly," or "systematic" means of doing so.  *See Webster's New Universal Unabridged Dictionary* 1134 (2d ed. 1983); *Webster's Third New International Dictionary* 2322. So a method is a deliberate or systematic means of obtaining a particular end.

Section 1008 thus denies funding to programs in which abortion is a regular or systematic means of enabling individuals to determine the number and spacing of their children.  For achieving that end, of course, there are many means other than abortion:  contraception, abstinence, in vitro fertilization, adoption.  A program that has nothing to do with a particular means is not a program in which that means is a "method."  For a program to be one in which a particular means "is a method of family planning," rather, the program must assist the patient in using or obtaining that means, and do so in a deliberate or systematic way.  Yet the program itself need not provide the ultimate service or product necessary for those means:  the 2019 and 2021 Rules both expressly contemplate referrals to "actual providers of services," 42 C.F.R. § 59.5(b)(8), (9) (2019) and 42 C.F.R. § 59.5(b)(8), (9) (2021); and surely adoption and IVF, for example, are methods of family planning for programs that help patients obtain those services elsewhere.  For a means to be attributable to a program as a "method," therefore, deliberate or systematic facilitation must be enough.

Facilitation means assistance toward a particular end.  In this context, facilitation means assistance toward a patient's use of a particular means of family planning.  Referral is such assistance, regardless of the means the patient seeks.  For in family planning, as in life generally, knowledge of where to obtain a product or procedure is the first step toward actually obtaining it. Indeed, in the 2021 Rule, HHS itself acknowledged that referrals to abortion providers are "affirmative action" toward actually obtaining an abortion—when HHS stated that, apart from the referral itself, a Title X funds recipient "may not take *further* affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient."  86 Fed. Reg. 56144, 56150 (Oct. 7, 2021) (emphasis added).  For purposes of § 1008, however, HHS's distinction between referrals and these other affirmative actions is without a difference:  all these actions provide assistance toward "secur[ing] abortion services for the patient."  *Id.*  And the referral requirement makes that assistance systematic, since by its terms every recipient of Title X funds must provide it.

Just as adoption or IVF are methods of family planning for programs that refer patients to providers for those services, therefore, so too is abortion a method of family planning for programs that refer patients to abortion providers. And the 2021 Rule mandates that every Title X program do exactly that. Thus, HHS's abortion-referral requirement makes every Title X program one "where abortion is a method of family planning."

HHS counters, in passing, that Tennessee could comply with the referral requirement "by providing Title X patients the number for a call-in hotline where operators would supply the requisite information." Br. at 10. But the "hotline" would supply the patient with the same information ("requisite" for obtaining an abortion) that handing her a printed list of abortion providers would. That indeed would transparently be the whole point of the exercise. Providing the patient with the hotline number would facilitate actually obtaining an abortion just as handing her the form would. That the hotline would contrive to add a step to that referral process (namely, that of dialing a phone number) should make zero difference to the analysis under § 1008. Courts enforce legal rules, rather than allow parties patently to circumvent them.

In sum, the abortion-referral requirement likely violates § 1008's proscription, and I would enjoin its enforcement.

\*        \*        \*

A closer question is whether the 2021 Rule's requirement of nondirective counseling regarding abortion is likewise contrary to § 1008. The 2021 Rule provides in relevant part:

A project must:

(i)  Offer pregnant clients the opportunity to be provided information and counseling regarding each of the following options:

(A) Prenatal care and delivery;

(B) Infant care, foster care, or adoption; and

(C) Pregnancy termination.

(ii)  If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling.

No. 24-5220                *Tennessee v. Becerra, et al.*                Page 29

42 C.F.R. § 59.5 (2021). Counseling on these topics must therefore be "neutral" and "nondirective[.]" The question, then, is whether the counseling requirement—to provide, upon request, nondirective counseling regarding abortion and various other topics—likewise makes a Title X program one in which abortion is a method of family planning.

An action is not a "method" just because it makes a particular outcome more likely. Rather, a method is deliberate or systematic action toward a particular end. And nondirective counseling by definition is not directed toward a particular outcome. (The same is not true of promotion or advocacy: persuading a person to choose a particular outcome is a deliberate step toward reaching it.) Nondirective counseling helps the patient choose her own means of family planning, but advances none of them. Hence nondirective counseling does not amount to deliberate or systematic facilitation of any of the pregnancy options the counseling might cover. Thus, the 2021 Rule's requirement of nondirective counseling likely does not violate § 1008.

An appropriations rider enacted every year since 1996 (including the years relevant here) all but confirms the point. By way of background, Congress "may amend substantive law in an appropriations statute, as long as it does so clearly." *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 440 (1992). "Clearly" need not mean "expressly." In *Robertson*, for example, the Court held that an appropriations statute had implicitly (though clearly) "modified" provisions of the Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*, among two other Acts. 503 U.S. at 438-40.

Here, the appropriations rider provides in relevant part:

> For carrying out the program under Title X . . . to provide for voluntary family planning projects, $286,479.00: *Provided*, that amounts provided to said projects under such title shall not be expended for abortions, [and] that all pregnancy counseling shall be nondirective[.]

Omnibus Consol. Rescissions and Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, 444 (Mar. 15, 2022).

An ordinary reader would understand the phrase "all pregnancy counseling shall be nondirective" to mean that nondirective pregnancy counseling is permissible under Title X. In like fashion, for example, the phrases "all passenger vehicles must have seatbelts" and "all dogs

shall be kept on a leash," proscribe neither manufacturing passenger vehicles nor taking dogs for a walk; instead, those phrases specify a condition for doing those things lawfully. Here, the specified condition is that counseling be "nondirective"; and the rider makes clear enough that pregnancy counseling is lawful under Title X so long as that condition is met.

Moreover, the rider's reference to "all" pregnancy counseling suggests that such counseling may concern various topics; and the relevant context—among other things, that the rider's preceding clause ends with the word "abortions"—suggests that abortion is one of them. Indeed, in light of § 1008, one can surmise that abortion, above all, was the topic Congress had in mind when it mandated that "pregnancy counseling" be nondirective. Thus—regardless of whether one thinks that § 1008, construed within its four corners, would bar nondirective counseling regarding abortion—§ 1008 construed along with the appropriations rider, in the years in which the rider is enacted, very likely permits such counseling. The prior administration thought so, *see* 84 Fed. Reg. 7714, 7745-46 (Mar. 4, 2019); and I think they were likely right. Nor should it matter that the 2019 Rule permitted such counseling, whereas the 2021 Rule requires it: if nondirective counseling falls outside the proscription of § 1008, whether an agency permits or requires it is immaterial for purposes of that proscription. Thus, in my view, Tennessee is unlikely to prevail on its claim under the APA that the 2021 Rule's requirement of nondirective pregnancy counseling is contrary to law; and so I would not enjoin that requirement.

*        *        *

Given that (in my view) the abortion-referral requirement violates § 1008, I do not reach Tennessee's parallel challenge to that requirement on constitutional grounds (namely under the Spending Clause). *See Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Tennessee does claim that the 2021 Rule's requirement of nondirective pregnancy counseling likewise "expressly violate[s] the Spending Clause by imposing unforeseen conditions far afield from Congress's Title X legislation." Complaint ¶112. But I think that claim will likely fail, since the rider plainly contemplates nondirective pregnancy counseling and indeed prescribes a rule for its legality (namely that the counseling be nondirective). Nor do I

think that Tennessee will likely show that the agency's actions with regard to the counseling requirement were arbitrary and capricious under the APA.

I respectfully dissent in part and concur in the judgment in part.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5220

STATE OF TENNESSEE,

     Plaintiff - Appellant,

     v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; OFFICE OF POPULATION AFFAIRS,

     Defendants - Appellees.

```
┌─────────────────────────────┐
│          FILED              │
│       Aug 26, 2024          │
│  KELLY L. STEPHENS, Clerk   │
└─────────────────────────────┘
```

Before:  GIBBONS, KETHLEDGE, and DAVIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of injunctive relief is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

_____

Kelly L. Stephens, Clerk